Appeal No. 2021-2218

**IN THE**

# UNITED STATES COURT OF APPEALS
**FOR THE FEDERAL CIRCUIT**

GOOGLE LLC,
*Appellant*

v.

HAMMOND DEVELOPMENT INTERNATIONAL, INC.,
*Appellee*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2020-00081

# PRINCIPAL BRIEF OF APPELLANT GOOGLE LLC


KEVIN D. RODKEY
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
271 17TH STREET NW, SUITE 1400
ATLANTA, GA 30363-6209
(404) 653-6400

DANIEL C. TUCKER
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
1875 EXPLORER STREET, SUITE 800
RESTON, VA 20190-6023
(571) 203-2700

ERIKA H. ARNER
SYDNEY R. KESTLE
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 NEW YORK AVENUE, NW
WASHINGTON, DC 20001-4413
(202) 408-4000

*Counsel for Appellant Google LLC*


December 10, 2021

**Exemplary Claims of U.S. Patent No. 10,270,816**

14. A communication system, comprising:

a plurality of application servers;

a first communication link coupled to the plurality of application servers, the first communication link comprising a data connection;

a first one of the plurality of application servers configured to execute a first application to establish a communication session with at least one communication device coupled to the first communication link in response to a request from the at least one communication device to establish the communication session;

a second one of the plurality of application servers coupled to a second communication link, the second one of the plurality of servers either (a) configured to receive a second application from at least one repository having a database maintaining the second application over the second communication link, or (b) configured to cause an execution of the second application via the second communication link;

wherein the second communication link comprises a data connection;

wherein the second one of the plurality of application servers is configured to execute or cause the execution of the second application remote from the at least one communication device;

***wherein at least one of the plurality of application servers is configured to communicate a request for processing service to the at least one communication device***; and

wherein the request for processing service is communicated to the at least one communication device over the first communication link.

18. The communication system of claim 14, wherein ***the request for processing service comprises an instruction to present a user of the at least one communication device voice data or audio data.***

Appx123-124 at 14:47-15:10 (claim 14); Appx124 at 15:21-24 (claim 18) (emphases added).

## CERTIFICATE OF INTEREST

**Case Number** 2021-2218

**Short Case Caption** Google LLC v. Hammond Development International, Inc.

**Filing Party/Entity** Google LLC

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box.** Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: December 10, 2021 Signature: */s/ Erika H. Arner*

Name: Erika H. Arner

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| ☐ None/Not Applicable | ☒ None/Not Applicable | ☐ None/Not Applicable |
| Google LLC | | XXVI Holdings Inc.; Alphabet Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

| **4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).<br><br>☐ None/Not Applicable ☐ Additional pages attached | | |
|---|---|---|
| John M. Mulcahy<br>Finnegan, Henderson, Farabow, Garrett & Dunner, LLC | | |

| **5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).<br><br>☐ None/Not Applicable ☐ Additional pages attached | |
|---|---|
| *Hammond Dev. Int'l, Inc. v. Google LLC*, No. 6:19-cv-00356 (W.D. Tex.) | *Hammond Dev. Int'l, Inc. v. Amazon.com Inc.*, No. 1:20-cv-00342 (W.D. Tex.) |

| **6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).<br><br>☒ None/Not Applicable ☐ Additional pages attached | | |
|---|---|---|
| | | |

**TABLE OF CONTENTS**

STATEMENT OF RELATED CASES .......... viii

STATEMENT OF JURISDICTION .......... 1

I. PRELIMINARY STATEMENT .......... 2

II. STATEMENT OF THE ISSUES .......... 4

III. STATEMENT OF THE CASE .......... 5

A. The ’816, ’483, and ’032 Patents Share a Common Specification and Are Directed to Establishing a Communications Session Between a Client Device and a Remote Application .......... 5

B. Each ’816 Patent Claim That the Board Confirmed Has a Counterpart ’816 Patent Claim That the Board Found Invalid .......... 7

C. The Confirmed Claims in the ’816 Patent Are Substantially Similar to Unpatentable Claims in the Related ’032 and ’483 Patents .......... 11

D. Despite Evaluating Overlapping Prior Art Mappings for Substantially Similar Claim Limitations, the Board Issued Inconsistent Final Written Decisions .......... 15

1. In the ’483 and ’032 Patent IPRs, the Board Found All Challenged Claims Unpatentable .......... 15

2. In the ’816 Patent IPR, the Board Found Claims 1-13 and 20-30 Unpatentable, but Confirmed Claims 14-19 That Are Substantially Similar to the Unpatentable Claims .......... 16

a. Google’s Petition Relied on a Combination of Gilmore and Dodrill to Teach the Two “Request for Processing Service” Limitations of Claims 1 and 18 .......... 17

b. The Board's Final Written Decision Invalidated Claims 1-13 and 20-30 but Confirmed Claims 14-19 ... 20

c. The Board Denied Google's Request for Director Review and Request for Rehearing Without Explanation ... 22

IV. SUMMARY OF THE ARGUMENT ... 23

V. ARGUMENT ... 25

A. Standards of Review ... 25

B. The Board's Prior Holdings Invalidating Substantially Similar Claims Based on the Same Prior Art Require That Claim 18 Is Also Invalid ... 25

1. Claim 18 Is Invalid Based on Issue Preclusion Resulting from the Finality of the '483 and '032 Patent IPRs ... 27

2. Claim 18 Is Invalid Based on the Board's Undisputed Findings Regarding Substantially Similar Claim 1 in the Same IPR ... 35

C. Independent Claim 14 Is Invalid Because Dependent Claim 18 Is Invalid ... 39

D. The Board's Fact-Findings Support Reversal Regarding Remaining Dependent Claims 15-17 and 19 ... 41

VI. CONCLUSION ... 44

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) ....................................................................41

*Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*,
499 F.3d 1293 (Fed. Cir. 2007) ....................................................................39

*B&B Hardware, Inc. v. Hargis Indus., Inc.*,
575 U.S. 138 (2015)........................................................................................27

*Callaway Golf Co. v. Acushnet Co.*,
576 F.3d 1331 (Fed. Cir. 2009) ..................................................4, 5, 24, 39

*Comaper Corp. v. Antec, Inc.*,
596 F.3d 1343 (Fed. Cir. 2010) ....................................................................40

*Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017) ......................................................................41

*In re Cuozzo Speed Techs., LLC*,
793 F.3d 1268 (Fed. Cir. 2015), *aff'd sub nom. Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261 (2016) ..................................................40

*Cuozzo Speed Techs., LLC v. Lee*,
579 U.S. 261 (2016)........................................................................................40

*Franklin v. Cmty. Reg'l Med. Ctr.*,
998 F.3d 867 (9th Cir. 2021) .........................................................................32

*In re Freeman*,
30 F.3d 1459 (Fed. Cir. 1994) ...............................................................28, 33, 34

*In re Hodges*,
882 F.3d 1107 (Fed. Cir. 2018) .............................................................41, 44

*In re Lee*,
277 F.3d 1338 (Fed. Cir. 2002) ...........................................................25, 31, 36

*MaxLinear, Inc. v. CF CRESPE LLC*,
880 F.3d 1373 (Fed. Cir. 2018) ................................................................*passim*

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)...........................................................................25, 36

*Ohio Willow Wood Co. v. Alps S., LLC*,
735 F.3d 1333 (Fed. Cir. 2013) ..........................................................25, 28, 29

*Ormco Corp. v. Align Tech., Inc.*,
498 F.3d 1307 (Fed. Cir. 2007) ....................................................................39

*Papst Licensing GMBH & Co. KG v. Samsung Elecs. Am., Inc.*,
924 F.3d 1243 (Fed. Cir. 2019) ....................................................................28

*Secombe v. Steele*,
61 U.S. 94 (1857)..........................................................................................33

*Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*,
778 F.3d 1311 (Fed. Cir. 2015) ..........................................................29, 30, 39

*In re Warsaw Orthopedic, Inc.*,
832 F.3d 1327 (Fed. Cir. 2016) ....................................................................25

*Westwood Chem., Inc. v. United States*,
525 F.2d 1367 (Ct. Cl. 1975).................................................................28, 30

**Statutes**

5 U.S.C. § 706(2) .............................................................................................25

28 U.S.C. § 1295(a)(4)(A) ..................................................................................1

35 U.S.C. § 6.......................................................................................................1

35 U.S.C. § 141 ...................................................................................................1

35 U.S.C. § 318(a) .........................................................................................1, 34

35 U.S.C. § 319....................................................................................................1

**Regulations**

37 C.F.R. § 90.3 ...............................................................................................16

## STATEMENT OF RELATED CASES

Counsel for Appellant Google LLC hereby certifies that no other appeal from the same proceeding in the United States Patent and Trademark Office, Patent Trial and Appeal Board, is or was previously before this Court or another appellate court, whether under the same or similar title. The Court's decision in this appeal can affect the following district court case: *Hammond Dev. Int'l, Inc. v. Google LLC*, No. 6:19-cv-00356 (W.D. Tex.), previously consolidated with lead case *Hammond Dev. Int'l, Inc. v. Amazon.com Inc.*, No. 1:20-cv-00342 (W.D. Tex.).

## STATEMENT OF JURISDICTION

The Patent Trial and Appeal Board ("Board") issued a final written decision in IPR2020-00081 on June 4, 2021. *E.g.*, Appx1-106. The Board had subject matter jurisdiction over the underlying proceeding under 35 U.S.C. §§ 6, 318(a). Appellant Google LLC timely filed its notice of appeal on August 16, 2021. ECF No. 1. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c), 319.

## I. PRELIMINARY STATEMENT

Google appeals from the Board's final written decision finding claims 14-19 of U.S. Patent No. 10,270,816 ("the '816 patent") not unpatentable. The Board's finding cannot be squared with its other findings in the same final written decision and in the final written decisions of two related inter partes reviews ("IPRs"). In all three decisions, the Board invalidated substantially similar claims based on the same prior art. Hammond never appealed, so these findings are now final. The Court should therefore reverse the Board's findings regarding claims 14-19 of the '816 patent based on either issue preclusion from the two related IPRs or the irreconcilable inconsistencies within the final written decision for the '816 patent IPR.

Google initiated IPRs against three patents that Hammond had asserted against Google. One of the three patents is the '816 patent, which is the subject of this appeal. The other two patents (U.S. Patent Nos. 9,264,483 ("the '483 patent") and 10,264,032 ("the '032 patent")) are in the '816 patent family and have the same specification as the '816 patent. *See infra* Section III.A. The claims of each of the '816, '483, and '032 patents recite substantially the same invention, but use slightly different language to recite the same subject matter, as discussed in greater detail below in Sections III.B-C.

The Board issued final written decisions in all three IPRs. Appx1-106; Appx3825-3927; Appx3898-3976. The Board held that all challenged claims of the ’483 and ’032 patents were obvious. Appx3895-3896; Appx3975. It also held that claims 1-13 and 20-30 of the ’816 patent were obvious. Appx104-105. But it found that Google failed to show claims 14-19 of the ’816 patent were unpatentable, Appx104-105, despite those claims being substantially similar to unpatentable claims in each of the ’816, ’483, and ’032 patents.

In particular, and as shown herein, dependent claim 18 of the ’816 patent (which depends from independent claim 14) is substantially similar to unpatentable claims in the ’816, ’483, and ’032 patents. *See infra* Sections III.B-C. The Board determined that the prior art combination of Gilmore and Dodrill rendered obvious the “request for processing service” limitations recited in the ’483 and ’032 patents. Appx3870-3887; Appx3947-3952; Appx3955-3967. Similarly, the Board determined that the same prior art combination rendered obvious the “request for processing service” limitations recited in claim 1 of the ’816 patent. Appx55-59. But the Board inconsistently determined that Google failed to show that Gilmore and Dodrill rendered obvious the same “request for processing service” limitations recited in claim 18 of the ’816 patent. Appx79-81.

The Court should reverse the Board’s decision on claim 18 for two reasons. First, Hammond never appealed the decisions in the ’483 and ’032 patent IPRs,

which are now final, so issue preclusion applies to claim 18 with respect to the "request for processing service" limitations. *See infra* Section V.B.1. Second, the Board's final written decision in the '816 patent is internally inconsistent and should be reversed, aside from the preclusive effects of the earlier two IPRs. *See infra* Section V.B.2.

Moreover, because claim 18 is invalid, so too are remaining claims 14-17 and 19. First, independent claim 14 is invalid because claim 18 depends from it, and "[a] broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness." *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1344 (Fed. Cir. 2009). *See infra* Section V.C. Second, dependent claims 15-17 and 19 each ultimately depend from invalid claim 14, and the Board's decision in the '816 patent IPR already found that the asserted prior art rendered obvious all the limitations of the remaining dependent claims. *See infra* Section V.D. Hammond did not challenge those fact-findings. The Court should therefore reverse the Board's decision and find claims 14-19 unpatentable.

## II. STATEMENT OF THE ISSUES

1A. Does collateral estoppel render claim 18 of the '816 patent obvious when final Board decisions in previous IPRs found substantially similar claims obvious over a combination of the same prior art references?

1B. Does the Board's unappealed, and now final, finding that claim 1 of the '816 patent is unpatentable require finding that claim 18 of the '816 patent is also unpatentable, where the claims recite substantially the same invention and were challenged based on the same prior art references?

2. If dependent claim 18 is properly found unpatentable (see issues 1A, 1B), is independent claim 14 also unpatentable when the Court has consistently made clear that "[a] broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness," *Callaway Golf*, 576 F.3d at 1344?

3. If claim 14 is properly found unpatentable (see issue 2), are the remaining dependent claims 15-17 and 19 also unpatentable when the Board made fact-findings that each limitation of those claims would have been obvious?

## III. STATEMENT OF THE CASE

### A. The '816, '483, and '032 Patents Share a Common Specification and Are Directed to Establishing a Communications Session Between a Client Device and a Remote Application

The '483 and '032 patents are both part of the '816 patent family. Specifically, the '483 patent is a parent to both the '032 and '816 patents through a series of continuation applications. *See, e.g.*, Appx4-5; Appx3977-3978; Appx112-113. All three patents share the same specification. The following overview provides citations to the '816 patent, the subject of this appeal.

The ’816 patent describes a communications system 10 that allows a communication device to remotely execute a software application:



FIG. 1D

Appx115 at Fig. 1D; Appx112 at Abstract; Appx515-516. The system includes communication devices 18a-18n, which “couple to network 12 through one or more communication links 32 and/or one or more networks 14, 16.” Appx516; Appx118 at 4:7-9; Appx115 at Fig. 1D. The network 12 couples to application servers 24 through one or more communication links 30. Appx516; Appx118 at 3:55-57; Appx115 at Fig. 1D. And a repository 20 connects via a direct link 36 to application servers 24. *See* Appx516; Appx121-122 at 10:67-11:3; Appx115 at Fig. 1D.

The system “enables a client 18 to have one or more applications 28 executed remotely” by an application server 24. Appx119 at 6:13-18; Appx6-7. Specifically,

the communication device 18 can "communicat[e] a request to application server 24." Appx119 at 6:15-18; Appx112 at Abstract; Appx119 at 5:50-52, 6:40-45. The application server 24 notifies repository 20 upon receiving the request. Appx119 at 6:40-42; Appx7. The repository 20 "identif[ies] [the] desired application 28" and "communicate[s] application 28, or portions thereof, to application server 24 for execution." Appx119 at 6:42-45; Appx7. The application server 24 executes these applications to communicate "queries" requesting information from, or presenting information to, the communication device 18. Appx118 at 4:49-52; Appx119 at 6:45-53.

### B. Each '816 Patent Claim That the Board Confirmed Has a Counterpart '816 Patent Claim That the Board Found Invalid

The '816 patent has thirty claims, including four independent claims that reshuffle limitations. Relevant here and as detailed below, each of claims 14-19, which the Board held were not unpatentable, is substantially similar to other '816 patent claims that the Board held unpatentable.

Specifically, claim 18 (which depends from claim 14) includes substantially similar limitations to unpatentable claim 1. These claims are reproduced side-by-side below:

| **Claim 18 (with Claim 14)**<br>**Board Found <u>Not Unpatentable</u>** | **Claim 1**<br>**Board Found <u>Unpatentable</u>** |
|---|---|
| 14. A communication system, comprising: | 1. A communication system comprising: |
| a plurality of application servers;<br>a first communication link coupled to the plurality of application servers, the first communication link comprising a data connection; | an application server coupled to a first communication link and coupled to a second communication link, the first communication link and the second communication link each comprising a data connection, |
| a first one of the plurality of application servers configured to execute a first application to establish a communication session with at least one communication device coupled to the first communication link in response to a request from the at least one communication device to establish the communication session; | the application server adapted to establish a communication session with at least one communication device coupled to the first communication link in response to a request from the at least one communication device to establish the communication session, |
| a second one of the plurality of application servers coupled to a second communication link, | [second communication link is included above in the first limitation after the preamble] |
| | wherein the application server comprises a voice processing software program and the request from the at least one communication device comprises packetized voice data; |

| **Claim 18 (with Claim 14)**<br>**Board Found <u>Not Unpatentable</u>** | **Claim 1**<br>**Board Found <u>Unpatentable</u>** |
| --- | --- |
| the second one of the plurality of servers either<br>(a) configured to receive a second application from at least one repository having a database maintaining the second application over the second communication link, or<br>(b) configured to cause an execution of the second application via the second communication link; | a repository having access to an application comprising at least one portion of computer code;<br>wherein the application server is either<br>(a) configured to receive the application via the second communication link, or<br>(b) configured to cause an execution of the application via the second communication link; |
| wherein the second communication link comprises a data connection; | [second communication link comprising a data connection is included above in the first limitation after the preamble] |
| wherein the second one of the plurality of application servers is configured to execute or cause the execution of the second application remote from the at least one communication device; | wherein the application server is configured to execute or cause the execution of the application remote from the at least one communication device; |
| | wherein the voice processing software program is configured to generate a voice representation of information derived from the application; |
| wherein at least one of the plurality of application servers is configured to communicate a request for processing service to the at least one communication device; and<br>wherein the request for processing service is communicated to the at least one communication device over the first communication link. | wherein the application server is configured to transmit the voice representation and a request for processing service over the first communication link to the at least one communication device; and |

| Claim 18 (with Claim 14)<br>**Board Found Not Unpatentable** | Claim 1<br>**Board Found Unpatentable** |
|---|---|
| 18. The communication system of claim 14, wherein the request for processing service comprises an instruction to present a user of the at least one communication device voice data or audio data. | wherein the request for processing service comprises an instruction to present a user of the at least one communication device the voice representation. |

Appx123 at 13:38-14:3 (claim 1); Appx123-124 at 14:47-15:10 (claim 14); Appx124 at 15:21-24 (claim 18) (emphases added).

As shown in the table above, claims 1 and 18 include substantially similar limitations, with each limitation of claim 18 having a counterpart in claim 1. Unpatentable claim 1 even contains limitations absent from claim 18, including "voice processing software." While claim 1 requires "an application server" and claim 18 requires "a plurality of application servers," the Board found that the prior art reference Creamer disclosed a plurality of application servers. Appx81-84. Hammond has not appealed that finding.

Central to this appeal, and as shown above in red and blue, claims 1 and 18 include substantially the same recitations for the "request for processing service." The first "request for processing service" limitation, shown above in red, describes how the request for processing service is communicated. It requires that an application server "is configured to communicate a request for processing service to the at least one communication device" over the first communication link. The

second "request for processing service" limitation, shown above in blue, describes what that same request for processing service includes, namely, "an instruction to present a user" of the communication device with voice data. When invalidating claim 1, the Board found that the prior art disclosed both "request for processing service" limitations. Appx55-59. It then found claim 18 patentable over the same prior art based on these same limitations. Appx79-80.

The remaining dependent claims that the Board did not find unpatentable (claims 15-17 and 19) depend from claim 14. These dependent claims recite limitations present in other claims of the '816 patent that the Board found unpatentable. *See infra* Section V.D.

### C. The Confirmed Claims in the '816 Patent Are Substantially Similar to Unpatentable Claims in the Related '032 and '483 Patents

The '483 and '032 patents are part of the '816 patent family, share its specification, and include claims that recite substantially the same invention. *See, e.g.*, Appx4-5; Appx3977-3978; Appx112-113. During prosecution of the '816 patent, Hammond filed a "Terminal Disclaimer to Obviate a Double Patenting Rejection over [the '483] Patent." Appx1525. All of the challenged claims in the '483 and '032 patents were found unpatentable, while substantially similar claims in the '816 patent survived.

The chart below shows how claim 18 of the ’816 patent (including base claim 14) includes substantially similar limitations to claim 18 of the ’483 patent (including base claims 10 and 17). Despite the identity between the two claims, the Board found the former not unpatentable and the latter unpatentable. As discussed further below, the chart also highlights in red and blue text the limitations at issue on appeal.

| **’816 Patent Claim 18 (+Claim 14)**<br>**Board Found Not Unpatentable** | **’483 Patent Claim 18 (+Claims 10, 17)**<br>**Board Found Unpatentable** |
|---|---|
| 14. A communication system, comprising: | 10. A communication system capable of enabling one or more communication devices to remotely execute one or more applications, comprising: |
| a plurality of application servers;<br>a first communication link coupled to the plurality of application servers, the first communication link comprising a data connection; | one or more application servers coupled to a first communication link, the first communication link comprising a data connection, |
| a first one of the plurality of application servers configured to execute a first application to establish a communication session with at least one communication device coupled to the first communication link in response to a request from the at least one communication device to establish the communication session; | at least one of the one or more application servers adapted to execute an application to establish a communication session with at least one communication device coupled to the data connection in response to a request from the at least one communication device to establish the communication session, the at least one application server residing at a location remote from the at least one communication device; |

| ’816 Patent Claim 18 (+Claim 14) Board Found Not Unpatentable | ’483 Patent Claim 18 (+Claims 10, 17) Board Found Unpatentable |
|---|---|
| a second ***one of the plurality of application servers coupled to a second communication link***,<br><br>the second one of the plurality of servers ***either (a) configured to receive a second application from at least one repository having a database maintaining the second application over the second communication link***, or (b) configured to cause an execution of the second application via the second communication link;<br><br>wherein the second communication link comprises a data connection; | wherein the at least ***one application server is operable to receive over a second communication link an application from a repository having access to one or more applications maintained in a database coupled to the at least one repository***, |
| wherein the second one of the plurality of application servers is configured to execute or cause the execution of the second application remote from the at least one communication device; | wherein the at least one application server is further operable to execute the received application remote from the at least one communication device and to establish the communication session with the at least one communication device, |
| wherein at least one of the plurality of application servers is configured to communicate a request for processing service to the at least one communication device; and<br><br>wherein the request for processing service is communicated to the at least one communication device over the first communication link. | wherein the at least one application server is operable to communicate a request for processing service to the at least one communication device, and<br><br>wherein the request for processing service is communicated to the at least one communication device over the data connection, and |

| ’816 Patent Claim 18 (+Claim 14) Board Found <u>Not Unpatentable</u> | ’483 Patent Claim 18 (+Claims 10, 17) Board Found <u>Unpatentable</u> |
|---|---|
| | wherein the request for processing service comprises one or more queries for information from a user. |
| 18. The communication system of claim 14, wherein the request for processing service comprises an instruction to present a user of the at least one communication device voice data or audio data. | 17. The system of claim 10, wherein the request for processing service comprises one or more instructions to present information to the user. |
| | 18. The system of claim 17, wherein the one or more instructions to present information to the user is selected from the group consisting of an audio output, a voice output, a text output, a video output, and an image output. |

Appx123-124 at 14:47-15:10 (’816 patent claim 14); Appx124 at 15:21-24 (’816 patent claim 18); Appx2578 at 14:3-32 (’483 patent claim 10), 14:56-58 (’483 patent claim 17), 14:59-62 (’483 patent claim 18) (emphases added).

As shown in the table above, claim 18 of the ’483 patent includes substantially similar limitations to claim 18 of the ’816 patent. Each recitation in claim 18 of the ’816 patent has a corresponding recitation in claim 18 of the ’483 patent. Moreover, while claim 18 of the ’483 patent requires “one or more application servers” and claim 18 of the ’816 patent requires “a plurality of application servers,” the Board found that the prior art disclosed the plurality of application servers, a finding that Hammond has not appealed. Appx81-84.

Central to this appeal, both sets of claims share substantially similar "request for processing service" limitations. These limitations recite communicating the request to the communication device, as shown in red above. They further recite that the request includes an instruction to present the user with voice or audio data, as shown in blue above.

The '032 patent likewise contains substantially similar claims to the '816 and '483 patents, except that the '032 patent recites claims from the perspective of the "communication device" instead of the "communication system." *See* Appx3988-3989 at 13:37-15:16 (claims 1-15). As a specific example, like the claims discussed above, unpatentable claim 1 of the '032 patent recites the "request for processing service" limitations. Appx3988 at 13:66-14:3 (claim 1). These limitations specify how the communication device "receive[s] the request for processing service from the application server over the first communication link," and how the "request for processing service comprises an instruction to present the user the voice representation." *Id.*

### D. Despite Evaluating Overlapping Prior Art Mappings for Substantially Similar Claim Limitations, the Board Issued Inconsistent Final Written Decisions

#### 1. In the '483 and '032 Patent IPRs, the Board Found All Challenged Claims Unpatentable

In the final written decisions of the '483 and '032 patent IPRs, the Board found all challenged claims unpatentable as obvious. Those decisions issued on

April 12, 2021 and April 21, 2021, respectively. Appx3825; Appx3898. Hammond did not appeal either of the Board's decisions, which became final on June 14, 2021 and June 23, 2021, respectively. 37 C.F.R. § 90.3.

Relevant to this appeal, the Board found that claims 10, 17, and 18 of the '483 patent (among others) were unpatentable based on a combination of the prior art references Gilmore and Dodrill. Appx3895. In particular, the Board determined that Gilmore and Dodrill rendered obvious both "request for processing service" limitations. Appx3870-3887.

Likewise, the Board found that claim 1 of the '032 patent (among others) was unpatentable based on a combination that included Gilmore and Dodrill.[1] Appx3975. Consistent with its findings in the '483 patent IPR, the Board again determined that Gilmore and Dodrill rendered obvious both "request for processing service" limitations. Appx3947-3952; Appx3955-3967.

#### 2. In the '816 Patent IPR, the Board Found Claims 1-13 and 20-30 Unpatentable, but Confirmed Claims 14-19 That Are Substantially Similar to the Unpatentable Claims

Consistent with its decisions in the '483 and '032 patent IPRs, the Board found that claims 1-13 and 20-30 of the '816 patent were unpatentable as obvious over

---

[1] The invalidity ground for claim 1 of the '032 patent also relied on Dhara to teach limitations related to packetized voice data that do not appear in claim 18 of the '816 patent. *See* Appx3906; Appx3953-3955.

prior art combinations that included Gilmore and Dodrill. Appx104-105. In doing so, the Board again found that Gilmore and Dodrill rendered obvious the "request for processing service" limitations in claims 1-13 and 20-30 of the '816 patent. Appx55-59.

Despite claims 14-19 reciting substantially similar limitations to their invalid counterparts in the '816 patent and related '483 and '032 patents, however, the Board upheld those claims. It reasoned that Google had presented only Gilmore, and not Dodrill, as part of its obviousness combination for broader independent claim 14, and therefore upheld claim 14 based on the first "request for processing service" limitation. Appx78-79. Moreover, even though Google undisputedly included Dodrill in its prior art combination for dependent claim 18, the Board determined that Google's omission of Dodrill in its other ground for independent claim 14 infected its ground for claim 18, and thus the Board refused to find claim 18 invalid. Appx79-81. Key details from the IPR are summarized below.

#### a. Google's Petition Relied on a Combination of Gilmore and Dodrill to Teach the Two "Request for Processing Service" Limitations of Claims 1 and 18

Google's petition challenged all claims 1-30 of the '816 patent using a variety of grounds. Appx514-515. Relevant to the appeal, Google challenged the following claims based on the following grounds:

- Claim 1 is rendered obvious by Gilmore, Dhara, and Dodrill;

- Claim 14 is rendered obvious by Gilmore and Creamer; and
- Claim 18 is rendered obvious by Gilmore, Creamer, and Dodrill.

Appx514-515. Google added Dhara to the claim 1 ground to disclose the "packetized voice data" features that are required of claim 1 but not of claims 14 and 18. Appx529-532. Likewise, Google added Creamer to the claim 14 and claim 18 grounds to disclose the "plurality of application servers" required of claims 14 and 18 but not of claim 1. Appx560-564; Appx568.

For independent claim 1, Google argued that the combination of Gilmore and Dodrill rendered obvious the two "request for processing service" limitations (referred to below as elements [1h] and [1i]). Appx543-548. Google explained how Gilmore's application server (gateway 108/208) generates audio files to send to the user. Appx543. It further explained how Dodrill's system can send audio files with an instruction to play the audio to the user device, and that it would have been obvious to combine the two teachings. Appx544-548.

As explained above in Section III.B, the elements of claim 18 (including base claim 14) are substantially similar to the elements of claim 1. Thus, when analyzing each of the elements of claims 14 and 18, Google's petition referred to the analysis of the corresponding elements of claim 1 with respect to Gilmore and Dodrill. Appx558-565; Appx568 (stating "[a]s explained in Sections . . ." and referring back to the corresponding claim 1 limitation for each claim 14 and claim 18 limitation).

In particular, for the first "request for processing service" limitation in claim 14, Google referred back to the claim 1 analysis of both the first and second "request for processing service" limitations ("[1h]-[1i]"). Appx565 (citing Appx543-548). Google alleged that "Gilmore discloses that the request for processing service (e.g., a prompt or message to which the user can respond) is communicated to [the] communication device . . . ." Appx565. Because Google's petition urged that no claim term required construction, Appx517, it relied on Gilmore's prompt or message to the user as meeting the plain meaning of the first "request for processing service" limitation. Appx543; Appx540-542.

Because claim 18 adds the second "request for processing service" limitation, further defining the same request to include "an instruction to present a user of the at least one communication device voice data or audio data," Google added Gilmore to the ground challenging claim 18. Appx568. However, in doing so, Google cited back to the claim 1 analysis of both the first and second "request for processing service" limitations with respect to Gilmore and Dodrill, not just to the analysis of the second "request for processing" limitation. Appx568 (citing Appx543-548). The cited analysis explains how Dodrill's request for processing service provides "additional functionality," including sending voice data "as an embedded .wav file along with an instruction to play the voice representation in script processed by the user device." Appx544-546. It also explains how it would have been obvious to

incorporate Dodrill's additional teachings to "transmi[t] . . . the embedded voice representation generated by [Gilmore's] gateway 108/208 (e.g., .wav file) with the instructions to present the voice [re]presentation as part of the request for processing." Appx544-545. Thus, the analysis that Google's petition pointed to for its claim 18 ground required modifying Gilmore's "request for processing service" with the additional teachings of Dodrill. Appx543-548 (as cited at Appx568).

#### b. The Board's Final Written Decision Invalidated Claims 1-13 and 20-30 but Confirmed Claims 14-19

The Board's final written decision found that claims 1-13 and 20-30 were unpatentable and that claims 14-19 were not unpatentable. Appx105. In the decision, the Board construed "processing service" within the phrase "request for processing service" to mean "a computing process ***performed by a communication device*** for all or part of the application." Appx25 (emphasis added).

When analyzing claim 1, the Board determined that Gilmore and Dodrill together rendered obvious the two "request for processing service" limitations, including that the application server sends the "request for processing service" and that "the request for processing service comprises an instruction to present a user . . . the voice representation." Appx55-59. The Board noted that Google had relied on Gilmore in combination with Dodrill for the two limitations, and that Dodrill "teaches sending executable instructions to the user device, thus meeting the

construction of 'request for processing services." Appx58 (citing Appx543-548; Appx909). The Board ultimately agreed with Google that Gilmore and Dodrill together teach the two "request for processing service" limitations even under the Board's construction. *See* Appx58-59 (explaining how Gilmore sends a voice representation to the user device and Dodrill receives the voice representation in software and executes an instruction to play the voice representation as audio for the user).

When analyzing claim 14, the Board determined that Google had not shown claim 14 to be unpatentable based on its proposed ground of Gilmore and Creamer. Appx77-79. The basis for the Board's decision was that Google's proposed ground did not include Dodrill, and Gilmore alone did not teach the first "request for processing service" limitation as the Board construed it. Appx78-79. The Board construed the "request for processing service" to require "a computing process ***performed by a communication device***," Appx25 (emphasis added), and the Board reasoned that in Gilmore, "the application server, rather than the communication device, processes all instructions," Appx79. Because the Board found that Google had not "point[ed] us to any disclosure in Gilmore" for claim 14, it found that Google had not shown claim 14 to be unpatentable. Appx79.

When analyzing claim 18, which requires both "request for processing service" limitations, the Board noted that Google's ground added Dodrill and thus

was different than the ground for claim 14. Appx79. The Board also recognized that, for the claim 18 ground, Google referred back to its claim 1 analysis for both "request for processing service" limitations. Appx80. But the Board interpreted Google's petition narrowly and found that Google had not relied on Dodrill to teach the first "request for processing service" limitation recited in base claim 14, even though Google's claim 18 ground expressly included Dodrill. Appx79-80. The Board based its finding on Google's statement that Dodrill discloses "this additional limitation" of claim 18. Appx79-80 (quoting Appx568). The Board interpreted this statement as representing that Google relied on Dodrill for teaching only the second "request for processing" limitation, and not the first. Appx79-80. It did so even though Google's analysis for claim 18 referred to the claim 1 analysis of ***both*** the first and second "request for processing service" limitations. Appx79-80; Appx568 (citing Appx543-548). The Board noted that this was "a close call," but it narrowly interpreted Google's petition as being limited to relying on Dodrill to teach only the second "request for processing limitation" in claim 18, and not the first "request for processing limitation" in claim 18's base claim. Appx80.

#### c. The Board Denied Google's Request for Director Review and Request for Rehearing Without Explanation

Google requested Director review or, in the alternative, panel rehearing of the Board's decision regarding claims 14-19. Appx1108-1124. Google argued that

because the time had passed for Hammond to appeal the Board's decisions holding unpatentable substantially similar claims in the '483 and '032 patent IPRs, issue preclusion applied to the "request for processing service" limitations of the '816 patent, and thus the Board should find the remaining '816 patent claims unpatentable. Appx1115-1119. Google also argued that the Board's final written decision failed to address the obviousness combination of Gilmore and Dodrill that it had undisputedly presented for claim 18, and that the combination's rendering of claim 18 as obvious also necessitated a finding that claim 14 (from which claim 18 depends) was also obvious. Appx1119-1121. Finally, Google argued that the Board overlooked Google's arguments in its reply brief, made in response to Hammond's claim construction of the "processing service" claim limitation, which the Board adopted in its final written decision. Appx1121-1124.

The Office summarily rejected Google's request, stating only that it had "received a request," that "[t]he request was referred to" the acting Director, that it was "denied," and that the Board's final written decision "is the final decision of the agency." Appx107-108. The order provided no explanation for the denial. Google appealed.

## IV. SUMMARY OF THE ARGUMENT

The Court should reverse the Board's erroneous refusal to find unpatentable claims 14-19 of the '816 patent despite finding substantially similar claims

unpatentable in three different final written decisions. In particular, the Court should reverse the Board's finding that Google had not shown dependent claim 18 of the '816 patent to be unpatentable for two reasons. First, collateral estoppel renders claim 18 of the '816 patent obvious because the Board's final written decisions in the '483 and '032 patent IPRs found substantially similar claims obvious over a combination of the same prior art references, and Hammond never appealed. Second, the Board's unappealed finding that claim 1 of the '816 patent is unpatentable also requires finding that claim 18 of the '816 patent is unpatentable.

The Court should also reverse the Board's decision regarding remaining claims 14-17 and 19. Independent claim 14 is invalid because claim 18 depends from it, and "[a] broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness." *Callaway Golf*, 576 F.3d at 1344. Moreover, dependent claims 15-17 and 19 all depend from invalid claim 14, and the Board's '816 patent IPR decision found that the asserted prior art rendered obvious the limitations of these claims when it invalidated counterpart claims in the '816 patent that include the same limitations. The Court should therefore reverse the Board's decision and find claims 14-19 unpatentable.

## V. ARGUMENT

### A. Standards of Review

The Court reviews the Board's legal determinations de novo. *In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1329 (Fed. Cir. 2016). Collateral estoppel, also referred to as issue preclusion, is a legal determination subject to de novo review. *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1341 (Fed. Cir. 2013). Collateral estoppel applies even if the earlier decision becomes final after the second decision issues. *See MaxLinear, Inc. v. CF CRESPE LLC*, 880 F.3d 1373, 1376-77 (Fed. Cir. 2018) (applying issue preclusion even though the first decision became final while the second case was pending on appeal).

The Court reviews the Board's decisions under the Administrative Procedure Act to determine whether the Board's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) (quoting 5 U.S.C. § 706(2)). Under this standard, the Board's "[o]mission of a relevant factor required by precedent is both legal error and arbitrary agency action." *Id.* at 1344 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### B. The Board's Prior Holdings Invalidating Substantially Similar Claims Based on the Same Prior Art Require That Claim 18 Is Also Invalid

In final written decisions that Hammond never appealed, the Board found the claims of the '483 and '032 patents obvious over prior art combinations containing

Gilmore and Dodrill. Appx3895; Appx3975. In doing so, the Board found that Gilmore and Dodrill rendered obvious the "request for processing service" limitations of those claims. Appx3870-3887; Appx3947-3952; Appx3955-3967. Consistent with those prior decisions, in the '816 patent IPR final written decision, the Board found claims 1-13 and 20-30 unpatentable over prior art combinations including Gilmore and Dodrill. Appx104-105. And like the '483 and '032 patent IPRs, the Board found that Gilmore and Dodrill taught both "request for processing service" limitations. Appx55-59.

But despite claim 18 of the '816 patent being substantially similar to the unpatentable claims of each of the '483, '032, and '816 patents, and despite claim 18 also being challenged based on a combination of Gilmore and Dodrill, the Board refused to find it unpatentable. As explained below, this is error for two reasons. First, when the decisions invalidating the claims of the '483 and '032 patents became final, issue preclusion attached to substantially similar '816 patent claim 18, which was challenged using the same prior art. Second, even if collateral estoppel were not to attach, the Board's final, unappealed findings invalidating claim 1 of the '816 patent similarly invalidate claim 18. The Board's holding to the contrary is irreconcilably inconsistent.

### 1. Claim 18 Is Invalid Based on Issue Preclusion Resulting from the Finality of the ’483 and ’032 Patent IPRs

Claim 18 of the ’816 patent recites substantially similar limitations to claims of the ’483 and ’032 patents that the Board found were unpatentable over the same combination of references, Gilmore and Dodrill. In the ’483 and ’032 patent IPRs, the Board found that Gilmore and Dodrill taught the “request for processing service” limitations, the same limitations that formed the basis of its determination that claim 18 of the ’816 patent was unpatentable. Issue preclusion therefore bars Hammond from relitigating the validity of substantially similar claim 18 in the ’816 patent. Thus, the Court should reverse the Board’s final written decision and hold that claim 18 is unpatentable based on issue preclusion.

Issue preclusion applies “[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment.” *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148 (2015) (alteration in original) (citation omitted). The adjudicated issue is then “conclusive in a subsequent action between the parties, whether on the same or a different claim.” *Id.* (citation omitted). Issue preclusion applies to prior IPR determinations once they become final. *MaxLinear*, 880 F.3d at 1376. This is true even if the earlier decision becomes final after the second decision issues. *See id.* at 1376-77 (applying issue preclusion even though the first decision became final while the second case was

pending on appeal); *Papst Licensing GMBH & Co. KG v. Samsung Elecs. Am., Inc.*, 924 F.3d 1243, 1249, 1252-53 (Fed. Cir. 2019) (applying issue preclusion when judgment of related patent became final after close of briefing on appeal).

The Court reviews issue preclusion determinations de novo. *Ohio Willow Wood*, 735 F.3d at 1341. There are four requirements for issue preclusion to apply: "(1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) [the estopped party] had a full and fair opportunity to litigate the issue in the first action." *In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994). All four requirements are met here.

***First***, all three IPR proceedings presented the same issue. *Id.* In each case, Google challenged substantially similar claims using the same prior art. This first requirement begins by comparing the adjudicated claims (unpatentable '483 and '032 patent claims) to the unadjudicated claims ('816 patent claims on appeal). *Westwood Chem., Inc. v. United States*, 525 F.2d 1367, 1375 (Ct. Cl. 1975). "If [the claims] are of identical scope, it readily follows that no new issues bearing on the obviousness determination are presented." *Id.* But the claims need not be identical—issue preclusion attaches even when the patent claims "are substantially similar to" one another or "use slightly different language to describe substantially the same invention." *Ohio Willow Wood*, 735 F.3d at 1342-43. Thus, issue preclusion will still

apply "[i]f the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity." *MaxLinear*, 880 F.3d at 1377 (quoting *Ohio Willow Wood*, 735 F.3d at 1342).

Here, claim 18 of the '816 patent (including base claim 14) is "substantially similar to" and describes "substantially the same invention" as claim 18 of the '483 patent (including base claims 10 and 17), as shown above in the side-by-side comparison of Section III.C. *Ohio Willow Wood*, 735 F.3d at 1342-43. There are no substantive differences between the claims, and every limitation in claim 18 of the '816 patent has a counterpart in unpatentable claim 18 of the '483 patent, as shown above in Section III.C. Nor is there a substantive difference between claim 18 of the '816 patent and claim 1 of the '032 patent. *See supra* Section III.C. While the claims sometimes use slightly different language for each claim element, the substance of the claims is the same, and "[c]omplete identity of claims is not required to satisfy the identity-of-issues requirement . . . ." *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1319 (Fed. Cir. 2015).

Central to this appeal, every set of claims shares the "request for processing service" limitations, namely, that the request be communicated to the communication device and that it includes an instruction to present the user with voice or audio data. *See supra* Section III.C. These limitations appear in both the unpatentable claims of the '483 and '032 patents. *Id.* Thus, because these claim

elements "are of identical scope, it readily follows that no new issues bearing on the obviousness determination are presented." *Westwood*, 525 F.2d at 1375.

Moreover, any differences in claim language are not material and do not alter the question of validity. For example, as discussed above in Section III.C, claim 18 of the '816 patent recites "a plurality of application servers," while the claims of the '483 patent recite "one or more application servers." But Google showed, and the Board found, that the Creamer prior art reference taught a plurality of application servers and that one skilled in the art would have found it obvious to combine Gilmore and Creamer for this purpose, and Hammond did not appeal those findings. Appx81-84; Appx558-564. Thus, this minor difference "does not materially alter the question of the validity" of claim 18. *Soverain Software*, 778 F.3d at 1319. The same conclusion holds for the '032 patent. As discussed above in Section III.C, there are no substantive differences between claim 18 of the '816 patent and claim 1 of the '032 patent.

The claims of the '483 and '032 patents were also challenged under the same prior art combination as claim 18 of the '816 patent, namely, Gilmore in view of Dodrill. Appx2-3 ('816 patent IPR grounds); Appx3833 ('483 patent IPR grounds); Appx3906 ('032 patent IPR grounds).[2] Because the claims are substantially similar

[2] Each of these grounds includes Gilmore and Dodrill. While Google's challenge to claim 18 of the '816 patent added Creamer to the combination, Appx2-

and were challenged under the same prior art combination of Gilmore and Dodrill, the ’483 and ’032 patent IPRs and the ’816 patent IPR “present identical issues of patentability,” and thus issue preclusion applies. *MaxLinear*, 880 F.3d at 1377.

The Board’s final written decision did not address issue preclusion because at that time the Board’s ’483 and ’032 patent IPR decisions were not yet final. After those decisions became final, however, Google requested rehearing and Director review of the ’816 patent IPR decision based on issue preclusion. Appx1108-1124. The Office summarily rejected Google’s request without explanation; it simply stated that the Board’s previously issued final written decision was the final decision of the agency. Appx107-108. This alone was error because the Board must explain the basis for its decisions, and it did not do so here. *In re Lee*, 277 F.3d at 1346 (“The agency tribunal must make findings of relevant facts, and present its reasoning in sufficient detail that the court may conduct meaningful review of the agency action.”).

---

3, this was to disclose “a plurality of application servers,” Appx558-564, which, as discussed above, is one of the minor differences between the ’816 patent and the ’483 and ’032 patents that does not affect the outcome here. Moreover, as discussed, the Board found that Creamer taught a plurality of servers, and that one skilled in the art would have found it obvious to combine Gilmore and Creamer for this purpose. Appx81-84. Hammond did not appeal those findings. Likewise, the grounds for the ’032 patent add Dhara to teach limitations related to packetized voice data that do not appear in claim 18 of the ’816 patent. *See* Appx3906; Appx3953-3955.

But the Board's error runs deeper than a failure to explain its rationale. Its summary denial of Google's request refers to the final written decision, but that decision improperly attacks a pleading formality in Google's petition. Specifically, when refusing to invalidate claim 18, the Board narrowly parsed Google's petition and determined that Google had not properly relied on the combination with Dodrill to teach the first of the two "request for processing" limitations. Appx79-81. Not only is this interpretation incorrect, *see infra* Section V.B, it is error to apply this rationale to a collateral estoppel argument. "In matters of equity," such as the application of collateral estoppel, "it is the substance of the plaintiff's claim that counts, not the form of its pleading." *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 875 (9th Cir. 2021). The Board even noted that this was "a close call," but it "decline[d] to parse the Petition" in a manner weighing substance over form, as equity requires. Appx79-81.

While it is impossible to know why the Office refused to find collateral estoppel (because it did not articulate a reason), it would have been error for the Board to have done so based on its disagreements over the form of Google's pleading. Elevating form over substance in this manner would be improper when it comes to matters of equity, like collateral estoppel. "[C]ourts of equity make a distinction in all cases between that which is matter of substance and that which is matter of form; and if it find[s] that, by insisting on form, the substance will be

defeated, it holds it to be inequitable to allow a person to insist on such form, and thereby defeat the substance." *Secombe v. Steele*, 61 U.S. 94, 104 (1857).

The first requirement for collateral estoppel is thus met because the same issue was presented in the now-final '483 and '032 patent IPRs as was presented in the '816 patent IPR.

***Second***, the issue was actually litigated and decided in the prior IPRs. *In re Freeman*, 30 F.3d at 1465. For example, the Board determined in the '483 patent IPR that claims 10, 17, and 18 were unpatentable based on a combination of Gilmore and Dodrill. Appx3895; Appx3852-3891. In doing so, the Board considered and decided the parties' dispute regarding the "request for processing service" limitations, finding that Gilmore and Dodrill rendered them obvious. Appx3877-3887; Appx3889-3891. Likewise, in the '032 patent IPR, the Board determined that claim 1 was invalid based on a combination including Gilmore and Dodrill, Appx3927-3967, finding that Gilmore and Dodrill taught both "request for processing service" limitations, Appx3947-3952. Indeed, the Board found that the prior art combinations including Gilmore and Dodrill rendered obvious each and every limitation of the challenged claims. *See* Appx3895; Appx3975.

***Third***, resolution of the issue was essential to the final judgment in both the '483 and '032 patent IPRs. *In re Freeman*, 30 F.3d at 1465. The Board's findings regarding the claims of the '483 and '032 patents were essential to the final written

decisions in those proceedings because the very nature of the final written decision was to determine whether those claims were unpatentable. *See* 35 U.S.C. § 318(a) (requiring the Board to "issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner"). Moreover, the Board's analysis of the combined teachings of Gilmore and Dodrill, including whether Gilmore and Dodrill teach the "request for processing service" limitations, form a core part of the Board's final written decisions. Appx3877-3887; Appx3889-3891; Appx3947-3952.

***Fourth***, Hammond had a full and fair opportunity to litigate the issue. *In re Freeman*, 30 F.3d at 1465. Specifically, Hammond had the opportunity to (and did) submit a patent owner response and a sur-reply in each proceeding, and it also participated in oral argument. Appx3826 ('483 patent IPR); Appx3899 ('032 patent IPR). Hammond also had the opportunity to appeal the final written decisions in both proceedings, but it chose not to do so.

All four requirements of issue preclusion are thus met. The Board's final, unappealed determinations that the claims of the '483 and '032 patents are invalid are thus determinative of the validity of substantially similar claim 18 of the '816 patent that was challenged using the same prior art.

### 2. Claim 18 Is Invalid Based on the Board's Undisputed Findings Regarding Substantially Similar Claim 1 in the Same IPR

As shown above in the chart in Section III.B, claim 18 (including claim 14 from which it depends) is substantially similar to claim 1 in the '816 patent. Google presented overlapping combinations and arguments for claim 18 as it did for claim 1, challenging both claims as being obvious based on a combination of Gilmore and Dodrill.[3] In particular, when analyzing the "request for processing service" limitations of claim 18 (and claim 14), Google's petition referred back to the analysis of both "request for processing service" limitations of claim 1. Appx565 (citing to claim elements [1h]-[1i] in analysis of claim 14 (Appx543-548)); Appx568 (same for claim 18).

The Board found that claim 1 was obvious over Gilmore and Dodrill. Appx37-59. In doing so, it found that Gilmore and Dodrill taught the "request for processing service" limitations of claim 1. Appx55 (referred to as "*limitation 1h and 1i*"). Despite Google's petition referring to its analysis of these very limitations of claim 1 when analyzing the substantially similar "request for processing service" limitations of claim 18, however, the Board refused to consider the combination. The Board reasoned that Google's petition relied only on Gilmore, and not Dodrill, for the first

[3] As previously discussed, Google also relied on Creamer for teaching a "plurality of application servers" in claims 14 and 18. Appx558-564.

"request for processing service" limitation that appears in claim 14. Appx78-79. And while it recognized that Google's petition relied on the combination of Gilmore and Dodrill for claim 18, including citing back to the analysis for ***both*** "request for processing service" limitations in claim 1, it interpreted the petition as relying on Dodrill to teach only the second "request for processing service" limitation expressly stated in claim 18. While the Board considered this a "close call," it "decline[d] to parse the Petition" to consider Dodrill's teachings for both "request for processing services" limitations. Appx80.

The Board erred by failing to consider Google's arguments, including its combination of Gilmore and Dodrill for claim 18. Google's analysis for its claim 18 ground—which includes Gilmore and Dodrill—refers back to its claim 1 analysis for both "request for processing service" limitations, which relies on Gilmore and Dodrill. The Board was required to consider this relevant evidence and argument for the first and second "request for processing service" limitations, and it erred when it failed to do so. "Omission of a relevant factor required by precedent is both legal error and arbitrary agency action." *In re Lee*, 277 F.3d at 1344; *see also Motor Vehicle Mfrs.*, 463 U.S. at 42-43 (holding that "the agency must examine the relevant data and articulate a satisfactory explanation for its action," and that an agency action is arbitrary and capricious when it "entirely failed to consider an important aspect of the problem").

The Board's purported basis for ignoring the petition's arguments is flawed. The Board interpreted the petition's statement that "Dodrill renders this additional limitation obvious" as meaning that Dodrill could only be relied on to teach the second "request for processing service" limitation and not the first. Appx80 (quoting Appx568). But this assumes that the second "request for processing service" limitation in claim 18 is somehow divorced from the first "request for processing service" limitation in claim 14. The Board's assumption is wrong. Instead, the second "request for processing service" limitation that appears in claim 18 further defines the "request for processing service" introduced in the first limitation in claim 14. They are thus directly related, and the second "request for processing service" limitation of claim 18 implicates the first "request for processing service" limitation of claim 14.

Indeed, this is why Google's claim 18 analysis points to Dodrill and then expressly refers back to its analysis of ***both*** the first and second "request for processing service" limitations in claim 1. Appx568 (citing Appx543-548 (referring to both limitations "[1h]-[1i]" in its analysis of claim 18)). If Google had intended to limit Dodrill to the only the second "request" limitation ([1i]), it would have done so. But it did not. Instead, Google's analysis for claim 18 expressly refers to Dodrill's teachings of both limitations "[1h]-[1i]," and the Board erred in refusing to look at the full scope of Google's evidence and analysis.

When considering Google's analysis in the petition, it makes no sense for the Board to limit Google's reliance on Dodrill to only the second "request for processing service" limitation. As explained above in Section III.D.2.a, Google's analysis showed how it would have been obvious to modify Gilmore's "request for processing service" with Dodrill's teachings. Appx543-548. Under Google's analysis, therefore, Gilmore's request for processing service is transformed into a request for processing service taught by the combination of the two references. That analysis treated both "request for processing service" limitations as one concept, which makes sense because they are both describing the same "request for processing service." There is no way to dissect Google's analysis to recognize its reliance on Dodrill for the second limitation but ignore it for the first limitation when both describe the same "request for processing service."

Moreover, the Board's undisputed and unappealed fact-findings regarding claim 1 firmly establish that claim 18 is invalid. The Board concluded that Gilmore and Dodrill disclose both "request for processing service" limitations in claim 1. Appx55-59. Those limitations also appear in claim 18, and thus Gilmore and Dodrill necessarily disclose them as well. The Board's conclusion that claim 18 is not unpatentable based on the "request for processing service" limitations is therefore irreconcilably inconsistent with, and directly refuted by, its unchallenged findings

that those limitations would have obvious in claim 1. The Board's findings thus establish that claim 18 is also invalid.

### C. Independent Claim 14 Is Invalid Because Dependent Claim 18 Is Invalid

It is axiomatic that "[a] broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness." *Callaway Golf*, 576 F.3d at 1344. Because claim 18 is invalid for the reasons discussed above in Section V.B, so too is independent claim 14 from which it depends. Broader claim 14 cannot have a different fate than claim 18, as a matter of law and logic.

The Court has repeatedly recognized this principle when invalidating an independent claim based on a finding that a claim from which it depends is obvious. *See, e.g.*, *Soverain Software*, 778 F.3d at 1315 ("Although claim 15 of the '492 patent, at issue here, was not explicitly invalidated in *Newegg*, we invalidated claim 41, which depends from claim 15. Therefore, the invalidity determination as to claim 41 extended to claim 15, as well." (citations omitted)); *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1300 (Fed. Cir. 2007) (holding that the invalidity of dependent claim 2 "is dispositive of the obviousness of claim 1 as well, because claim 1 is to a broader genus containing the same subject matter"); *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1319 (Fed. Cir. 2007) ("Because claims 10 and 17 were found to have been obvious, the broader claims 1 and 11 must

also have been obvious."); *see also Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1349-55 (Fed. Cir. 2010) (granting new trial and holding that the jury's verdict finding dependent claims obvious but independent claims nonobvious "reflect[ed] an irreconcilable inconsistency").

In the IPR context, this Court has similarly recognized that a challenge to a dependent claim necessarily challenges the claims from which it depends. Specifically, in *Cuozzo*, the Court recognized that "[a]ny grounds which would invalidate claim 17 would by necessary implication also invalidate claims 10 and 14," from which claim 17 depended. *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1275 (Fed. Cir. 2015), *aff'd sub nom. Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261 (2016). The Supreme Court affirmed that decision, and Justice Alito agreed in his concurrence, noting that "an assertion that claim 17 is unpatentable in light of certain prior art is necessarily an assertion that claims 10 and 14 are unpatentable as well." *Cuozzo*, 579 U.S. at 296 (Alito, J., concurring in part and dissenting in part).

Applying the law to these facts is simple. Claim 18 is unpatentable for the reasons discussed above in Section V.B. Claim 18's unpatentability implicates claim 14 and likewise renders it unpatentable. Thus, the Court should reverse the Board's determination regarding claim 14 and hold claim 14 unpatentable.

### D. The Board's Fact-Findings Support Reversal Regarding Remaining Dependent Claims 15-17 and 19

Ordinarily, where the Board has not considered the dependent claims, the Court would remand for consideration of those claims. *See, e.g.*, *MaxLinear*, 880 F.3d at 1377-78 (invalidating independent claims based on collateral estoppel, but remanding for consideration of dependent claims because "the Board has not separately addressed the dependent claims"). But remand is unnecessary here. As discussed below, the Board separately addressed all the limitations of the remaining dependent claims and found them obvious. Hammond did not challenge those findings. Thus, the only viable conclusion on this record is that remaining dependent claims 15-17 and 19 are also obvious.

When the record supports only one conclusion, as it does here, remand is unnecessary, and reversal is appropriate. *See, e.g.*, *Corning v. Fast Felt Corp.*, 873 F.3d 896, 903 (Fed. Cir. 2017) (finding that, "[b]ased on the record before us, there is only one permissible factual finding," and thus reversing the Board's decision and finding all claims obvious); *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1366 (Fed. Cir. 2016) (reversing rather than vacating the Board's decision "where a more reasoned explanation than that provided by the Board [could not] be gleaned from the record"); *see also In re Hodges*, 882 F.3d 1107, 1115-16 (Fed. Cir. 2018) (reversing anticipation rejection when "[t]he only permissible factual finding" was that the prior art reference was missing a particular element).

Because the record unambiguously and exclusively supports finding that dependent claims 15-17 and 19 are obvious, the Court should reverse. As explained below, each of dependent claims 15-17 and 19 has a counterpart claim elsewhere in the ’816 patent that was also invalidated by the Board.

Claim 15 requires a “plurality of application servers comprising a voice processing software program,” which mirrors claim 1’s recitation of an “application server compris[ing] a voice processing software program.” Appx124 at 15:11-13 (claim 15); Appx123 at 13:47-49 (claim 1). Claim 15 also requires that “the request from the at least one communication device comprises packetized voice data,” which is recited verbatim in independent claim 1. Appx124 at 15:13-15 (claim 15); Appx123 at 13:49-51 (claim 1). Google presented the same combination of prior art (Gilmore and Dhara) for the limitations of both claims, and Google’s petition referred to its analysis of claim 1 when analyzing claim 15. Appx565 (citing Appx528-532); Appx3. The Board found that Gilmore, alone or with Dhara, satisfied these limitations of claim 1, and it noted that Hammond had not disputed that these limitations were obvious. Appx40. The Board thus made the findings necessary to warrant reversal regarding claim 15.

Claim 16 requires that the “repository comprises a server,” which is identical to the limitation of claim 4. Appx124 at 15:16-17 (claim 16); Appx123 at 14:13-15 (claim 4). Google’s obviousness position for claim 16 was the same as its

obviousness position for claim 4. Appx 565 (citing Appx552). The Board found that Google had shown claim 4 to be obvious, and again noted that Hammond did not argue separately for the patentability of claim 4. Appx59-60. The Board thus made the findings necessary to warrant reversal regarding claim 16.

Claim 17 requires that "the second communication link comprises a plurality of data socket connections," which mirrors claim 24's limitation of "the first communication link and/or the second communication link further comprise at least one data socket connection." Appx124 at 15:18-20 (claim 17), 16:7-9 (claim 24). Google presented the same combination of prior art (Gilmore and Fawcett) for the limitations of both claims, and Google's petition referred to its analysis of claim 17 when analyzing claim 24. Appx589 (citing Appx566-568); Appx3. The Board found that the prior art rendered this limitation obvious, relying on a combination of Fawcett's and Gilmore's teachings. Appx100-102. The Board thus made the findings necessary to warrant reversal regarding claim 17.

Finally, claim 19 requires that the communication device comprises a "voice recognition application configured to recognize at least one word spoken by a user of the at least one communication device," which is the same as the limitation of invalid claim 10. Appx124 at 15:25-29 (claim 19); Appx123 at 14:32-36 (claim 10). Google presented the same combination of prior art (Gilmore and Ladd) for the limitations of both claims, and Google's petition referred to its analysis of claim 10

when analyzing claim 19. Appx590 (citing Appx572-573); Appx3. The Board found that the prior art rendered this limitation obvious, relying on a combination of Ladd's and Gilmore's teachings. Appx84-85. The Board thus made the findings necessary to warrant reversal regarding claim 19.

In view of the above, and because independent claim 14 is invalid as obvious, the only permissible findings that can be drawn from the Board's findings of the related claims are that the prior art also renders obvious dependent claims 15-17 and 19. *See In re Hodges*, 882 F.3d at 1115-16. The Court should therefore reverse the Board's decision as it relates to dependent claims 15-17 and 19, and hold those claims unpatentable. *Id.*

## VI. CONCLUSION

For the reasons set forth above, Google respectfully requests that the Court reverse the Board's decision and hold that claims 14-19 are unpatentable.

Date: December 10, 2021

Respectfully submitted,

/s/ *Erika H. Arner*
Erika H. Arner
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 NEW YORK AVENUE, NW
WASHINGTON, DC 20001-4413
(202) 408-4000
*Counsel for Appellant Google LLC*

# ADDENDUM

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

GOOGLE LLC,
Petitioner,

v.

HAMMOND DEVELOPMENT INTERNATIONAL, INC.,
Patent Owner.

---

IPR2020-00081
Patent 10,270,816 B1

---

Before MICHELLE N. WORMMEESTER, AMBER L. HAGY, and KRISTI L. R. SAWERT, *Administrative Patent Judges.*

SAWERT, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

This is a Final Written Decision in an *inter partes* review challenging the patentability of claims 1–30 ("the challenged claims") of U.S. Patent No. 10,270,816 B1 (Ex. 1001, "the '816 patent"). We have jurisdiction under 35 U.S.C. § 6 and enter this Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons set forth below, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 1–13 and 20–30 are unpatentable, but that Petitioner has not shown, by a preponderance of the evidence, that claims 14–19 are unpatentable. *See* 35 U.S.C. § 316(e).

# II. BACKGROUND

## *A. Procedural History*

Google LLC ("Petitioner") filed a petition for *inter partes* review under 35 U.S.C. § 311. Paper 1 ("Pet."). Petitioner supported its Petition with the Declaration of Stuart J. Lipoff.[1] Ex. 1021.

Hammond Development International, Inc. ("Patent Owner") filed a Preliminary Response. Paper 7 ("Prelim. Resp."). Pursuant to 35 U.S.C.

[1] With the Board's approval, after our Institution Decision, Petitioner substituted the Declaration of Stuart J. Lipoff (Ex. 1021) for the declaration of Petitioner's original expert, Leonard Forys (Ex. 1003), while maintaining the identical substantive content of the original declaration. Per our Order granting authorization for the substitution, we consider cites to the original declaration in the Petition and other filed documents to refer to the substitute declaration. *See* Paper 18, 5. Therefore, we refer herein to Ex. 1021 instead of to Ex. 1003 as originally cited in the Petition.

§ 314, we instituted an *inter partes* review of all challenged claims on all grounds presented in the Petition:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–6, 11–13 | 103(a)[2] | Gilmore,[3] Dhara,[4] Dodrill[5] |
| 14, 16 | 103(a) | Gilmore, Creamer[6] |
| 15 | 103(a) | Gilmore, Creamer, Dhara |
| 7, 8 | 103(a) | Gilmore, Dhara, Dodrill, Creamer |
| 17 | 103(a) | Gilmore, Creamer, Fawcett[7] |
| 18 | 103(a) | Gilmore, Creamer, Dodrill |
| 9, 10, 29, 30 | 103(a) | Gilmore, Dhara, Dodrill, Ladd[8] |
| 20, 22, 23, 25–28 | 103(a) | Gilmore, Dodrill, Ladd |
| 24 | 103(a) | Gilmore, Dodrill, Ladd, Fawcett |
| 19 | 103(a) | Gilmore, Creamer, Dodrill, Ladd |
| 21 | 103(a) | Gilmore, Dodrill, Ladd, Patel[9] |

[2] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103, effective March 16, 2013. Because the '816 patent claims priority to an application that has an effective filing date before this date, the pre-AIA version of § 103 applies.

[3] Gilmore, et al., U.S. Pat. Pub. No. 2003/0216923 A1, published Nov. 20, 2003 (Ex. 1005, "Gilmore").

[4] Dhara, et al., U.S. Pat. Pub. No. 2003/0202504 A1, published Oct. 30, 2003 (Ex. 1009, "Dhara").

[5] Dodrill, et al., U.S. Pat. No. 6,766,298 B1, issued July 20, 2004 (Ex. 1006, "Dodrill").

[6] Creamer, et al., U.S. Pat. Pub. No. 2004/0122941 A1, published June 24, 2004 (Ex. 1010, "Creamer").

[7] Fawcett, et al., U.S. Pat. No. 5,802,526, issued Sept. 1, 1998 (Ex. 1017, "Fawcett").

[8] Ladd, et al., U.S. Pat. No. 6,269,336 B1, issued July 31, 2001 (Ex. 1016, "Ladd").

[9] Patel, et al., U.S. Pat. Pub. No. 2006/0256950 Al, published Nov. 16, 2006 (Ex. 1007, "Patel").

Paper 8 ("Institution Decision" or "Inst. Dec.").

Patent Owner filed a Response. Paper 20 ("PO Resp."). Patent Owner supported its Response with the Declaration of Dr. Vernon Thomas Rhyne, III. Ex. 2029. Petitioner filed a Reply to Patent Owner's Response. Paper 24 ("Reply"). Patent Owner filed a Sur-reply. Paper 32 ("Sur-reply").

An oral hearing was held on March 9, 2021. A copy of the transcript is included in the record. Paper 35 ("Tr.").

*B. Real Parties in Interest*

Petitioner identifies Google LLC as the real party in interest. Pet. 80. Patent Owner identifies Hammond Development International, Inc., as the real party in interest. Paper 4, 2.

*C. Related Matters*

Petitioner and Patent Owner both state the '816 patent has been asserted by Patent Owner in *Hammond Development International, Inc. v. Google LLC*, No. 6:19-cv-00356 (W.D. Tex.) and in *Hammond Development International, Inc. v. Amazon.com, Inc.*, No. 6:19-cv-00342 (W.D. Tex.). Pet. 81; Paper 31, 2. According to Patent Owner, these judicial proceedings have been consolidated and are currently stayed. Paper 31, 2. In addition to the present proceeding, the '816 patent is also the subject of a pending *inter partes* review proceeding brought by petitioner Amazon.com, Inc. ("Amazon") in IPR2020-01067.

Petitioner also states that "[t]he '816 patent is part of a family of patents that claim priority to U.S. Patent No. 9,264,483 [B2 (the '483 patent)]." Pet. 81. Petitioner sought an *inter partes* review of the '483 patent in IPR2020-00020 (the "020 IPR"). *Id.* We issued a Final Written Decision in the 020 IPR on April 12, 2021. 020 IPR, Paper 38. The '483 patent was also the subject of an *inter partes* review in IPR2020-00460 (the

"460 IPR"), brought by Amazon. On May 4, 2021, we issued a Judgment granting Patent Owner's request for adverse judgment after institution of trial and canceling all claims of the '483 patent. 460 IPR, Paper 34, 3.

Related U.S. Patent 10,264,032 B1 was also the subject of two *inter partes* review proceedings: IPR2020-00080 (Petitioner Google) (the "080 IPR") and IPR2020-01029 (Petitioner Amazon) (the "1029 IPR"). Pet. 81; Paper 31, 2–3. We issued a Final Written Decision in the 080 IPR on April 21, 2021. 080 IPR, Paper 38. We also issued a Judgment granting Patent Owner's request for adverse judgment after institution of trial and canceling all claims of the '032 patent on May 10, 2021. 1029 IPR, Paper 19, 3.

Finally, Petitioner states that pending U.S. Patent Application No. 16/389,170 "is part of the '816 patent family." Pet. 81.

*D. The '816 patent (Ex. 1001)*

The '816 patent, titled "Method and System for Enabling a Communication Device to Remotely Execute an Application," issued April 23, 2019, based on an application filed November 16, 2018. Ex. 1001, codes (22), (45), (54). The '816 patent claims priority, through a chain of continuation applications, to the '483 patent. *Id.* at code (63).

The '816 patent describes a communication system that establishes a communication session between a client device and a remote application server, which executes an application for the client, e.g., the remote application server "execut[es] an application for a thin-client device." *Id.* at 2:1–5, 2:45–57. Figure 1D of the '816 patent, reproduced below, shows an embodiment of a communication system.




FIG. 1D

Figure 1D shows a block diagram of a communications system and associated components. Ex. 1001, 2:65–67.

As shown in Figure 1D, "clients 18*a*–18*n* . . . couple to network 12 through one or more communications links 32 and/or one or more networks 14, 16." *Id.* at 4:7–9.[10] Additionally, "application servers 24 couple to network 12 through one or more communications links 30." *Id.* at 3:56–57. Further, repository 20 and application server 24 are connected via "a direct communication link 36." *Id.* at 11:1–3.

The communication system of the '816 patent "enables a client 18 to have one or more applications 28 executed remotely" by the application server 24. *Id.* at 6:13–18. A user of the client "initiates an information collection and/or retrieval process by communicating a request to application server 24." *Id.* at 6:16–18; *see also id.* at 5:50–52 ("In some embodiments,

[10] All bolding of reference numbers has been omitted in material quoted herein from the '816 patent and the prior-art references.

clients 18 can be configured to initiate a connection with repositories 20 and/or application servers 24."), 2:14–17 ("At least one of the one or more communication devices is operable to communicate a request to establish a communication session."). After that, "application server 24 notifies repository 20 that a communication session with client 18 has been requested." *Id.* at 6:40–42. "Repository 20 . . . operates to identify a desired application 28 and to communicate application 28, or portions thereof, to application server 24 for execution." *Id.* at 6:42–45. Further, "[u]pon receipt of application 28, application server 24 executes application 28 and begins a communication session with client 18a." *Id.* at 6:45–47. In particular, "application server 24 begins the process of communicating information to and/or retrieving information from client 18a" by "requesting that the user of client 18a respond to a series of queries associated with application 28." *Id.* at 6:47–49, 7:6–12. For example, application server 24 executes an application based on voice extensible markup language (Voice XML) that "enables application server 24 to interact with and collect information from client 18a." *Id.* at 6:50–53. "[A]pplication server 24 communicates information relating to portions of Voice XML-based code to client 18*a* for execution on client 18*a*," e.g., "by requesting that the user of client 18*a* respond to a series of queries associated with application 28." *Id.* at 7:6–12. The "user of client 18*a* responds to each of the series of queries by 'speaking' a response to each query communicated to client 18*a* for execution." *Id.* at 7:16–19.

*E. Illustrative Claims*

Of the challenged claims, claims 1, 14, 20, and 29 are independent. Claims 2–13 depend, directly or indirectly, from claim 1; claims 15–19 depend, directly or indirectly, from claim 14; and claims 21–28 depend,

directly or indirectly, from claim 20; and claim 30 depends from claim 29. Claims 1, 14, 20, and 29, reproduced below, illustrate the claimed subject matter[11]:

> 1. [1preamble] A communication system comprising:
>
> [1a] an application server coupled to a first communication link and coupled to a second communication link, the first communication link and the second communication link each comprising a data connection,
>
> [1b] the application server adapted to establish a communication session with at least one communication device coupled to the first communication link in response to a request from the at least one communication device to establish the communication session,
>
> [1c1] wherein the application server comprises a voice processing software program and
>
> [1c2] the request from the at least one communication device comprises packetized voice data;
>
> [1d] a repository having access to an application comprising at least a portion of computer code;
>
> [1e] wherein the application server is either (a) configured to receive the application via the second communication link, or (b) configured to cause an execution of the application via the second communication link;
>
> [1f] wherein the application server is configured to execute or cause the execution of the application remote from the at least one communication device;
>
> [1g] wherein the voice processing software program is configured to generate a voice representation of information derived from the application;

[11] We have added numbering to the elements in keeping with the numbering used by the parties. *See* Pet. ii–x; Ex. 2001 (App. of Challenged Claims).

[1h] wherein the application server is configured to transmit the voice representation and a request for processing service over the first communication link to the at least one communication device; and

[1i] wherein the request for processing service comprises an instruction to present a user of the at least one communication device the voice representation.

Ex. 1001, 13:38–14:3.

14. [14preamble] A communication system, comprising:

[14a] a plurality of application servers;

[14b] a first communication link coupled to the plurality of application servers, the first communication link comprising a data connection;

[14c] a first one of the plurality of application servers configured to execute a first application to establish a communication session with at least one communication device coupled to the first communication link in response to a request from the at least one communication device to establish the communication session;

[14d] a second one of the plurality of application servers coupled to a second communication link, the second one of the plurality of servers either (a) configured to receive a second application from at least one repository having a database maintaining the second application over the second communication link, or (b) configured to cause an execution of the second application via the second communication link;

[14e] wherein the second communication link comprises a data connection;

[14f] wherein the second one of the plurality of application servers is configured to execute or cause the execution of the second application remote from the at least one communication device;

[14g] wherein at least one of the plurality of application servers is configured to communicate a request for processing service to the at least one communication device; and

[14h] wherein the request for processing service is communicated to the at least one communication device over the first communication link.

*Id.* at 14:47–15:10.

20. [20preamble] An interactive, voice-based communication system, comprising:

[20a] at least one application server coupled to a first communication link and coupled to a second communication link, the first communication link and the second communication link each comprising a data connection,

[20b] the at least one application server operable to establish a communication session in response to a request from at least one communication device;

[20c] at least one repository coupled to the second communication link, the at least one repository either (a) configured to transmit at least one portion of an application to the at least one application server, or (b) configured to execute the at least one portion of the application;

[20d] wherein the communication session comprises an exchange of packetized voice data from the at least one communication device and packetized voice data or audio data from the at least one application server;

[20e] wherein the at least one application server comprises a first voice recognition application, a speech-to-text application, and a text-to-speech application;

[20f] wherein the first communication link comprises the Internet; and

[20g] wherein the at least one portion of the application is maintained in the at least one repository or a database coupled to the at least one repository.

*Id.* at 15:30–55.

29. [29preamble] A method of providing responses in an interactive, voice-based communication system, comprising:

[29a] receiving, by at least one application server over a first communication link, a request from at least one communication device, wherein the request comprises packetized voice data;

[29b] translating, by the at least one application server, the packetized voice data to a text representation using a first application;

[29c] identifying, by the at least one application server or at least one repository coupled to the at least one application server, a second application to be executed in response to the request using the text representation;

[29d] executing at least one portion of the second application;

[29e] transmitting, by the at least one application server, packetized voice or audio data to the at least one communication device, the packetized voice or audio data responsive to the request;

[29f] wherein the first communication link comprises a data connection;

[29g] wherein the first communication link further comprises the Internet; and

[29h] wherein the at least one portion of the second application is maintained in the at least one repository or a database coupled to the at least one repository.

*Id.* at 16:31–55.

## III. ANALYSIS

We have reviewed the parties' respective briefs as well as the relevant evidence discussed in those papers. For the reasons discussed in detail below, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–13 and 20–30 of the '816 patent are unpatentable under 35 U.S.C. § 103 as having been obvious, but that Petitioner has not

shown by a preponderance of the evidence that claims 14–19 are unpatentable.

### *A. Principles of Law*

To prevail in its challenges to the patentability of all claims of the ’816 patent, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d) (2019). “In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable.” *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (2012) (requiring *inter partes* review petitions to identify “with particularity . . . the evidence that supports the grounds for the challenge to each claim”)). This burden of persuasion never shifts to patent owner. *See Dynamic Drinkware, LLC v. Nat’l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015); *see also In re Magnum Oil Tools Int’l, Ltd.*, 829 F.3d 1364, 1375–78 (Fed. Cir. 2016) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable for obviousness if, to one of ordinary skill in the pertinent art, “the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made.” 35 U.S.C. § 103(a) (2006); *see also KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of

nonobviousness.[12] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). A petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *Magnum Oil*, 829 F.3d at 1380. Moreover, a decision on the ground of obviousness must include "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

We analyze Petitioner's asserted grounds of unpatentability in accordance with the above-stated principles.

### *B. Level of Ordinary Skill in the Art*

We consider the asserted grounds of unpatentability in view of the understanding of a person of ordinary skill in the art and, thus, begin with the level of ordinary skill in the art. The level of ordinary skill in the art is "a prism or lens through which . . . the Board views the prior art and the claimed invention" to prevent hindsight bias. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

Relying on the declaration testimony of Mr. Lipoff, Petitioner contends that a person of ordinary skill in the art of the '816 patent "would have at least a bachelor's degree in Computer or Electrical Engineering, Computer Science, or equivalent engineering discipline, and approximately three years' experience working on remotely-processed applications and data networking, including voice-related applications and voice-over packet technologies." Pet. 5 (citing Ex. 1021 ¶ 50).

[12] The parties do not direct our attention to any evidence of objective indicia of nonobviousness.

Patent Owner disagrees with Petitioner's characterization of an ordinarily skilled artisan and argues that "a person of ordinary skill in the art of the '816 patent at the time of invention would have had at least a bachelor's degree in Computer or Electrical Engineering, Computer Science, or equivalent discipline, and approximately one to two years of work experience in data networking." PO Resp. 22. Patent Owner further argues that "the level of ordinary skill is not a rigid formula," and that "[m]ore education with less experience or more experience with less formal education could equally qualify an individual" as an ordinarily skilled artisan. *Id.* (citing Ex. 2029 ¶ 41). Patent Owner's proposed level of skill thus includes fewer years of work experience, but in only "data networking" (as opposed to Petitioner's definition, which requires work experience on both remotely-processed applications and data networking), and Patent Owner urges a less rigid requirement.

To the extent necessary herein, we apply Patent Owner's definition of the level of ordinary skill in the art, as we did in the Institution Decision. Inst. Dec. 12–14. We determine the definition offered by Patent Owner is consistent with the teachings of the '816 patent and the prior art of record. *Cf. Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (noting that the prior art itself may reflect an appropriate level of skill in the art). We note, however, that neither party explains how the differences in the parties' competing proposals are material to the issues before us. We further note that our adoption of Patent Owner's proposed definition does not reflect a view that adopting Petitioner's competing definition of the level of ordinary skill in the art would have any impact on the outcome of this proceeding. To the contrary, our fact findings would be the same under either party's definition.

### *C. Claim Construction*

In interpreting the claims of the ’816 patent, we “us[e] the same claim construction standard that would be used to construe the claim[s] in a civil action under 35 U.S.C. [§] 282(b).” *See* 37 C.F.R. § 42.100(b). The claim construction standard includes construing claims in accordance with the ordinary and customary meaning of such claims as would have been understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. *See id.*; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc).

We did not expressly construe any terms in our Institution Decision, in part because neither party presented any terms expressly for construction. Inst. Dec. 16; *see also* Pet. 5; Prelim. Resp. 30–31. We did, however, address, within the context of our obviousness analysis, the parties’ apparent dispute regarding the term “establish the communication session.” Inst. Dec. 14–15, 29–34. We advised that “the parties may wish to further develop the record at trial as to how an ordinarily skilled artisan, at the time of the invention, would have interpreted ‘communication session’ and would have understood when a ‘communication session’ is ‘established,’ in light of the disclosure of the ’816 patent.” *Id.* at 15; *see also id.* at 33–34.

In its Response, Patent Owner takes issue with Petitioner’s position that no claim terms need to be construed. PO Resp. 15–16; *see also* Pet. 5. Specifically, Patent Owner argues that Petitioner “sought specific constructions for *ten* terms from the ’816 patent” in the co-pending district court litigation, but none in this proceeding, and suggests that Petitioner’s failure to offer the same constructions here means that Petitioner has failed to satisfy its obligations in this proceeding. PO Resp. 16. We disagree. Although Patent Owner is correct that the same claim construction standards

apply to this proceeding as to the district court proceeding, the common standard does not mandate that all claim construction disputes submitted to the district court must also be aired here. Rather, "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (*citing Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

Patent Owner then argues that the Board should adopt the same constructions adopted by the district court for several terms of the '816 patent, PO Resp. 17–20, and also proposes a construction for one other term not construed by the district court, *id.* at 20–21. We address those terms below.

*1. "request . . . to establish the communication session"*

Independent claims 1 and 14 recite a "request from the at least one communication device to establish the communication session." Ex. 1001, 13:46–47 (claim 1), 14:56–57 (claim 14). In our Institution Decision, we noted an apparent dispute between the parties over whether a telephone call to a host system was a "request" to "establish the communication session," as Petitioner argued, or was itself sufficient to actually establish such a session, as Patent Owner argued in its Preliminary Response. Inst. Dec. 29–34 (citing Pet. 13–15 (arguing that the phone call in Gilmore is merely a request, and the communication session is thereafter established by the gateway executing an interactive voice application), Prelim. Resp. 38 (arguing, in describing Gilmore's teachings, that "dialing a telephone number is not a request to establish a communication session; rather, it *is*

*itself* the establishment of a call session")[13]). We preliminarily determined, for purposes of our Institution Decision, that "an ordinarily skilled artisan would have understood that a communication device placing a telephone call to a voice response system . . . does not itself 'establish' a communication session, but rather is a 'request' to establish such a session." Inst. Dec. 34. We further noted that "the parties may wish to develop the record further at trial as to how an ordinarily skilled artisan, at the time of the invention, would have interpreted 'communication session,' and would have understood when a 'communication session' is 'established,' in light of the disclosure of the '816 patent." *Id.* at 35–36.

In its Response, Patent Owner states the district court determined the phrase "request . . . to establish [a/the] communication session" should be "given its plain and ordinary meaning," but "the request must occur *before* the establishment of the communication session." PO Resp. 17 (emphasis added) (quoting Ex. 2009, 1). Patent Owner does not, however, further address the construction of this entire term. Instead, Patent Owner focuses its evidence and arguments on what it deems the characteristics of a "communication session," while acknowledging that neither party requested the district court to construe "communication session." *Id.* at 17–19.

In particular, Patent Owner argues, relying on the testimony of Dr. Rhyne, that the ordinarily skilled artisan would have understood that a "communication session" in the context of the '816 patent "has certain characteristics." *Id.* at 17. Namely, according to Patent Owner, a

[13] Patent Owner now argues that we misunderstood Patent Owner's arguments from the Preliminary Response, and that what Patent Owner argued was that "a phone call (or 'call session') is not a communication session." PO Resp. 41–42 (emphasis omitted).

communication session "(a) is a 'session' with a beginning and an end (b) that is the result of a *processed request* and (c) that includes an exchange of information (d) between an application server and (e) a client device (f) *over a data connection*." *Id.* at 17–18 (emphases added) (footnotes omitted) (citing Ex. 2029 ¶ 51). Patent Owner further argues that, "[a]t its most essential, the 'communication session' of the '816 patent is a temporary information exchange between computing devices over a data connection in response to a request from a client device." *Id.* at 18. Patent Owner then argues that, accordingly, a "communication session" as claimed by the '816 patent "is *not* satisfied by a mere telephone call." *Id.* at 19 (citing Ex. 2029 ¶ 52).

Petitioner responds that Patent Owner "does not argue that its [narrower construction or additional requirements] are material to patentability, . . . so the Board need not address them." Reply 5–6. Petitioner then counters Patent Owner's asserted characteristics of a communication session, contending, among other things: (1) a "computing device" is not required for the client device because the '816 patent describes communication sessions over a telephone network, *id.* at 6 (citing Ex. 1001, 3:61–4:6, 5:64–6:7); and (2) construing a "communication session" as being "in response to a request from a client device" would be redundant of other limitations in the claims, *id.* at 7. Petitioner notes the '816 patent describes a "communication session" as "the process of communicating information to and/or retrieving information from client 18a," and "enabl[ing] application server 24 to interact with and collect information from client 18a" through, for example, queries to and responses from a user. *Id.* at 7–8 (quoting Ex. 1001, 6:45–53, 7:6–19; citing *id.* at 5:59–64 (alteration in original)).

In its Sur-reply, Patent Owner argues that it proposed to the district court, and now advocates here, that the "communication session" terms carry their "plain and ordinary meaning." Sur-reply 6–7. Patent Owner then reiterates its position that "the telephone call of *Gilmore* cannot be a communication session" because a "computing device" is required for the client device, as illustrated by the district court's construction of a different term—"request for processing service." *Id.* at 7–9. Patent Owner further argues that, because a request to establish a communication session must occur *before* the communication session is established, a session cannot be established *until the request is processed*. *Id.* at 9–10.

The parties' arguments post-institution do not reveal a material dispute over the construction of the term "communication session" itself. Rather, the parties' disputes hinge on different claim terms, including "request for processing service." *See, e.g.*, PO Resp. 20–21; Reply 9–11; Sur-reply 8–13. We address that construction below. To the extent necessary, we construe a "communication session," consistent with the disclosure of the '816 patent, as the process of a communication device communicating information to, and/or retrieving information from, another communication device. *See* Ex. 1001, 6:47–49.

We determine that we need not further construe this term to resolve the parties' disputes herein; rather, as noted, the parties' disputes invoke additional terms, which we address below.

*2. "request for processing service"*

Independent claims 1 and 14 recite that the communication device receives a "request for processing service" from the application server, and further recite "wherein the request for processing service comprises an instruction to present a user of the at least one communication device the

voice representation." Ex. 1001, 13:64–14:3, 15:5–7. Claim 26, which depends indirectly from independent claim 20, similarly recites that the communication device receives a "request for processing service" from the server, and further recites that the request is part of "at least one instruction transmitted by the at least one server to the at least one communication device." *Id.* at 16:7–11. We first summarize the parties' positions, then turn to our analysis of this term.

*a) The parties' positions*

Patent Owner addresses "request" separately from "processing service." *See* PO Resp. 19 ("processing service[]" terms), 20–21 ("request"). As to the term "request," Patent Owner acknowledges that the parties did not ask the district court to construe that term, but argues that it should be afforded its "plain and ordinary meaning." *Id.* at 20. According to Patent Owner, the plain and ordinary meaning of "request" in the context of the '816 patent is "an action at the computer-code-instruction level." *Id.* As support, Patent Owner quotes several passages from the written description of the '816 patent that Patent Owner argues "make[] clear that the 'requests' in the '816 patent are instructions that must be processed or handled by system components." *Id.* at 21–23 (citing Ex. 1001, 6:16–18, 7:47–49, 7:66–8:4, 8:31–34, 9:1–3, 12:64–13:3; Ex. 2029 ¶ 53).

In its Reply, Petitioner contends that "[t]he plain meaning of 'request' is an 'act or an instance of asking for something' or 'the state of being sought after.'" Reply 9 (quoting Ex. 1024, 3). Petitioner contends that the district court rejected Patent Owner's construction of "request" as "an action at the computer-code-instruction level" when the district court construed

"terms including 'request' as [having their] plain meaning." *Id.* (citing Ex. 2009, 1–2).

As to "processing service," Patent Owner argues that the district court construed that term as "a computing process performed by a communication device for all or part of the application." PO Resp. 19 (quoting Ex. 2009, 2). Patent Owner contends "[t]his is an important construction because it recognizes that the '816 patent recites a communication device that processes instructions sent by an application server." *Id.* Petitioner, on the other hand, "maintains that claim construction is not necessary," but contends that "the Petition shows unpatentability under both [Patent Owner's] and the district court's constructions." Reply 11 (citing Pet. 31–36).

*b) Arguments and construction in the district court*

The district court's order on claim construction does not provide reasoning behind the constructions adopted therein. *See* Ex. 2009. However, we find instructive that the district court, in construing "processing service(s)," essentially adopted a construction proposed by Petitioner (aside from excluding the negative limitation at the end of Petitioner's proposal). Specifically, Petitioner proposed construing "request for [a] processing service" as a "request for a communication device to perform a computing process for the application *that constitutes more than acting as a speaker or input device*." Ex. 2012, 24 (emphasis added).[14] Petitioner similarly proposed construing "processing service(s)" as "a computing process performed by a communication device for the application

[14] For ease of reference, we refer herein to the original pagination of the district court papers.

*that constitutes more than acting as a speaker or input device*." *Id.* (emphasis added). The district court essentially adopted Petitioner's proposed construction for "processing service(s)," except for the italicized portion quoted above, and determined that "request for [a] processing service" should be afforded its "[p]lain and ordinary meaning." *See* Ex. 2009, 2 (stating that "request for [a] processing service" is given its "[p]lain and ordinary meaning" and that "processing service(s)" is "a computing process performed by a communication device for all or part of the application" (first alteration in original)).

In support of its proposed constructions, Petitioner argued:

> The specification confirms that the "services" are provided to the "application." It describes that the application server executes an application and sends a "request for processing service" to the communication device. The communication device performs the "processing service" for the application to assist with the interaction between the communication device and the remotely executed application. The claims also all recite that a "request for processing service" is sent to a communication device after the step wherein the application is executed.

Ex. 2012, 26 (citations omitted).

Patent Owner, on the other hand, proposed construing "processing service(s)" as "automated operation of a hardware component on [a]/[the] [communication device]/[client device]." Ex. 2011, 14 (alterations in original). Patent Owner argued that the "processing service(s)" are "'automated' at least because they are controlled by computer code instructions." *Id.*

Petitioner argued that Patent Owner's proposed construction for "processing service(s)" was under-inclusive in requiring "automated operation," reasoning that "the specification gives examples of 'processing

services' that are not 'automated' and instead require user input to the processing service." Ex. 2012, 27. "For instance," Petitioner continued, "the application server may communicate a 'voice recognition software program' to 'assist client 18a in executing one or more queries associated with the VoiceXML-based application.' To perform the 'processing service,' the communication device needs user input. This processing service is thus not an 'automated operation.'" *Id.* (citation omitted).

Patent Owner responded by characterizing Petitioner's argument as "conflat[ing] the *processing service* (*i.e.*, the activity performed by the device) with the *user's interaction with the device* (*i.e.*, the user's spoken response to the microphone in the communication device)." Ex. 2014, 18–19. Patent Owner then asserted that human interaction does not provide the automated processing that Patent Owner asserts is required by the '816 patent claims:

> Humans do not process computer code instructions the same way a communication device does. This is the same mistake [Petitioner] makes in every one of its IPR Petitions, where it argues that playing an audio prompt on the host side of the system for the user to listen to on a telephone call is a "request for processing service." It is not, because it does not provide for any processing of instructions *on the client device*—it solicits only a spoken or touchtone response *from the user*, which is processed on the host side. In contrast, in the ['816 patent] . . . the application server transmits executable instructions to the communication device. Contrary to [Petitioner's] under-inclusive argument, this processing is "automated" (as in [Patent Owner's] construction) because it results from the automatic processing of instructions on the communication device. For example, if the instruction to the communication device is to activate a microphone and listen for a spoken response, that instruction is executed whether the user gives a spoken response or not. [Petitioner's] example therefore fails.

*Id.* at 19.

*c) Analysis*

Turning first to the term "request," we note that the '816 patent uses this term broadly, spanning different contexts beyond those described in the excerpts quoted by Patent Owner. *See* PO Resp. 21–22. For example, in describing Figure 1A, the '816 patent describes client 18a as initiating "an information collection and/or retrieval process by communicating a request to application server 24." Ex. 1001, 6:16–18. The '816 patent further states that "any of clients 18*a*–18*n* could initiate the communication session with application server 24." *Id.* at 6:20–22. As illustrated in Figure 1, clients 18*a*–18*n* include cell phones, personal digital assistants ("PDAs"), Wi-Fi devices, and IP phones. *Id.* at Fig. 1A; *see also id.* at 4:22–27, 6:5–7. The '816 patent further states that "[l]andline phones and/or IP phones can also communicate with repository 20 and/or application server 24 in the same manner as mobile phones." *Id.* at 6:5–7. Thus, by describing that a "request" may be sent by a landline phone, and not just by a cell phone or computer, the '816 patent uses the term "request" without limiting it to "an action at the computer-code-instruction level," as Patent Owner argues. *See* PO Resp. 20. We, therefore, do not adopt Patent Owner's proposed construction of "request." We do not need to further construe that term to resolve the parties' disputes herein.

Turning next to "processing services," we note that the '816 patent describes "processing services" in the context of a "thin-client" as the client device. *See, e.g.*, Ex. 1001, 4:18–22. The '816 patent states that such a client "may include, for example, a wireless device, a voice over IP device, a desktop computer, a laptop computer, a personal digital assistant, a cell-phone, a Wi-Fi device, a workstation, a mainframe computer, a mini-frame

computer, a web server, or any other computing and/or communicating device." *Id.* at 4:22–27. The '816 patent further describes the processing services provided by a thin-client as "execut[ing] portions of code to assist with the interaction with remotely executed application 28." *Id.* at 6:32–33. By way of example, the '816 patent describes the application server as executing "a VoiceXML-based application" that enables the application server to interact with and collect information from the client. *Id.* at 6:49–53. In that example, the application server communicates a voice recognition software program to the client, which the client then uses to convert a user's spoken responses to a series of queries into data that is packetized and communicated, in a packet-based communication, back to the application server. *Id.* at 7:1–22. The application server then "receives and decodes the user's responses to each of the queries associated with the Voice XML-based application." *Id.* at 7:25–27.

Thus, in the context of the '816 patent, a "request for processing service" comes from, e.g., a server, and encompasses a request for a client device to process a user's spoken responses into, e.g., packetized data that can then be returned to the server for use in executing the application. This description is consistent with the construction of "processing service" adopted by the district court, as "a computing process performed by a communication device for all or part of the application" (Ex. 2009, 2), which, as noted above, is a broader version of what Petitioner advocated before the district court (Ex. 2012, 24) and is the same as what Patent Owner advocates here (PO Resp. 19).

We, therefore, construe "processing service" as "a computing process performed by a communication device for all or part of the application."

*3. "application"*

Independent claims 1, 14, 20, and 29 recite "an application." Ex. 1001, 13:52–53, 14:52–55, 15:40–43, 16:37–39. For example, claim 1 recites that the application is executed by an application server that is remote from a communication device (e.g., client device). *Id.* at 13:58–63.

Patent Owner states that the district court construed the term "application[]" according to "its plain and ordinary meaning." PO Resp. 20. Patent Owner purportedly agrees with the district court's approach, but further contends that, consistent with the use of the term in the '816 patent and in the cited prior art, the ordinarily skilled artisan "would understand that an application is not merely a script or variable *used by an application* to interact with a user or a communication device." *Id.* (citing Ex. 2029 ¶¶ 100–105).

Petitioner did not propose a construction of "application" in the Petition. Pet. 5. In response to Patent Owner's proposal, Petitioner contends that "[t]he plain meaning of 'application' in the '816 patent is 'functionality that is capable of facilitating the ability to collect information from and/or present information to one or more clients . . . or users of [the] system.'" Reply 4–5 (quoting Ex. 1001, 4:45–49 (third alteration in original)).

As discussed in more depth below, the parties' dispute regarding the meaning of "application" is material to whether Gilmore's VoiceXML scripts are excluded from the scope of "application(s)" as recited in the '816 patent claims, as Patent Owner contends. *See* PO Resp. 33–35 (arguing that VoiceXML scripts are not applications but are scripts used by an application); *but see* Reply 12–14 (arguing that VoiceXML scripts provide the functionality of an application as described in the '816 patent). We preview that dispute here to provide context for the parties' competing

constructions.

The ’816 patent provides an explicit description of the term “application,” stating:

> As used throughout this document, the term “application” *refers to functionality that is capable of facilitating the ability to collect information from and/or present information to one or more clients 18 or users of system 10.* In one particular non-limiting example, application 28 comprises a series of queries requesting information from and/or presenting information to a user of client 18. In some cases, applications 28 may include, for example, a Voice XML-based application, an HTML-based application, an XML-based application, an XIVR-based application, or a combination of these or other application formats. Applications 28 may comprise, for example, software, firmware, code, portions of code, a program, a web-page, information compilations, and/or a combination of these or any other types of utilities. In other embodiments, database 22 may be capable of storing, for example, one or more functions and/or other information.

Ex. 1001, 4:45–61 (emphasis added). This broad description includes not just “software” and “program(s),” but also includes, e.g., “a series of queries requesting information” as well as “information compilations.” *Id.* As such, this description is broader than Patent Owner’s apparent contention that the “plain and ordinary meaning” of the term “application” is an executable program, which does not encompass merely a “script” that may be “used by an application.” *See* PO Resp. 20; Sur-reply 4 (“While there may be a voice application that is executed in *Gilmore*, it is not the script files Petitioner consistently relies on in its Petition.”).

At oral argument, Patent Owner argued that the ’816 patent’s use of the term “comprises” in describing the above-quoted example of an application that “comprises a series of queries requesting information from and/or presenting information to a user of client 18” means that a “series of

queries requesting information" is *not* sufficient to constitute an "application." Tr. 20:15–21:11. That is, Patent Owner argued that use of the open-ended term "comprises" means that *more is required* for an application than the listed items, and thus the above-quoted description means only that, for example, a "series of queries" could be *part of* an application or a piece of an application, but is not an application *per se*. *Id.* at 23:6–13 (characterizing an "application" as "the component that truly provides the functionality" and stating that "something that goes into an application, such as a script or a word, that the application then operates upon . . . is different than what an application is").

Patent Owner's argument is unavailing. From a logical standpoint, if the '816 patent's written description were listing items that are merely a *portion* of some larger (albeit undefined) "application" entity, it would not list both "code" as well as "portions of code," much less include broader categories of "software" and "program[s]" in the same list. The more logical reading of the quoted passage is that any one of the listed items is an example of an "application," as long as it provides "functionality that is capable of facilitating the ability to collect information from and/or present information to one or more clients 18 or users of system 10." Ex. 1001, 4:45–49.

Based on the description provided in the '816 patent, we construe the term "application" as "functionality that is capable of facilitating the ability to collect information from, and/or present information to, one or more client devices or users."

*4. Other terms*

We determine that we do not otherwise need to expressly construe any other terms for purposes of this Decision. *See Nidec Motor Corp.*, 868 F.3d at 1017.

*D. Asserted References*

Before turning to Petitioner's asserted grounds of unpatentability, we provide a brief summary of the asserted references.

*1. Gilmore (Ex. 1005)*

Gilmore is a published U.S. Patent Application entitled "Dynamic Content Generation for Voice Messages." Ex. 1005, code (54). Gilmore was published on November 20, 2003 (*id.* at code (43)), and is thus prior art under 35 U.S.C. § 102(b). Pet. 1. Patent Owner does not dispute the prior-art status of Gilmore.

Gilmore's method "simulate[s] a conversation with the caller" using an automated voice response system having a voice gateway that presents a generated voice message to a telephone caller. Ex. 1005 ¶¶ 10, 39; *see also id.* ¶ 3. Figure 2 shows such a voice response system and is reproduced below.




Fig. 2

> Figure 2 shows a block diagram of a voice communications system and associated components. Ex. 1005 ¶ 17.

As shown in Figure 2, users of voice communications device 202, e.g., a telephone, place calls using voice/data network 204. *Id.* ¶¶ 33, 38. According to Gilmore, such networks include the following:

> [A] circuit-switched voice network such as the public switched telephone network (PSTN), a packet-switched data network, or any other network able to carry voice. Data networks may include, for example, Internet protocol (IP)-based or asynchronous transfer mode (ATM)-based networks and may support voice using, for example, Voice-over-IP, Voice-over-ATM, or other comparable protocols used for voice data communications.

*Id.* ¶ 31; *see also id.* ¶ 36. The "[i]ncoming calls are answered by the telephony services and signal processing component 208a of the voice gateway 208" (*id.* ¶ 38), i.e., the voice gateway "responds to the calls in accordance with a voice program" (*id.* ¶ 33). In particular, an interpreter program in the voice gateway responds to the incoming calls by "retrieving and executing voice programs," and "application server 212 provides the execution environment for voice applications." *Id.* ¶¶ 39–40. Each voice application "may be a combination of, for example, java servlets, java server pages, other java code, and voice scripts such as VoiceXML scripts or SALT scripts." *Id.* ¶ 40. "In typical operation, the voice gateway 208 retrieves the initial voice script from local memory and/or from the application server 212 and . . . execut[es] the voice-specific instructions within the script." *Id.* ¶ 48. The "voice-specific instruction may be a prompt instruction," i.e., a request for the user to respond with user input. *Id.* ¶¶ 39, 48.

*2. Dhara (Ex. 1009)*

Dhara is a published U.S. Patent Application entitled "Method of Implementing a VXML Application into an IP Device and an IP Device having VXML Capability." Ex. 1009, code (54). Dhara was published on October 30, 2003 (*id.* at code (43)), and thus is prior art under 35 U.S.C. § 102(b). Pet. 1. Patent Owner does not dispute the prior-art status of Dhara.

Dhara discloses an IP device, e.g., an IP phone, personal digital assistant, wireless communication device, that executes the instructions of a "voice extensible markup language (VXML)" script file "to establish an audio interface with . . . the user of the IP device." Ex. 1009 ¶¶ 7, 19. Figure 2 shows such an IP device and is reproduced below.




FIG. 2

Figure 2 shows a block diagram of an IP device in a computer network system. Ex. 1009 ¶¶ 11, 28.

As shown in Figure 2, "IP device 102" includes components for "implementing a [VoiceXML] application to provide an audio interface to a user of the device 102." *Id.* ¶ 20. In particular, the IP device includes a VoiceXML browser 126 that contains instructions to "implement an audio interface accessible to a user of the IP device 102." *Id.* ¶ 23. Further, IP device 102 includes "a text-to-speech (TTS) module 204," which converts text into synthesized speech for IP device 102. *Id.* ¶ 28; *see also id.* ¶ 25. The text to be converted into speech is transmitted to the IP device in VoiceXML script files from VoiceXML server 106. *Id.* ¶¶ 24, 31–32. For

example, the VoiceXML script includes "an instruction contain[ing] a text prompt element." *Id.* ¶ 32.

### *3. Dodrill (Ex. 1006)*

Dodrill is a U.S. Patent entitled "Application Server Configured for Dynamically Generating Web Pages for Voice Enabled Web Applications." Ex. 1006, code (54). Dodrill issued on July 20, 2004 (*id.* at code (45)), and thus is prior art under 35 U.S.C. § 102(b). Pet. 1. Patent Owner does not dispute the prior-art status of Dodrill.

Dodrill teaches a "web-based voice messaging system [that] provides voice application control between a [user's] web browser and an application server." Ex. 1006, code (57). The web browser is provided by a client, e.g., a "thin client." *Id.* at 3:4–9, 3:16–22. The "application server executes a voice-enabled web application by runtime execution of extensible markup language (XML) documents that define the voice-enabled web application to be executed." *Id.* at 5:7–10. Those "XML pages are stored as XML applications and functions 96, for example within a document database accessible by the application server." *Id.* at 9:16–19.

### *4. Creamer (Ex. 1010)*

Creamer is a published U.S. Patent Application entitled "Customized Interactive Voice Response Menus." Ex. 1010, code (54). Creamer was published on June 24, 2004, *id.* at code (43), and is thus prior art under 35 U.S.C. § 102(b), *see* Pet. 1. Patent Owner does not dispute the prior-art status of Creamer.

Creamer relates to a method for providing customized interactive voice response (IVR) menus, which includes "monitoring user interactions with an [IVR] system." Ex. 1010, code (57). Creamer teaches that the "IVR system 125 can include one or more IVR applications hosted on one or more

IVR servers." *Id.* ¶ 25. Creamer teaches that, in one embodiment, "the IVR system 125 can include a stand-alone solution contained within a single server interfacing directly with the telecom network 110 without being communicatively linked to the computer communications network 120." *Id.* In another embodiment, "[t]he IVR system 125 can alternatively be implemented by multiple servers in a distributed fashion." *Id.*

5. *Fawcett (Ex. 1017)*

Fawcett is a U.S. Patent entitled "System and Method for Graphically Displaying and Navigating Through an Interactive Voice Response Menu." Ex. 1017, code (54). Fawcett issued on September 1, 1998, *id.* at code (45), and thus is prior art under 35 U.S.C. § 102(b), *see* Pet. 2. Patent Owner does not dispute the prior-art status of Fawcett.

Fawcett relates to the "graphical and textual display of [IVR] information." Ex. 1017, 1:15–16. Figure 4 of Fawcett, reproduced below, shows "a block diagram showing a layered software support messaging architecture used to produce a graphical display." *Id.* at 4:40–43.




Figure 4 is a block diagram of Fawcett's layered software support messaging architecture. Ex. 1017, Fig. 4.

Fawcett teaches that data and commands are passed between the client and the server via a "socket connection" 56. *Id.* at 7:19–23, 7:33–34.

Fawcett teaches that it "is well known in the art" that "a socket is a communication object from which messages are sent and received," and that "[s]ockets are common inter-process communication objects in many operating systems." *Id.* at 7:34–38. As examples of sockets, Fawcett lists "VoiceView™ sockets, UNIX® sockets, or datagrams, TCP/IP sockets, IPX or other sockets." *Id.* at 7:39–42. In addition, Fawcett teaches that "[c]ommunication between a particular interpreter and agent occurs via a socket identifier allocated to the pair." *Id.* at 8:4–5.

*6. Ladd (Ex. 1016)*

Ladd is a U.S. Patent entitled "Voice Browser for Interactive Services and Methods Thereof." Ex. 1016, code (54). Ladd issued on July 31, 2001, *id.* at code (45), and thus is prior art under 35 U.S.C. § 102(b), *see* Pet. 2. Patent Owner does not dispute the prior-art status of Ladd.

Ladd relates to "methods and systems to allow a user to access information from an information source." Ex. 1016, 1:22–25. Ladd teaches that the "system 100 enables users to access information from any location in the world via any suitable network access device." *Id.* at 2:40–42. Further, "users can preferably access information from the information source 106 using voice inputs or commands." *Id.* at 2:48–49.

In one embodiment, the system includes a voice recognition (VRU) server 234. *Id.* at 6:65–7:1. The VRU server 234 "receives speech communications from the user," "processes the speech communications and compares the speech communications against a vocabulary or grammar stored in the database server unit 244 or a memory device," and "provides output signals, representing the result of the speech processing." *Id.* at 8:55–63.

Ladd teaches that the VRU server 234 "preferably includes a text-to-speech (TTS) unit 252, an automatic speech recognition (ASR) unit 254, and a speech-to-text (STT) unit 256." *Id.* at 9:1–3. "The TTS unit 252 processes the textual data and converts the data to voice data or information." *Id.* at 9:8–10. "The STT unit 256 of the VRU server 234 receives speech inputs or communications from the user and converts the speech inputs to textual information (i.e., a text message)." *Id.* at 9:45–47. Ladd teaches that the textual information can be sent to the markup language servers and a voice browser. *Id.* at 9:48–51. Ladd teaches that "voice browser 250 generates a content request (i.e., an electronic address) to navigate to a destination" providing information, such as a URL. *Id.* at 11:30–36.

*7. Patel (Ex. 1007)*

Patel is a published U.S. Patent Application entitled "System and Method for Improved Contact Center Services to Disabled Callers." Ex. 1007, code (54). Patel published on November 16, 2006, *id.* at code (43), and is prior art under 35 U.S.C. §§ 102(a), (e), *see* Pet. 1. Patent Owner does not dispute the prior-art status of Patel.

Patel is directed to a system for providing automated voice response call services. Ex. 1007 ¶¶ 2, 10. In particular, "[w]hen a person with a disability calls into a call or contact center the caller's disability is identified . . . an initial menu prompt may ask the caller to make a certain keypad, touch-tone, or voice response if they have a disability and would like to receive special treatment." *Id.* ¶ 15. Caller devices "include[] a user interface (e.g., keypad, voice, touch-screen, etc.) that enables the caller to input data" such as "keypad or touch-tone input." *Id.* ¶ 18. Further, those features "may be downloaded as a computer program product, wherein the

program may be transferred from a remote computer (e.g., a server) to a requesting process (e.g., from a caller device)." *Id.* ¶ 26.

### *E. Ground 1: Obviousness over Gilmore, Dhara, and Dodrill*

Petitioner contends that claims 1–6 and 11–13 are unpatentable under 35 U.S.C. § 103(a) as obvious over Gilmore, Dhara, and Dodrill. Pet. 5–46. Patent Owner opposes. PO Resp. 33–61; Sur-reply 13–24. Having considered the totality of the arguments and evidence, we find that Petitioner has shown by a preponderance of the evidence that claims 1–6 and 11–13 are unpatentable as having been obvious over Gilmore, Dhara, and Dodrill.

#### *1. The limitations of claim 1*

Petitioner contends that Gilmore teaches most of the limitations of claim 1. Pet. 10 (citing Ex. 1021 ¶¶ 77–164). As to those limitations not taught by Gilmore alone, Petitioner contends that the combination of Gilmore and Dhara teaches limitation 1c2, and that the combination of Gilmore and Dodrill renders obvious limitations 1h and 1i. *Id.* at 17–20, 31–36.

In support of its contentions as to Gilmore, Petitioner provides a detailed mapping of: the preamble,[15] *see id.* at 10 (citing Ex. 1005 ¶¶ 29, 36; Ex. 1021 ¶ 79); limitation 1a, *see id.* at 10–13 (citing Ex. 1005, Fig. 2, ¶¶ 29, 31–35, 39–41, 43, 46, 48, 51; Ex. 1021 ¶¶ 80–83); limitation 1b, *see id.* at 13–15 (citing Ex. 1005 ¶¶ 15, 33, 38–40, 46–49; Ex. 1021 ¶¶ 84–96); limitation 1c1, *see id.* at 16–17 (citing Ex. 1005, Fig. 2, ¶¶ 37, 39, 44, 48–49, 72; Ex. 1021 ¶¶ 97–100); limitation 1d, *see id.* at 21–23 (citing Ex. 1005,

[15] Neither party takes a position on whether the preambles to the claims are limiting. We accept Petitioner's showing that the preambles are taught or suggested by the prior art, without deciding whether the preambles are limiting.

Fig. 2, ¶¶ 14, 40, 42, 45–46, 52, 75; Ex. 1021 ¶¶ 118–124); limitation 1e, *see id.* at 23–26 (citing Ex. 1005, Figs. 1–2, ¶¶ 40, 45–46, 48, 52, 75; Ex. 1021 ¶¶ 125–131); limitation 1f, *see id.* at 26–28 (citing Ex. 1005, Fig. 1, ¶¶ 31, 35, 39–40, 46, 48; Ex. 1021 ¶¶ 132, 134–136); limitation 1g, *see id.* at 28–31 (citing Ex. 1005, Fig. 9, ¶¶ 39, 43–44, 48, 52, 64, 70, 74, 77, 103; Ex. 1021 ¶¶ 137–144). In support of its contentions as to the combination of Gilmore and Dhara, Petitioner provides a detailed mapping of limitation 1c2. *See id.* at 17–19 (citing Ex. 1005 ¶¶ 3, 31, 35, 39, 50, 104, 115; Ex. 1009 ¶¶ 19, 30, 31, 42; Ex. 1021 ¶¶ 101–109). And, in support of its contentions as to the combination of Gilmore and Dodrill, Petitioner provides a detailed mapping of limitations 1h and 1i. *See id.* at 31–33 (citing Ex. 1005, Fig. 9, ¶¶ 33–34, 39–48, 103; Ex. 1006, Fig. 7, 8:18–24, 9:12–24, 11:61–12:30; Ex. 1021 ¶¶ 145–150).

In response, Patent Owner argues that Petitioner's showing as to claim 1 is deficient because: (1) Gilmore's VoiceXML scripts are not "applications," and therefore the Petition fails to identify the claimed "application" and related elements, PO Resp. 33–38 (identifying limitations 1e and 1g); (2) the Petition fails to identify an application server that establishes a communication session in response to a request from a communication device, *id.* at 38–43 (identifying limitation 1b); and (3) Gilmore does not disclose an application server that sends a request for processing service to a communication device, *id.* at 43–50 (identifying limitations 1h and 1i). Below, we address first the undisputed limitations of claim 1, and then turn to the disputed limitations.

*a) Undisputed limitations*

We find Petitioner has shown, by a preponderance of the evidence, that the undisputed limitations of claim 1 (i.e., the preamble, limitation 1a,

limitations 1c1 and 1c2, limitation 1d, and limitation 1f) are satisfied by Gilmore, Dhara, and Dodrill. We adopt the contentions set forth in the Petition and in Mr. Lipoff's Declaration as mapped to the undisputed limitations of challenged claim 1 as our own findings. *See In re NuVasive, Inc.*, 841 F.3d 966, 974 (Fed. Cir. 2016) (explaining that the Board need not make specific findings about claim limitations that a patent owner does not dispute are disclosed in the prior art).

For example, Patent Owner does not expressly challenge Petitioner's showing of "an application server" coupled to a "first communication link" and "a second communication link," each comprising "a data connection," as recited in limitation 1a. We find that Petitioner has shown, by a preponderance of the evidence, that these recitations are satisfied by Gilmore. In particular, Petitioner presents evidence that Gilmore discloses a voice gateway 108/208 coupled to a voice/data network 104/204 and to a data network 112. Petitioner persuasively maps Gilmore's voice gateway to the claimed application server, Gilmore's voice/data network to the claimed first communication link, and Gilmore's data network to the claimed second communication link. Pet. 10–13 (citing Ex. 1005, Figs. 1, 2, ¶¶ 29, 31–35, 39–41, 43, 46, 48, 51; Ex. 1021 ¶¶ 80–83). Petitioner presents evidence that Gilmore's voice/data network 104/204 is a "data connection" as claimed in limitation 1a because it is a data network that uses "Internet protocol (IP) or other comparable protocol for 'voice data connections' to transfer data," such as voice data or web pages. *Id.* at 12 (citing Ex. 1005 ¶ 31; Ex. 1021 ¶ 82). And Petitioner presents evidence that Gilmore's data network 112 is also a "data connection" because it is a data network "compatible with standard network data protocols (e.g., TCP /IP) and capable of carrying packetized data, such as VoiceXML scripts." *Id.* at 13 (citing Ex. 1005

¶¶ 35, 40–41, 46; Ex. 1021 ¶ 83). We find that Petitioner's showing is supported by the cited disclosures and the credible testimony of Mr. Lipoff.

As another example, Patent Owner does not expressly challenge Petitioner's showing of an application server comprising "a voice processing software program" as recited in limitation 1c1, nor Petitioner's showing of a request from a communication device comprising "packetized voice data" as recited in limitation 1c2. *See generally* PO Resp. Again, we find that Petitioner has shown, by a preponderance of the evidence, that these limitations are satisfied by Gilmore and/or the combination of Gilmore and Dhara. Petitioner presents evidence that Gilmore's voice gateway "includes software, such as interpreter program 208b, audio playback component 208c, text-to-speech generation component 208d, and speech recognition engine 208e" and that these components are a "voice processing software program" as recited in limitation 1c1 because they generate a voice representation of information. Pet. 16–17 (citing Ex. 1005, Fig. 2, ¶¶ 37, 39, 44, 48–49, 72; Ex. 1021 ¶¶ 97–100). As to limitation 1c2, Petitioner also presents persuasive evidence that Dhara teaches or suggests software stored in memory to capture voice inputs for packetization, transmit communication requests, transmit packetized voice data, receive processing requests, and present voice representations to the user. *Id.* at 17–19 (citing Ex. 1005 ¶¶ 3, 31, 35, 39, 50, 104, 115; Ex. 1009 ¶¶ 19, 30, 31, 42; Ex. 1021 ¶¶ 101–109). Again, we find that Petitioner's showings are supported by the cited disclosures and the credible testimony of Mr. Lipoff.

As for the remaining undisputed limitations, we find that Petitioner has set forth persuasive argument and evidence for: the preamble, *id.* at 10 (citing Ex. 1005 ¶¶ 29, 36; Ex. 1021 ¶ 79); limitation 1d, *id.* at 21–23 (citing Ex. 1005, Fig. 2, ¶¶ 14, 40, 42, 45–46, 52, 75; Ex. 1021 ¶¶ 118–124), and

limitation 1f, *id.* at 26–28 (citing Ex. 1005, Fig. 1, ¶¶ 31, 35, 39–40, 46, 48; Ex. 1021 ¶¶ 132, 134–136).

*b) Disputed limitations*

We now address the sufficiency of Petitioner's showing as to the remaining, disputed, limitations of claim 1 (i.e., 1b, 1e, 1g, 1h, and 1i) in the context of Patent Owner's arguments.

*(1) Applications received by an application server and from which a voice representation of information is derived (limitations 1e and 1g)*

Claim 1 recites that "the application server is either (a) configured to receive the application via the second communication link, or (b) configured to cause an execution of the application via the second communication link." Ex. 1001, 13:54–57 (limitation 1e). Claim 1 further recites that the application server comprises a voice processing software program that "is configured to generate a voice representation of information derived from the application." *Id.* at 13:61–63 (limitation 1g).

Central to the parties' dispute over these limitations is the proper construction of the term "application," which we have addressed above. *Supra* § III.C.3. We first address application of that construction to Petitioner's showing regarding Gilmore's VoiceXML scripts as applications. Then we turn to the parties' disputes regarding whether (1) Gilmore teaches or suggests an application server that is configured to receive an application via a second communication link or to cause execution of the application via the second communication link (limitation 1e); and (2) Gilmore teaches or suggests an application server that is configured to generate a voice representation of information derived from an application or an execution of an application (limitation 1g).

*(a) Gilmore's VoiceXML scripts are applications*

Patent Owner argues that Petitioner has failed to demonstrate that any of the "application" limitations are satisfied because Petitioner maps the claimed "applications" to Gilmore's VoiceXML scripts and dynamic content generation ("DCG") commands, which Patent Owner contends "are not 'applications' as the term is used in the '816 [p]atent and as it would be understood by [the ordinarily skilled artisan]." PO Resp. 33. Patent Owner continues:

> *Gilmore* at most discloses a *single* VoiceXML-based application (not identified in the Petition) that is executed on the application server. It accesses VoiceXML script files, processes them as part of the execution of the application, and sends prompts to the voice gateway to be rendered and played over the phone to a user. But the script files themselves (and particular text within them) are not applications.

*Id.* at 35 (citing Ex. 2029 ¶¶ 104–105).

Petitioner responds that VoiceXML scripts meet the definition of an application as recited in the '816 patent—namely, functionality that is capable of facilitating the ability to collect information from and/or present information to one or more client devices or users. *See* Reply 14 (citing Ex. 1001, 4:45–49). Thus, according to Petitioner, "executing VoiceXML scripts executes 'applications' as used in the '816 patent." *Id.* Petitioner also presents evidence that Gilmore processes DCG commands as part of the "application" caused to be executed on application server 212. *Id.* at 13 (citing Ex. 1005 ¶¶ 40, 52, 90–91, 110; Pet. 25–26). In particular, Gilmore describes "[a] dynamic content generation (DCG) command may be used in the voice scripts to significantly increase the ability of the scripts to dynamically change in response to different types of callers and in response to different caller inputs." Ex. 1005 ¶ 52.

Patent Owner's arguments are unavailing in part because they are premised on an overly narrow interpretation of the term "application," which we have not adopted. *Supra* § III.C.3. As we discuss above, we agree with Petitioner that an "application," within the meaning of the '816 patent claims, includes "functionality that is capable of facilitating the ability to collect information from and/or present information to one or more client devices or users." *Id.*; *see* Ex. 1001, 4:45–49.

We also agree with Petitioner that a VoiceXML script, as described in Gilmore, falls within the scope of an "application" as recited in the '816 patent claims. In particular, Petitioner presents an annotated version of Figure 1 of Gilmore, reproduced below. Pet. 6.




Figure 1 (annotated by Petitioner) is a diagram of an exemplary voice communications system. Ex. 1005 ¶ 16.

Petitioner presents evidence that, as shown in Figure 1, Gilmore discloses a communication system "for remotely executing applications in an interactive voice response ('IVR') system 106 (**green**) over a voice/data network 104/204 (**blue**)." Pet. 5–6 (citing Ex. 1005 ¶ 31). Petitioner further presents evidence that Gilmore's "[g]ateway 108/208 (**yellow**) remotely

executes, e.g., VoiceXML applications that interact with user device 102/202 (**orange**).” *Id.* at 6 (citing Ex. 1005 ¶¶ 33–34, 39–48).

Petitioner also provides an annotated version of Gilmore’s Figure 2, reproduced below, which illustrates various components of Gilmore’s IVR system. Pet. 7.




Fig. 2

Figure 2 (annotated by Petitioner) is a block diagram of a voice communications system. Ex. 1005 ¶ 17.

Petitioner presents evidence that, as shown in Figure 2, “[a]fter receiving an incoming request from a user communications device 102/202 (**orange**), voice gateway 108/208 (**yellow**) ‘receives script files from the application server 212 [(**green**)] which obtains the files from the data store 214 [(**red**)].’” Pet. 6 (quoting Ex. 1005 ¶ 46) (alterations in original). Petitioner further presents evidence that:

> Gateway 108/208 then “parses the script by searching and executing the voice-specific instructions within the script.” While executing the scripts, gateway 108/208 “generat[es] outgoing speech or prompts using the audio playback component 208c and the text-to-speech generation component 208d . . . and

> listen[s] to spoken responses . . . using the speech recognition engine 208c."

*Id.* at 6–7 (quoting Ex. 1005 ¶¶ 48, 39) (alterations in original).

We find that Petitioner's showing is supported by the cited disclosures and the credible testimony of Mr. Lipoff. Gilmore discloses that its voice gateway executes voice scripts (e.g., VoiceXML scripts) to create speech prompts for a user and to receive caller responses to given prompts. Ex. 1005 ¶ 39. As such, Gilmore's VoiceXML scripts provide "functionality that is capable of facilitating the ability to collect information from and/or present information to one or more client devices or users"; therefore, we find that Gilmore's VoiceXML scripts qualify as "applications" within the meaning of the '816 patent.

*(b) Gilmore's application server is configured to receive the application via the second communication link or to cause an execution of the application via that link (limitation 1e)*

Petitioner presents evidence that Gilmore discloses both alternatives recited in limitation 1e—that the application server is either (a) configured to receive the application via the second communication link, or (b) configured to cause an execution of the application via the second communication link. Pet. 23–26. In particular, referring to annotated Figure 1 of Gilmore, reproduced below, Petitioner presents evidence that voice gateway 108/208 is configured to receive VoiceXML scripts (i.e., applications) from the application server 212 over data network 112 (labeled "second communication link" by Petitioner). *Id.* at 23–24 (citing Ex. 1005 ¶ 46; Ex. 1021 ¶¶ 126–128).




Figure 1 (annotated by Petitioner) is a diagram of an exemplary voice communications system. Ex. 1005 ¶ 16.

Petitioner also presents evidence that Gilmore's application server 212 "obtains the [script] files from the data store 214" (annotated **red** below), as shown by the double-headed arrow in annotated Figure 2, reproduced below, and sends the application to voice gateway 108/208. Pet. 23–24 (citing Ex. 1005 ¶¶ 45–46, 52 ("When the voice gateway 208 requests a script from the application server 212, the application server 212 accesses the script from the data store 214 . . . .") (alteration in original)).




Figure 2 (annotated by Petitioner) is a block diagram of a voice communications system. Ex. 1005 ¶ 17.

Thus, according to Petitioner, as shown in the annotated figure above, voice "gateway 108/208 (application server, **yellow**) receives VoiceXML script to be executed over data network 112 (second communication link, **blue**) from server 212 (**bright green**)." *Id.* at 24 (citing Ex. 1021 ¶ 128).

As to the second claimed alternative, Petitioner presents evidence that, when Gilmore's voice "'gateway 208 requests a script from the application server 212,' server 212 'processes the script by resolving any DCG [dynamic content generation] commands within the script into voice instructions' before sending it to voice gateway 108/208." Pet. 25 (citing Ex. 1005 ¶ 52). We find that Petitioner's showing is supported by the cited disclosures. Gilmore explains that "application server 212 provides the execution environment for voice applications" and that "application code executed by the application server 212 coordinates which scripts to send to the voice gateway 208." Ex. 1005 ¶ 40. Thus, Gilmore confirms that application server 212 may process the scripts before sending the processed scripts to the voice gateway 208, such as by executing DCG commands (which meet the '816 patent's definition of "application") over data connection 112 (second communication link) before receiving the application from application server 212. *Id.* ¶¶ 40, 52.

Patent Owner's challenge to Petitioner's showing regarding limitation 1e is premised on Patent Owner's contention that VoiceXML scripts and DCG commands are not applications. PO Resp. 33–38. Patent Owner's arguments are unavailing in part because they are premised on an overly narrow interpretation of the term "application," which we have not adopted. *See supra* § III.C.3. As we discuss above, we agree with Petitioner that an "application," within the meaning of the '816 patent claims, includes "functionality that is capable of facilitating the ability to collect information

from and/or present information to one or more client devices or users." *Id.*; *see* Ex. 1001, 4:45–49. We further agree, as also noted above, that Gilmore's VoiceXML scripts fall within the scope of an application. We similarly agree that DCG commands fall within the scope of an application, as they are used, for example, to "significantly increase the ability of the scripts to dynamically change in response to different types of callers and in response to different caller inputs." Ex. 1005 ¶ 52. As such, they facilitate the ability to collect information from and/or present information to one or more client devices or users.

For these reasons, we are persuaded by Petitioner's evidence and agree that Petitioner has sufficiently shown, by a preponderance of the evidence, that Gilmore teaches or suggests both of the alternatives recited in limitation 1e.

*(c) Gilmore's application server comprises a voice processing software program that is configured to generate a voice representation of information derived from the application (limitation 1g)*

As to the requirement that the application server comprises a voice processing software program configured to generate a voice representation of information derived from the application, Petitioner presents persuasive argument and evidence that Gilmore's generation of speech using text-to-speech processing is a voice representation "of information derived from the application," because Gilmore's VoiceXML script determines what audio to present based on the application's instructions (e.g., prompt/grammar) and information in the application, e.g., menu options to speak for a specific user. Pet. 28–31; Ex. 1005 ¶¶ 39, 43–44, 48, 52, 64, 70, 74, 77, 103, Fig. 9; Reply 14–15; Ex. 1021 ¶¶ 137–144.

Petitioner further presents persuasive argument and evidence that, in Gilmore, the generated speech is a voice representation "of information derived from an execution of an application" because Gilmore's voice gateway "generates speech from responses or response text (information) in the VoiceXML application," which "text is determined (derived) and tailored to the user's input by executing grammar instructions in the VoiceXML (execution of the application)." Reply 15 (citing Pet. 28–31, 43, 57; Ex. 1005 ¶¶ 39, 43–44, 48, 50, 64, 109). Petitioner further states that "[t]he new speech output from the prompt/text is thus the voice representation of the information (text) derived by executing the VoiceXML application." *Id.* (citing Ex. 1005 ¶¶ 39, 43–44, 50; Pet. 28–31, 43, 57). Petitioner adds that "Gilmore's speech is also 'of information derived from execut[ing] the application' because executing DCG commands in an application determines which information (e.g., menu options, prompts) to present to the user via text-to-speech based on user characteristics." *Id.* (citing Pet. 25–26; Ex. 1005 ¶¶ 90–91, 97–98 (alteration in original)). Again, we find that Petitioner's showing is supported by the cited disclosures and the credible testimony of Mr. Lipoff.

Patent Owner argues that Gilmore "fails to satisfy this element" because "the 'execution' of VoiceXML scripts in *Gilmore* is not the same thing as the execution of an *application* in *Gilmore* (and because the execution of the application in *Gilmore* does not happen on the alleged application server)." PO Resp. 37. In addition, according to Patent Owner:

> Even if the VoiceXML scripts/DCG commands of *Gilmore* are "applications" (which they are not), *Gilmore* still fails to disclose that an application server generates a voice representation that is *derived from* such an application, because there is no derivation taking place in the rendering of the text of VoiceXML scripts, as

> such information would be the application itself according to Petitioner.

*Id.* at 38 (citing Ex. 2029 ¶¶ 109–110).

We disagree with Patent Owner's contentions, which are somewhat conclusory with regard to Patent Owner's reading of "derived from" an application. In contrast, as noted above, Petitioner's contentions are persuasive and supported by the cited evidence.

For these reasons, we find that Petitioner has demonstrated by a preponderance of the evidence that Gilmore teaches or suggests "wherein the voice processing software program is configured to generate a voice representation of information derived from the application" as recited in claim 1 (limitation 1g).

*(2) "an application server adapted to establish a communication session . . . in response to a request from the at least one communication device to establish the communication session" (limitation 1b)*

Claim 1 recites that the application server is "adapted to establish a communication session . . . in response to a request from the at least one communication device to establish the communication session." Ex. 1001, 13:42–47 (limitation 1b). We address this limitation in two parts below, in which we determine: (a) whether Gilmore teaches a communication device that sends a request to establish a communication session; and (b) whether Gilmore's disclosure of executing VoiceXML scripts teaches a "communication session."

*(a) Request from the communication device to establish a communication session*

Petitioner presents persuasive argument and evidence that Gilmore teaches a communication device that transmits a *request to establish* a communication session, as recited in limitation 1b. Pet. 13–15. Gilmore

discloses a "voice communications device" 102/202 (e.g., a cellular phone), which Petitioner persuasively maps to the claimed communication device. Ex. 1005 ¶¶ 30, 36; Pet. 6. Petitioner contends, and we agree, that Gilmore's "communication session is established in response to a request from [communication] device 102/202 to establish a session, such as a telephone call over network 104/204." Pet. 15 (citing Ex. 1021 ¶ 92). Specifically, Gilmore's voice gateway 108/208 "receives user calls from voice communications devices 102 via the network 104 and responds to the calls in accordance with a voice program." Ex. 1005 ¶ 33; Pet. 15. Gilmore further teaches that "[i]ncoming calls are answered by the telephony services and signal processing component 208a of the voice gateway 208." Ex. 1005 ¶ 38; Ex. 1021 ¶ 93.

Petitioner also presents persuasive argument and evidence that Gilmore's voice gateway is adapted *to establish a communication session* in response to the communications device's request, as recited in limitation 1b, by executing interactive VoiceXML applications. Ex. 1005 ¶¶ 39–40, 46, 48; Pet. 13–14 (citing Ex. 1021 ¶¶ 84–86). Specifically, Gilmore teaches that "voice gateway 208 retrieves the initial voice script" and "parses the script by searching and executing the voice specific instructions within the script." Ex. 1005 ¶ 48. In one example, Gilmore's voice gateway begins ("establishes") the communication session when interpreter 208b "retriev[es] and execut[es] voice programs," such as an interactive VoiceXML application, and "generat[es] outgoing speech or prompts" to which a user can respond. *Id.* ¶¶ 39–40; Pet. 13–14 (citing Ex. 1021 ¶¶ 86–88). Thus, Petitioner contends, and we agree, that Gilmore's teaching of "[e]xecuting the application on gateway 108/208 *establishes a communication session*

with device 102/202 over network 104/204 (first communication link)." Pet. 13–14 (citing Ex. 1021 ¶ 87) (emphasis added).

In response, Patent Owner argues that Petitioner has a "stretched reading of *Gilmore*," and accordingly, has failed "to identify in *Gilmore* a request to establish a communication session that is sent by a communication device to the application server." PO Resp. 39 (citing Ex. 2029 ¶ 113). We disagree. As in the Institution Decision, we find that a communication device placing a call to a voice response system is a request to establish a communication session. *See* Inst. Dec. 29. In particular, we agree with Petitioner's contention (supported by the testimony of Mr. Lipoff regarding the contemporaneous understanding of the ordinarily skilled artisan, which we credit) that "the call to Gilmore's IVR system is a 'request'" to establish a communication session because the call "initiates retrieval and execution of the script that establishes the session." Pet. 15 (citing Ex. 1021 ¶ 95). We also find that, even if Gilmore's voice gateway performs an intermediate processing step between the user contacting the IVR ("interactive voice response") system and executing the application, the user's initial call to the IVR system is still a "request" that starts the process and results in the voice gateway executing the application. *See* Ex. 1013, Section 1.3.2 (explaining that a "session" "begins when the user starts to interact with a VoiceXML interpreter context," which occurs when the executed VoiceXML application sends a prompt to which a user can respond); Ex. 1021 ¶ 91; Pet. 14–15.

*(b) Gilmore discloses a communication session*

Patent Owner next argues that Gilmore's executing VoiceXML scripts "is not a communication session." PO Resp. 39–43. As support, Patent Owner makes various contentions that Gilmore discloses merely a

"traditional IVR system," and thus establishes only a "*call session*" and not a "communication session." *Id.* at 40. Patent Owner distinguishes the '816 patent as being "about connecting a computing device to a server so it can receive instructions requesting processing services and thus take on some of the application processing load, not making telephone calls." *Id.* Patent Owner further argues that "any sending and receiving of 'instructions' in *Gilmore* occurs over the link between the voice gateway and the application server of *Gilmore*—not between an application server and a communication device." *Id.* at 41 (citing Ex. 2029 ¶¶ 113–115). Patent Owner further argues that the need for a "voice gateway" in Gilmore underscores that Gilmore discloses merely telephone calls to an IVR system, because the voice gateway "acts to support telephone calls." *Id.* at 42. In contrast, Patent Owner argues, because the '816 patent does "not relate to telephone calls, there is no need for a voice gateway." *Id.*

Patent Owner's arguments boil down to the contention that Gilmore's "call session" (in Patent Owner's words) cannot be a "communication session" as claimed because it lacks the ability to send a request for processing services from the application server to the communication device. *Id.* at 40–43. As such, Patent Owner's arguments actually implicate a different limitation—the application server communicating a request for processing service to the communication device—which we address in the next section.

As to whether Gilmore teaches or suggests establishing a communication session, Patent Owner's arguments are unavailing because they are based on an unduly narrow reading of "communication session" that excludes voice telephone calls. The written description of the '816 patent broadly describes client communication devices as follows:

> Each client 18 may include, for example, a wireless device, a voice over IP device, a desktop computer, a laptop computer, a personal digital assistant, a cell-phone, a Wi-Fi device, a workstation, a mainframe computer, a mini-frame computer, a web server, or any other computing and/or communicating device.

Ex. 1001, 4:22–27. The written description also discloses that "[l]andline phones and/or IP phones can also *communicate* with repository 20 and/or application server 24 *in the same manner* as mobile phones." *Id.* at 6:5–7 (emphases added). Gilmore similarly describes a client (communication) device as "a device able to interface with a user to transmit voice signals across a network such as, for example, a telephone, a cell phone, a voice-enabled personal digital assistant (PDA), or voice-enabled computer." Ex. 1005 ¶ 30; *see also* Pet. 6. Thus, both the '816 patent and Gilmore contemplate use of similar communication devices, including landline phones. We, therefore, do not agree with Patent Owner's contention that a telephone call in Gilmore cannot qualify as a "communication session" as recited in the '816 patent claims.

As we note above, we construe a "communication session" as encompassing the process of a communication device communicating information to, and/or retrieving information from, another communication device. *Supra* § III.C.1. We find that Gilmore discloses a communication device (voice communication device 102/202), such as a landline phone, an IP phone, or cell phone (Ex. 1005 ¶¶ 30, 36, Fig. 2). We further find that such a communication device communicating information to, and/or retrieving information from, Gilmore's voice gateway falls within the scope of a "communication session," as recited in the '816 patent claims. In particular, in Gilmore, interpreter 208b on voice gateway 108/208 executes

the interactive VoiceXML application and send prompts that the user can interact with and respond to using the communication device. *E.g.*, Ex. 1005 ¶¶ 39, 40, 46, 48, Fig. 2; Ex. 1021 ¶¶ 87–88. In this manner voice, voice gateway 208 "is able to simulate a conversation with the caller." Ex. 1005 ¶ 39. We find such a simulated conversation, in which information is exchanged, is a communication session within the scope of the '816 patent claims.

Based on the foregoing, we determine that Petitioner has demonstrated by a preponderance of the evidence that Gilmore teaches "the application server adapted to establish a communication session . . . in response to a request from the at least one communication device to establish the communication session," as recited in claim 1 (limitation 1b).

*(3) Application server sends a "request for processing service" to a communication device, wherein the request for processing service "comprises an instruction to present a user . . . the voice representation" (limitation 1h and 1i)*

Claim 1 recites that the application server "is configured to transmit . . . a request for processing service . . . to the at least one communication device," and further recites that "the request for processing service comprises an instruction to present a user . . . the voice representation" of information derived from the application (limitations 1h and 1i). Ex. 1001, 13:62–63, 14:1–3. Petitioner relies on the combination of Gilmore and Dodrill to teach that the application server is configured to transmit the voice representation over the first communication link to a communication device, and that the request for processing includes an instruction to present the voice representation to the user. *See* Pet. 31–33 (citing Ex. 1005, Fig. 9, ¶¶ 33–34, 39–48, 103; Ex. 1006, Fig. 7, 8:18–24, 9:12–24, 11:61–12:30; Ex. 1021 ¶¶ 145–150).

As discussed above, we construe "processing service" as "a computing process performed by a communication device for all or part of the application." *Supra* § III.C.2. Thus, a request for processing service communicated by an application server to a communication device includes a request by the application server that the communication device perform a computing process for all or part of the application. *Id.*

Petitioner contends that Gilmore discloses presenting a "request for processing service" as outgoing voice representations, e.g., by using text-to-speech to generate audio .wav files, from the voice gateway to the user's communication device. Pet. 31 (citing Ex. 1005 ¶¶ 48, 103, Fig. 9). Petitioner also contends that Gilmore's voice gateway (application server) generates the voice representations (e.g., audio output from interpreter 208b and text-to-speech generation component 208d) by executing VoiceXML applications to generate voice representations of information derived from the applications. *See id.* at 29–30 (citing Ex. 1005 ¶¶ 39, 43, 44, 48, 52, 103, Fig. 9). According to Petitioner, this is accomplished by Gilmore's voice gateway either accessing an audio file at a specified URL or by employing text-to-speech to translate and play text included in a prompt instruction, resulting in an audio output such as the "What would you like to do?" query in Figure 9. *See id.* at 29–31 (citing Ex. 1005 ¶¶ 39, 44, 48, 64, 70, 74, 77, 103, Fig. 9).

Petitioner then contends that, "Dodrill (like Gilmore) discloses executing an IVR application on remote servers." *Id.* at 32 (citing Ex. 1006, 9:12–24; Ex. 1005 ¶¶ 33–34, 39–48). In particular, Petitioner contends "Dodrill teaches that, rather than sending audio directly, the system can send the voice representation as an embedded .wav file along with an instruction to play the voice representation in script processed by the user device." *Id.*

(citing Ex. 1006, 8:18–24, 11:66–12:30, Fig. 7). Dodrill's XML tags include instructions to present information to the user, such as to play audio files using a "PROMPT" or "autostart" instruction. *Id.* (citing Ex. 1006, 11:66–12:30, Fig. 7; Ex. 1021 ¶ 148).

In response, Patent Owner focuses its arguments on Petitioner's showing as to Gilmore, arguing that "in *Gilmore* the cited 'request' is an audio prompt—processed on the application server and played over the phone via a voice gateway—for *user interaction*, not for a processing service. The 'requested' activity is a user activity, not a device activity." PO Resp. 44 (citing Pet. 33). Patent Owner acknowledges that the '816 patent discusses VoiceXML scripts, but argues that, when the '816 patent does so, "it makes clear that the system of the '816 [p]atent—unlike traditional VoiceXML systems—involves distributing some of the processing functions to the client side for execution." *Id.* at 45 (citing Ex. 1001, 6:60–65 ("In this example, client 18*a* provides application independent processing services to Voice XML-based application 28 executing remotely.")). In contrast, Patent Owner continues, "all processing of instructions in *Gilmore* (and certainly all processing cited in the Petition) is done on the host side—*i.e.*, by the application server." *Id.* at 46 (citing Ex. 1005 ¶ 40). In that regard, Patent Owner challenges Petitioner's reliance on Gilmore's text-to-speech conversion, stating that such conversion and subsequent audio playback is performed *by the application server*, and not by the client device. *Id.* at 46–47. Patent Owner further argues that any interaction in Gilmore by a human on the client side, such as spoken commands or responses to the application server's audio prompts, are not a "processing service" within the scope of the '816 patent claims. *See id.*

Petitioner responds by pointing out that the Petition relies on Gilmore in combination with Dodrill, and asserts that Dodrill teaches sending executable instructions to the user device, thus meeting the construction of "request for processing services" adopted herein. *See* Reply 20 (citing Pet. 31–36). Patent Owner does not particularly challenge Dodrill's teachings, but asserts that the combination fails because Petitioner has failed to demonstrate that the ordinarily skilled artisan would have combined the teachings of Gilmore with Dodrill. *See* PO Resp. 43–48; Sur-reply 12–13, 19–22. We address those arguments below. *See infra* § III.E.3.

We are persuaded by Petitioner's arguments and evidence that the combination of Gilmore and Dodrill teaches or suggests an application server that communicates a request for processing service to a communication device, as recited in claim 1 (limitation 1h). In particular, Gilmore teaches the voice gateway generates a voice representation of information derived from executing a VoiceXML application, which it sends as audio prompts to the user communication device. Ex. 1005 ¶¶ 39, 43, 44, 48, 52, 103, Fig. 9. Petitioner persuasively points to teachings from Dodrill for the user communication device receiving the voice representation in software and executing an instruction in software on the user device to play the voice representation as audio for the user, as also recited in claim 1 (limitation 1i). Pet. 32 (citing Ex. 1006, 8:18–24, 11:66–12:30, Fig. 7). Dodrill, for example, discloses an application server generating a web page for a user's browser, wherein the web page includes media control to be performed on the user's device by a plug-in resource. Ex. 1006, 11:61–12:4. Dodrill's plug-in resource can play audio files for the user and also receive user input that the resource then matches to an input pattern; the resource may also record and capture user voice input and upload that input. *Id.* at

12:5–30. In that regard, we credit, and rely on, the testimony of Mr. Lipoff to the effect that the ordinarily skilled artisan would have understood that Dodrill discloses an application server sending instructions to a user device, to be executed on the user device for implementing various functionality, such as presenting audio or display prompts for a user. Ex. 1021 ¶¶ 112–114.

For these reasons, we find that Petitioner has demonstrated by a preponderance of the evidence that the combination of Gilmore and Dodrill teaches or suggests an application server sends a "request for processing service" to a communication device, as recited in claim 1 (limitation 1h), and further wherein the request for processing service "comprises an instruction to present a user . . . the voice representation," as also recited in claim 1 (limitations 1i).

*2. The limitations of the dependent claims*

Having decided that the combination of Gilmore, Dhara, and Dodrill teaches or suggests each and every limitation of claim 1, we turn to the remaining challenged claims in this ground of unpatentability—i.e., claims 2–6 and 11–13. Claims 2–6 and 11–13 depend, directly or indirectly, from claim 1. As such, they also include the above-discussed limitations. Patent Owner presents a separate argument for only dependent claim 3. *See* PO Resp. 48–50. We address that claim individually below.

*a) Dependent claims 2, 4–6, and 11–13*

As to claims 2, 4–6, and 11–13, we find that Petitioner persuasively maps the limitations of these dependent claims to the cited art (and to the

testimony of Mr. Lipoff in support of the combination of references).[16] *See* Pet. 36–38, 40–46 (citing, for **claim 2**: Ex. 1005 ¶¶ 3, 33, 37, 39, 40, 44, 48–49, 70, Figs. 9–14; Ex. 1021 ¶¶ 165–175; for **claim 4**: Ex. 1005 ¶¶ 40, 46, 52–103; Ex. 1021 ¶¶ 193–198; for **claim 5**: Ex. 1005 ¶¶ 34, 40, 47; Ex. 1021 ¶¶ 199–204; for **claim 6**: Ex. 1005 ¶¶ 30–31, 33–35, 39–48, 50; Ex. 1009 ¶¶ 19, 42; Ex. 1021 ¶¶ 205–213; for **claim 11**: Ex. 1005 ¶¶ 32, 41; Ex. 1021 ¶¶ 214–221; for **claim 12**: Ex. 1005 ¶ 52; Ex. 1021 ¶¶ 222–226; for **claim 13**: Ex. 1021 ¶¶ 227–230). Again, Patent Owner does not present separate and specific arguments for any of these dependent claims. *See* PO Resp. 33–45 (presenting arguments only as to certain limitations of claim 1); *see also id.* at 61 (arguing that the dependent claims not specifically addressed are nonobvious because the claims from which they depend are also nonobvious). We adopt the contentions set forth in the Petition and in Mr. Lipoff's Declaration as mapped to the limitations of the challenged claims as our own findings. *NuVasive*, 841 F.3d at 974.

*b) Dependent claim 3*

Claim 3 depends from claim 1 and recites that "the repository comprises a database, and the application is stored in the database." Ex. 1001, 14:10–12. For the reasons discussed below, we find that Petitioner has demonstrated by a preponderance of the evidence that Gilmore, alone or in combination with Dodrill, teaches or suggests that the applications are stored in a repository comprising a database, as recited in claim 3.

[16] Petitioner provides citations for limitations of certain claims by reference to earlier sections of the Petition discussing similar elements of other claims.

Petitioner presents evidence that Gilmore discloses a repository having access to one or more applications maintained in a data store coupled to the repository, and Gilmore alone, or in combination with Dodrill, renders obvious the data store being a "database." Pet. 38 (citing *id.* at 21–23). In particular, Petitioner provides an annotated version of Gilmore's Figure 2, reproduced below. Pet. 22.




Figure 2 (annotated by Petitioner) is a diagram of an exemplary voice communications system. Ex. 1005 ¶ 17.

By reference to annotated Figure 2, reproduced above, Petitioner presents evidence that Gilmore discloses that voice "gateway 208 receives script files from the application server 212 which obtains the files from the data store 214." Pet. 21–22 (citing Ex. 1005 ¶ 46). Petitioner presents evidence that voice gateway 108/208 (application server, annotated **yellow** above) receives the voice application to be executed (e.g., VoiceXML scripts) over data network 112 (second communication link, annotated **blue** above, double-headed arrow in Figure 2) from application server 212 (annotated **bright green** above), which corresponds to the claimed

"repository." *Id.* (citing Ex. 1005 ¶ 52). Petitioner presents evidence that application server 212 (repository) accesses the voice applications maintained in data store 214 (annotated red above), as shown by the double-headed arrow in Figure 2, and sends the application to voice gateway 108/208. *Id.* at 22 (citing Ex. 1005 ¶¶ 45–46, 52, 75); *see also id.* at 38 (citing Ex. 1005 ¶ 70).

As to the claimed limitation "repository compris[ing] a database," Petitioner contends Gilmore's data store 214 is a database, even though not explicitly referred to as such, and further contends that, "[r]egardless, Dodrill teaches storing IVR applications, such as XML voice applications, in database 96." *Id.* at 38 (citing Ex. 1005 ¶¶ 40–42; Ex. 1006, Fig. 8, 9:16–24, 12:36–42; Ex. 1021 ¶¶ 176–179).

Patent Owner challenges Petitioner's showing by arguing that the Petition fails to identify a database of applications:

> Petitioner identifies script files within *Gilmore's* "data store" as potentially satisfying this element, but *Gilmore* is clear that while its VoiceXML scripts are *used by* an application, they are not themselves applications. As Petitioner acknowledges, *Gilmore* defines the data store as "a storage device that stores files necessary for execution of the voice application," such as "script files, prompt files, grammar files," etc. By defining the script files as files "necessary for execution of the voice application," *Gilmore* makes clear that the files are *not* "the voice application" itself.

PO Resp. 48–49 (citing Pet. 22–23; Ex. 2029 ¶ 133).

As with Patent Owner's other arguments regarding the "application" limitations, Patent Owner's argument here is unavailing because it is premised on an overly narrow interpretation of the term "application," which we have not adopted. *See supra* § III.C.3. Because we agree with Petitioner that Gilmore's VoiceXML scripts fall within the scope of an "application,"

as recited in the ’816 patent claims, we also agree, for the reasons stated above, that Gilmore’s disclosure of the repository being coupled to a data store satisfies the claim’s recitation of a repository having access to a database. *See* Pet. 38; Ex. 1005 ¶ 42 (“The data store 214 is a storage device that stores files necessary for execution of the voice application . . . includ[ing] script files, prompt files, grammar files, and text-to-speech (TTX) text files.”). Aside from arguing that the type of files stored in Gilmore’s data store (e.g., VoiceXML scripts) are not “applications,” Patent Owner does not challenge Petitioner’s evidence showing that Gilmore’s data store satisfies the database limitation. *See* PO Resp. 48–49. We further find, in the alternative, that even if Gilmore’s data store did not qualify as a database, Dodrill teaches storing interactive voice applications, such as XML voice applications, in “application [document] database [96].” Ex. 1006, 9:16–24, 12:36–42. For these reasons, we find that Petitioner has demonstrated by a preponderance of the evidence that Gilmore, alone or in combination with Dodrill, teaches or suggests that the applications are stored in a repository comprising a database, as recited in claim 3.

*3. Motivation to combine/reasonable expectation of success*

Even “[i]f all elements of the claims are found in a combination of prior art references,” “the factfinder should further consider whether a person of ordinary skill in the art would [have been] motivated to combine those references, and whether in making that combination, a person of ordinary skill would have [had] a reasonable expectation of success.” *Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 833 (Fed. Cir. 2015). The “motivation to combine” and “reasonable expectation of success” factors are subsidiary requirements for obviousness subsumed within the *Graham* factors. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007).

As noted above, Petitioner relies primarily on Gilmore as disclosing the limitations of the challenged claims, but additionally relies on the teachings of Dhara or Dodrill in combination with Gilmore as to certain limitations of claim 1—namely, limitation 1c2 (the request from the communication device comprising packetized voice data) and limitations 1h and 1i (the application server communicating a request for processing service to the communication device), respectively. *See* Pet. 17–20 (limitation 1c2), 31–36 (limitations 1h and 1i). Petitioner also relies on the combination of Gilmore and Dodrill for teaching claim 3 (a repository having access to a database). *Id.* at 38–40. We address below Petitioner's showing as to the motivation for combining the teachings of these references by limitation, followed by Patent Owner's challenges to that showing.

*a) Packetized voice data (limitation 1c2)*

Even though Gilmore describes its data network as "capable of carrying packetized data," Gilmore does not explicitly disclose that the request from device 102/202 to establish a communication session comprises packetized voice data. *See* Ex. 1005 ¶¶ 31, 35; Pet. 17–18. Dhara, however, explicitly discloses an "audio command" "communicated using 'voice signals' sent 'over the IP network 104' 'in the form of data packets.'" Pet. 18 (citing Ex. 1009 ¶¶ 19, 30–31, 42; Ex. 1021 ¶¶ 106–107). As noted above, Patent Owner does not expressly challenge Petitioner's showing that a request from a communication device comprising "packetized voice data" as recited in limitation 1c2 is taught by the combination of Gilmore and Dhara. *Supra* § III.E.1.a. Patent Owner does, however, challenge

Petitioner's stated rationale combining those two references. PO Resp. 57–58.

As to motivation to combine, Petitioner presents evidence and articulated reasoning supporting a finding that an ordinarily skilled artisan "would have found it obvious to establish a communication session based on a request comprising packetized voice data, as taught by Dhara, because this would improve the user's options for accessing the system." Pet. 18 (citing Ex. 1021 ¶ 108). In particular, Petitioner presents evidence, including the testimony of Mr. Lipoff (which we credit), that transmitting the request "as a packetized spoken command" would "increase efficiency of retrieving the script for execution by eliminating the need for an initial interaction with gateway 108/208 to prompt the user to identify the desired website or database." *Id.* at 19 (citing Ex. 1021 ¶ 113).

We determine that Petitioner has set forth sufficiently why an ordinarily skilled artisan would have been motivated to combine the teachings of Gilmore and Dhara in the manner asserted by Petitioner; for example, to increase efficiency, minimize the number of necessary communications between client and server, improve access, and increase available design options for presenting voice information to the user. *Id.* at 19–20; *see also* Ex. 1021 ¶¶ 110–115. Indeed, Dhara explains that VoiceXML systems offer "flexibility to create and customize audio initiated dialogs" on the user device. Ex. 1009 ¶ 6. We also credit Mr. Lipoff's testimony that an ordinarily skilled artisan would have reasonably expected success with modifying Gilmore's system with Dhara's packetized voice data, especially given that doing so (i.e., sending the request as packetized voice data) would require only conventional techniques used in their ordinary and expected manner. Ex. 1021 ¶¶ 116–117.

As to combining the teachings of Gilmore and Dhara, Patent Owner argues the ordinarily skilled artisan would not have been motivated to "combine the features of the two systems" into a single system because they "independently accomplish similar functions—namely, offering IVR/VoiceXML functionality," and "each device independently operates effectively on its own." PO Resp. 57. Patent Owner further contends "Petitioner fails to provide sufficient evidence or technical reasoning to establish that the system of *Gilmore* is inadequate for providing IVR/VoiceXML functionality, such that further modification of the system to place those components on a communication device is necessary." *Id.* at 58. Petitioner counters that "the law does not require inadequacy for a skilled artisan to combine systems." Reply 27 (citing *KSR*, 550 U.S. at 415, 418–21).

We agree with Petitioner. Where, as here, the combination moves the processing from one known location to another, a finding of obviousness is supported. *See Uber Techs., Inc. v. X One, Inc.*, 957 F.3d 1334, 1338–42 (Fed. Cir. 2020) (holding that moving the location of processing from a remote server to a user device was obvious, regardless of underlying technological compatibility). Moreover, in making this argument, Patent Owner does not address any of the Petition's specified motivations for the combination or dispute that a skilled artisan would have expected success in the combination. *See* Pet. 19–20. Rather, Patent Owner relies on *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012), for the proposition that hindsight is the only reason to combine references where an advantage provided by one reference is redundant to another reference. PO Resp. 58. Patent Owner's argument and citation are unavailing. The court in *Kinetic Concepts* found no motivation to combine

in that case because the record was "devoid of any reason" to combine the references. 688 F.3d at 1369. Here, in contrast, we find that the Petition provides persuasive reasons based on the references' disclosures and testimony of Mr. Lipoff to combine Gilmore and Dhara—none of which Patent Owner persuasively rebuts. *See* Pet. 19–20; Ex. 1021 ¶¶ 110–117.

*b) Application server communicates a request for processing service to the communication device (limitations 1h and 1i)*

As explained above, we are persuaded by Petitioner's evidence that the combination of Gilmore and Dodrill teaches that the application server is configured to transmit the voice representation over the first communication link to a communication device, and that the request for processing includes an instruction to present the voice representation to the user, as recited in limitations 1h and 1i, respectively. *Supra* § III.E.1.b.3; *see also* Pet. 31–33; Ex. 1005, Fig. 9, ¶¶ 33–34, 39–48, 103; Ex. 1006, Fig. 7, 8:18–24, 9:12–24, 11:61–12:30; Ex. 1021 ¶¶ 145–150.

As to motivation for the combination, Petitioner presents evidence and articulated reasoning that the ordinarily skilled artisan would have had a reason to combine Dodrill's transmission of an instruction to present information to the user with Gilmore's interactive voice response system because: (1) both Gilmore and Dodrill describe executing an IVR application on remote servers, with Dodrill describing different options for presenting information, including sending the user an embedded .wav file along with an instruction to play the voice representation in script processed by the user device, Pet. 32 (citing Ex. 1006, 8:18–24, 11:66–12:30, Fig. 7; Ex. 1021 ¶ 147); (2) the ordinarily skilled artisan would have understood that incorporating Dodrill's embedded voice representation and instructions in Gilmore's request would have the effect of distributing some processing

tasks, thereby "freeing up resources at gateway 108/208 by not having to retrieve and play the voice scripts and stream them in audio form," *id.* at 33 (citing Ex. 1021 ¶ 150); and (3) incorporating Dodrill's option to send an executable with instructions to play an audio file would add additional functionality to Gilmore's system "so as to improve access to voice-browsing (as taught by Dodrill) and to increase the available options for executing voice applications" and to "reduc[e] the computation load on the application server," *id.* at 33–34 (citing Ex. 1021 ¶¶ 153, 156–157).

Petitioner presents evidence, including the testimony of Mr. Lipoff (which we credit), that an ordinarily skilled artisan would have had a reasonable expected success with the combination, because modifying Gilmore's system to include transmitting an embedded voice representation and a request for processing as taught by Dodrill's merely combines known elements in an expected manner. Pet. at 35–36 (citing Ex. 1021 ¶¶ 161–164).

For these reasons, we determine that Petitioner has sufficiently set forth articulated reasoning with sufficient rational underpinning as to why an ordinarily skilled artisan would have had reason to combine Gilmore and Dodrill, with a reasonable expectation of success. Dodrill and Gilmore both describe presenting voice prompts to a user on the user's device. *Id.* at 33; Ex. 1021 ¶ 151. In particular, Gilmore describes playing voice scripts to prompt a user for information. Ex. 1005 ¶¶ 33, 115. And Dodrill teaches sending the user an executable .wav file that contains instructions to present the voice prompts on the user's computer. Ex. 1006, 8:17–22, 11:61–12:30. Petitioner additionally presents the testimony of Mr. Lipoff (which we find persuasive and credit) in support of its contention that incorporating Dodrill's option into Gilmore's system would result in merely adding

functionality to Gilmore's system in which "[t]he executed instruction does not change, but instead merely requires the voice-enabled device to execute the instruction, which was known and conventional to the artisan." Pet. 35–36 (citing Ex. 1021 ¶ 163). We address Patent Owner's challenges to the combination of Gilmore and Dodrill below. *Infra* § III.E.3.d.

*c) Database coupled to a repository (claim 3)*

As explained above, we find that, even if Gilmore's data store did not qualify as a database, Dodrill teaches storing interactive voice applications, such as XML voice applications, in "application document database 96." *See supra* § III.E.2.b (citing Ex. 1006, 9:16–24, 12:36–42). Thus, the combination of Gilmore and Dodrill teaches or suggests the database limitation of claim 3.

As to motivation for the combination of Gilmore and Dodrill, Petitioner presents evidence and articulated reasoning that the ordinarily skilled artisan would have been motivated to combine Dodrill's database with Gilmore's storage because: (1) both are directed to remotely-executing voice applications; and (2) the ordinarily skilled artisan would have understood that using the structure format of Dodrill's database would have made retrieving voice applications more efficient. Pet. 39 (citing Ex. 1021 ¶¶ 181–184). Relying on the testimony of Mr. Lipoff, Petitioner explains that databases were "well-known as of the priority date of the '816 patent," and an ordinarily skilled artisan would have understood that using Dodrill's database as Gilmore's data store "would result in the ordinary and expected operation of storing applications to be retrieved for execution." *Id.* at 39–40 (citing Ex. 1021 ¶¶ 186–189).

We find that Petitioner has articulated reasoning supported by sufficient rational underpinning to support the combination of Gilmore and

Dodrill as to claim 3 with a reasonable expectation of success. We address Patent Owner's challenges to the combination of Gilmore and Dodrill below.

*d) Patent Owner's arguments challenging the combination of Gilmore and Dodrill*

Patent Owner raises several points in arguing that the ordinarily skilled artisan would not have been motivated to combine the teachings of Gilmore and Dodrill. PO Resp. 51–57, 60–61. In particular, Patent Owner contends that: (1) Gilmore and Dodrill are non-analogous art, *id.* at 52–53; (2) combining the teachings of Gilmore and Dodrill would require fundamental changes to one or both references, *id.* at 53–56; (3) Gilmore teaches away from Dodrill, *id.* at 56–57; and (4) Petitioner's proposed combination is motivated by hindsight, *id.* at 60–61. We address each of these contentions in turn below.

*(1) Non-analogous art*

Patent Owner's argument that Gilmore and Dodrill are non-analogous art is premised on three points: (1) Gilmore relates to live, interactive telephone calls to an IVR system, whereas Dodrill relates to a user's interaction with a web browser to retrieve voice mails over the Internet; (2) Gilmore's execution environment is an application server, whereas Dodrill's execution is done on a web browser on a client device; and (3) Gilmore and Dodrill are not both directed to remotely-executing voice applications because Gilmore's VoiceXML scripts are not applications, and Dodrill defines "XML applications" differently than Gilmore and Petitioner do. PO Resp. 52–53 (citing Ex. 2029 ¶¶ 139–143).

The test for determining whether a prior art reference constitutes analogous art to the claimed invention is: (1) whether the prior art is from the same field as the inventor's endeavor, regardless of the problem

addressed; and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved. *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004). A reference is "reasonably pertinent" to a problem if it "logically would have commended itself to an inventor's attention in considering his problem." *In re Icon Health & Fitness, Inc.*, 496 F.3d 1374, 1379–80 (Fed. Cir. 2007) (quoting *In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992)).

Patent Owner's contentions are unavailing because, as Petitioner correctly notes, Patent Owner has not addressed either prong of the test for nonanalogous art. *See* Reply 23. In particular, Patent Owner has not addressed whether either Gilmore or Dodrill are within the *field of the inventor's endeavor*, much less whether they are reasonably pertinent to that field. Rather, Patent Owner compares the fields of endeavor of Gilmore and Dodrill to *each other*, which misses the mark. *See* PO Resp. 52–53.

In any event, we agree with Petitioner that both Gilmore and Dodrill are in the same field of endeavor as the '816 patent, which is described as "the field of communication systems, and more particularly to a method and system that enables a communication device to remotely execute an application." Ex. 1001, 1:20–23; *see* Reply 23. Gilmore and Dodrill both describe methods and systems enabling communication devices to remotely execute applications on voice gateway 108/208 (Gilmore) or gateserver 92 (Dodrill). *See* Pet. 5–10, 33–36, 39–40; Ex. 1005 ¶¶ 31, 33–34, 39–48; Ex. 1006, Abstract, 5:6–24, 9:12–24, 11:19–26, 11:61–12:30, Fig. 7. Petitioner also notes, and we agree, that Patent Owner's argument that Dodrill's interactive voice applications may be voicemail applications, PO Resp. 52–53, is irrelevant because nothing limits the '816 patent, Gilmore,

or Dodrill to particular types of applications. *See* Reply 23–24. Rather, all three generally disclose remotely executed interactive voice application systems, making Gilmore and Dodrill analogous art because they are in the same field of endeavor of the ’816 patent.

Based on the record before us, we find that both Gilmore and Dodrill are analogous art to the field of invention of the ’816 patent.

*(2) Fundamental changes to the prior art*

Patent Owner next argues that “[a]lthough both *Gilmore* and *Dodrill* include disclosure concerning XML, the operations of their disclosed embodiments are fundamentally different, and combining them would require changes to one or both references that would render them unsuitable for their intended purpose.” PO Resp. 53–54 (citing Ex. 2029 ¶ 144).

First, Patent Owner argues that, because Gilmore’s applications (VoiceXML scripts) are not the same thing as the applications of Dodrill (web pages), the ordinarily skilled artisan would not have been motivated to use Dodrill’s database with Gilmore. *Id.* at 54. In so arguing, Patent Owner takes a literal approach, asserting that “[a]pplying *Dodrill* to *Gilmore* would result in *Dodrill*’s web pages being sent to *Gilmore*’s voice application—which expects VoiceXML scripts to process,” and vice versa—“[a]pplying *Gilmore*’s VoiceXML scripts to *Dodrill* would result in VoiceXML scripts being sent directly to a web browser—which expects an HTML page.” *Id.* at 54–55.

Patent Owner additionally argues that “Petitioner fails to explain how the web page of *Dodrill* would be applied to the alleged communication device of *Gilmore*, which serves the function of a telephone.” *Id.* at 55 (citing Ex. 1005 ¶ 30, Figs. 1–2). Patent Owner continues, “[t]here is simply no disclosure in *Gilmore* that would support the HTML-based voice

messaging web page of *Dodrill* without significant redesign and experimentation, none of which is discussed in the Petition or in Petitioner's expert's declaration." *Id.* (citing Ex. 2029 ¶ 147).

Patent Owner's arguments are unavailing, as a proposed combination of references is not limited to a bodily incorporation of the features of one reference into another. *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference."); *In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the teachings of references does not involve an ability to combine their specific structures.") (emphasis omitted). Here, Patent Owner's assertion that Gilmore's VoiceXML scripts and Dodrill's web pages are not inter-operative focuses improperly on the bodily incorporation of Gilmore's VoiceXML scripts with Dodrill's web pages, rather than what these references would have taught to one of ordinary skill in the art. Similarly, with regard to the questions Patent Owner poses to address design changes needed to incorporate Dodrill's teachings with Gilmore, PO Resp. 55–56 (citing Ex. 2029 ¶ 148), we find such alleged changes are, to a large extent, irrelevant, as they are based on Patent Owner's flawed premise of bodily incorporation.

We find that Petitioner has shown persuasively what a person of ordinary skill in the art, who is also a person of ordinary creativity, would have appreciated from the combined teachings of the references. *See* Pet. 33–36, 39–40; *see also KSR*, 550 U.S. at 421. And, contrary to Patent Owner's suggestion, the Petition does not rely solely on a "telephone call" in Gilmore, but also relies on data network connections (e.g., VoIP, IP) in Gilmore and Dodrill that send voice and data. Pet. 12, 17, 20, 42. Gilmore and Dodrill both disclose remote application execution over data

networks using IP phones, PDAs, and voice-enabled computers. Ex. 1005 ¶¶ 30–31; Ex. 1006, 8:18–24, 11:61–12:30. Dodrill discloses that user devices can receive data and voice information and include browsers and voice resource software to execute instructions at the user device (e.g., VoiceXML, XML)—a "request for processing service." Ex. 1006, 7:60–62, 9:6–11, 11:61–12:30; *see also* Ex. 1009 ¶¶ 20–21, 23 (confirming VoiceXML instruction execution on a user device using a browser). Petitioner's combination of Gilmore and Dodrill merely moves the location of processing from one known location (remote server) to another (user device), supporting a finding of obviousness. *Uber Techs.*, 957 F.3d at 1338–42; *see also KSR*, 550 U.S. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.").

We also find credible and persuasive the testimony of Mr. Lipoff on these issues. For example, we credit Mr. Lipoff's testimony that the ordinarily skilled artisan would have had reason to combine Dodrill's instruction to present voice presentation to the user as part of the request for processing with Gilmore's interactive voice response system because it would "improve access to voice-browsing (as taught by Dodrill) and to increase the available options for voice applications." Ex. 1021 ¶ 153. We also credit Mr. Lipoff's testimony that the ordinarily skilled artisan would have known that "[i]ncorporating Dodrill's alternative to sending an embedded audio file (voice representation) and an instruction to present the audio would result in merely adding known functionality to Gilmore's system." *Id.* ¶ 161. We also credit Mr. Lipoff's testimony that "[t]he executed instruction does not change, but instead merely requires the voice-

enabled device to execute the instruction," and, therefore, would have been considered conventional and expected to an ordinarily skilled artisan. *Id.* ¶¶ 162–164.

For the foregoing reasons, we disagree with Patent Owner that combining Dodrill's teachings with Gilmore would have required changes to either system that would have been beyond the skill of the ordinarily skilled artisan.

*(3) Teaching away*

Patent Owner also argues that the systems of Gilmore and Dodrill are "fundamentally different," basing this contention on statements in the Gilmore provisional application (Exhibit 2028) that distinguish web applications and voice applications. PO Resp. 56–57 (citing Ex. 2028, 6, 2). Patent Owner then states that Gilmore's system has a host system with an application server, which Patent Owner states is a "fundamentally different type of system than *Dodrill*." *Id.* at 57 (citing Ex. 2029 ¶ 149).

A reference teaches away from a combination when, for example, a person of ordinary skill in the art would be discouraged from following the path set out in the reference, or would be led in a direction divergent from that chosen by the inventor. *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). "[I]n general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." *Id.*

Patent Owner's arguments are both conclusory and legally unavailing. Even assuming that Gilmore and Dodrill disclose different types of systems, being "different" is not teaching away, which "requires 'clear discouragement' from implementing a technical feature." *Univ. of Md. Biotechnology Inst. v. Presens Precision Sensing GmbH*, 711 F. App'x 1007,

1011 (Fed. Cir. 2017) (quoting *In re Ethicon, Inc.*, 844 F.3d 1344, 1351 (Fed. Cir. 2017)). Patent Owner does not identify anything in Gilmore or Dodrill that discourages sending executable instructions to Gilmore's devices. Patent Owner's arguments also rely on differences between graphical and voice interfaces, PO Resp. 56–57, which are irrelevant because both Gilmore and Dodrill describe voice interface systems, not graphical ones, to remotely execute interactive voice applications. *See* Pet. 5–13, 31–32. Furthermore, even considering the Gilmore provisional application, we note that it confirms the "tremendous similarities" in the systems, explaining that "VoiceXML-based voice technologies are designed to work in the same general model used for Web pages" and are "interpreted in a browser (voice gateway)," like Dodrill's system and device browser. Ex. 2028, 8, 27.

*(4) Hindsight*

Finally, invoking the testimony of Dr. Rhyne, Patent Owner argues that "Petitioner's approach to proving obviousness represents an improper use of hindsight in a deliberate attempt to fish for disclosure in the prior art based on the teachings of the '816 [p]atent rather than through [an ordinarily skilled artisan's] understanding of the art." PO Resp. 60 (citing Ex. 2029 ¶¶ 139–142). We disagree. As discussed above, we find that Petitioner has articulated reasoning supported by evidentiary bases as to why the ordinarily skilled artisan would have combined the references in the manner proposed by Petitioner. In that regard, Petitioner's reasoning does not rely only on knowledge gleaned from the '816 patent's disclosure. *See In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971) ("Any judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was

within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper."). We find that Petitioner's showing is not premised on an improper hindsight reconstruction.

#### *4. Summary*

After having analyzed the entirety of the record and assigning appropriate weight to the cited supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–6 and 11–13 are unpatentable over the combination of Gilmore, Dodrill, and Dhara. In particular, we find that Petitioner has demonstrated sufficiently that the teachings of Gilmore and Dodrill and/or Dhara account for all the limitations of the claims, have been properly combined, and that an ordinarily skilled artisan would have found it obvious to combine these teachings in the manner proposed by Petitioner.

### *F. Grounds 2, 3, 5, 6, and 10: Obviousness over Gilmore, Creamer, Dhara, Fawcett, Dodrill, Ladd*

Petitioner contends that claims 14–19 are unpatentable under 35 U.S.C. § 103(a) over the combination of: Gilmore and Creamer (Ground 2); Gilmore, Creamer, and Dhara (Ground 3); Gilmore, Creamer, and Fawcett (Ground 5); Gilmore, Creamer, and Dodrill (Ground 6); and Gilmore, Creamer, Dodrill, and Ladd (Ground 10). Pet. 46–56, 78. Claim 14 is independent, and claims 15–19 depend, either directly or indirectly, from claim 14. *See* Ex. 1001, 14:47–15:15.

Limitation 14g, similar to limitation 1h, recites "*a request for processing service* to the at least one communication device." *Id.* at 15:5–7 (emphasis added). As discussed above, we construe "processing service" as "a computing process performed *by a communication device* for all or part

of the application." *Supra* § III.C.2 (emphasis added). And, based on that construction, we determine that the *combination* of Gilmore and Dodrill teaches or suggests an application server that sends a "request for processing service" to a communication device. *Supra* § III.E.1.b.3. Specifically, we find that Dodrill teaches sending executable instructions to the user device and, thus, meets our construction of "request for processing services." *Id.*

*1. Claims 14–17 (Grounds 2, 3, and 5)*

In Grounds 2, 3, and 5, Petitioner does not rely on, or cite to, Dodrill. *See* Pet. 46–56. Instead, Petitioner relies exclusively on Gilmore for teaching each element of claim 14, except for limitations 14a–14d. *See id.* at 46 (stating that "Gilmore teaches *each element* of claim 14, but does not expressly disclose a plurality of application servers" as recited in limitations 14a–14d (emphasis added)).[17] As to limitation 14g, Petitioner contends that "Gilmore discloses that at least one of the plurality of application servers is configured to communicate a request for processing service (e.g., a prompt or message to which the user can respond) to communication device 102/202," but again, makes no mention of the teachings of Dodrill. *Id.* at 52 (citing Ex. 1021 ¶ 254). Moreover, in its Reply, Petitioner emphasizes that "the Petition relies on the combination of Gilmore and Dodrill to send executable instructions, which meets both [Patent Owner's] and the district court's constructions of 'request' and 'processing service,'" *but only with respect to limitations 1h and 1i*. Reply 20 (citing Pet. 31–36).

[17] Limitations 14a–14d of claim 14 relate to a "plurality of application servers." Ex. 1001, 14:48–65. Petitioner relies on the teachings of Creamer as "render[ing] [limitations 14a–14d] obvious." Pet. 46 (citing Ex. 1021 ¶¶ 231–255); *see also infra* § III.G.

We agree with Patent Owner that Gilmore *alone* fails to teach or suggest "request for processing services," recited in limitation 14g, because, in the portions of Gilmore on which Petitioner relies, *see* Pet. 52; *id.* at 31 (citing Ex. 1005, Fig. 9, ¶¶ 28, 33–34, 39–48, 103), the application server, rather than the communication device, processes all instructions, *see* PO Resp. 46; Sur-reply 12 & n.2. For example, Gilmore teaches that "[t]he application code *executed by the application server 212* coordinates which scripts to send to the voice gateway 208" and "[t]he *application server 212 frequently processes* the scripts before sending the processed scripts to the voice gateway 208." Ex. 1005 ¶ 40 (emphases added). As noted above, Petitioner does not point us to any disclosure in Gilmore, either alone or in combination with Creamer and/or Dhara, that teaches or suggests this limitation without the addition of Dodrill. Because Petitioner's showing is missing a prior-art reference necessary for teaching all limitations of claim 14, Grounds 2, 3, and 5 are deficient.

*2. Claims 18 and 19 (Grounds 6 and 10)*

Unlike the grounds of unpatentability immediately above, Petitioner does make reference to Dodrill in Grounds 6 and 10. Specifically, in Ground 6, Petitioner contends that claim 18 is unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Gilmore, Creamer, and Dodrill. Pet. 56. And, in Ground 10, Petitioner contends that claim 19 is unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Gilmore, Creamer, Dodrill, and Ladd. *Id.* at 78. But, in both of these grounds, like in Grounds 2, 3, and 5, above, Petitioner does *not* rely on Dodrill to teach limitation 14g's recitation of "a request for processing service to the at least one communication device."

Specifically, for claim 18 (Ground 6), Petitioner states that "[c]laim 18 depends from claim 14, which is rendered obvious *by Gilmore and Creamer*." *Id.* at 56 (emphasis added). Petitioner then states that "[a]s explained in Sections V.A.4.i ([1h]-[1i]), Dodrill renders *this additional limitation* obvious." *Id.* (emphasis added) (citing Pet. 31–36). We interpret "this additional limitation" to be the additional limitation recited in claim 18—i.e., "wherein the request for processing service comprises an instruction to present a user of the at least one communication device voice data or audio data." *Id.*

Put differently, we interpret Petitioner's argument as relying on the combination of Gilmore and Creamer to teach all limitations of claim 14, and on Dodrill to teach the additional limitation recited in claim 18 only. But, as explained immediately above, we do not find that the combination of Gilmore and Creamer teaches or suggests all limitations of claim 14, namely for the reason that Gilmore fails to teach or suggest "request for processing services" as we have construed it here. Although perhaps a close call, we decline to parse the Petition to present an argument Petitioner could have made but did not, because "the petitioner is master of its complaint." *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018); *cf. Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1335 (Fed. Cir. 2020) (holding "that the Board erred by instituting *inter partes* review based on a combination of prior art references not advanced in [Petitioner's] petition").

Ground 10 suffers from the same infirmity, given that claim 19 depends from claim 18, and through reference to earlier sections of its Petition, Petitioner again relies only on Gilmore and Creamer to teach all limitations of the base independent claim—i.e., claim 14. Pet. 78.

### *3. Summary*

For these reasons, after considering the entirety of the record, we determine that Petitioner has not shown by a preponderance of the evidence that claims 14–19 are unpatentable as having been obvious over the particular combinations of Gilmore, Creamer, Dhara, Fawcett, Dodrill, and Ladd as presented in the Petition.

## *G. Ground 4: Obviousness over Gilmore, Dhara, Dodrill, and Creamer*

Petitioner contends that claims 7 and 8 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Gilmore, Dhara, Dodrill, and Creamer. Pet. 54. Claim 7 depends from claim 1, and recites that "the application server comprises a plurality of servers." Ex. 1001, 14:23–24. Claim 8 depends from claim 7, and recites that that "the voice processing software is distributed across the plurality of servers." *Id.* at 14:25–27.

As to claim 7, Petitioner acknowledges that Gilmore does not explicitly disclose that the voice gateway 108/208 (application server) comprises a plurality of servers, but contends that implementing the voice gateway 108/208 across a plurality of servers would have been obvious based on the teachings of Creamer. Pet. 54 (citing Ex. 1021 ¶¶ 262–264). Similarly, as to claim 8, Petitioner acknowledges that Gilmore does not explicitly disclose that its voice processing software program (e.g., text-to-speech generation component 208d and speech recognition engine 208e) could be distributed across a plurality of servers, but again contends that doing so would have been obvious to an ordinarily skilled artisan based on the teachings of Creamer. *Id.* (citing Ex. 1021 ¶¶ 265–268).

Patent Owner argues that Creamer "fails to disclose the claimed plurality of application servers," because Creamer "provides no specifics regarding any configuration of a plurality of servers." PO Resp. 50–51. We

disagree. Creamer expressly teaches that an IVR system "can . . . be implemented by multiple servers in a distributed fashion." Ex. 1010 ¶ 25. Creamer teaches that, in one embodiment, "the IVR system 125 can include a stand-alone solution contained within a single server interfacing directly with the telecom network 110 without being communicatively linked to the computer communications network 120." *Id.* And, in another embodiment, "[t]he IVR system 125 can alternatively be implemented by *multiple servers* in a distributed fashion." *Id.* (emphasis added). Thus, the teachings of Creamer clearly account for the "plurality of servers" recited in claims 7 and 8. *See, e.g.*, *Beckman Instruments Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989) (a reference is prior art for all that it teaches).

Relying on Mr. Lipoff's Declaration, Petitioner also contends that an ordinarily skilled artisan would have been motivated to combine the teachings of Creamer with those of Gilmore, Dhara, and Dodrill, with a reasonable expectation of success. Pet. 54 (citing Ex. 1021 ¶¶ 262–268); *see also id.* at 50–52. In particular, Petitioner contends that "[d]istributing software applications across multiple servers was well known to the artisan," and that implementing multiple servers in Gilmore's system "would merely combine known elements to achieve an expected result." *Id.* at 51–52 (citing Ex. 1021 ¶¶ 247–251). We agree with Petitioner, and credit Mr. Lipoff's testimony, that an ordinarily skilled artisan "would have found it obvious to host each of" Gilmore's applications "on separate servers (each executing its own 'application')," *id.* at 49, especially given that Creamer teaches that a distributed server system is an *alternative* to a "stand-alone solution contained within a single server," Ex. 1010 ¶ 25; *see also* Ex. 1021 ¶ 242. We also credit and rely on Mr. Lipoff's testimony that distributing Gilmore's applications over a plurality of servers would have been desirable,

because such a distributed system "would provide a more robust system that is less susceptible to software crashes and allow the gateway to serve a greater number of concurrent users." Ex. 1021 ¶ 244; *see also* Pet. 50.

Patent Owner argues that an ordinarily skilled artisan would not have been motivated to combine the teachings of Gilmore and Creamer, because the proposed combination would have been inoperable. PO Resp. 58–60 (citing Ex. 2029 ¶¶ 152–154). In so doing, Patent Owner again takes a literal approach—arguing that Creamer utilizes a plurality of IVR servers so that one server is available for each phone line of a business phone system that includes multiple lines, and that "[t]his 'distributed' approach does not logically lend itself to application in *Gilmore's* system." *Id.* at 59.

But, as explained above, Petitioner's proposed combination of Gilmore and Creamer does not require a bodily incorporation of the features of one of those references into the other. *Supra* § III.E.3.d.2. Moreover, as Petitioner contends and Patent Owner does not contest, distributing software applications across multiple servers was well known before the '816 patent and would have required only ordinary skill to implement. Pet. 51–52; Ex. 1021 ¶¶ 247–251; *see also KSR*, 550 U.S. at 417 (describing "the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement" as obvious).

For these reasons, after having analyzed the entirety of the record and assigning appropriate weight to the cited supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence that claims 7

and 8 are unpatentable as having been obvious over the combination of Gilmore, Dhara, Dodrill, and Creamer.

*H. Ground 7: Obviousness over Gilmore, Dhara, Dodrill and Ladd*

Petitioner contends that claims 9, 10, 29, and 30 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Gilmore, Dhara, Dodrill, and Ladd. Pet. 57–70. Having considered the totality of the arguments and evidence, we find that Petitioner has shown by a preponderance of the evidence that claims 9, 10, 29, and 30 are unpatentable as having been obvious over Gilmore, Dhara, Dodrill, and Ladd.

*1. Claims 9 and 10*

Claims 9 and 10 depend, either directly or indirectly, from claim 1, and therefore include the limitations of claim 1, discussed above in connection with Ground 1. *Supra* § III.E. Claim 9 specifies that the voice processing software program of claim 1 "comprises a voice recognition application, a speech-to-text application, and a text-to-speech application." Ex. 1001, 14:28–31. And claim 10 specifies that the communication device "comprises a second voice recognition application configured to recognize at least one word spoken by a user of the at least one communication device." *Id.* at 14:32–36. Petitioner contends that, to the extent Gilmore "does not explicitly disclose a speech-to-text application" as recited in claim 9, "Ladd renders this limitation obvious" by disclosing a speech-to-text application. Pet. 57–58 (citing Ex. 1021 ¶¶ 283–286). Petitioner also contends that Ladd discloses a voice recognition application, e.g., "voice browser [250] and/or RecServer software by Nuance Communications," that "can be integrated into the communication devices to recognize spoken words," as recited in claim 10. *Id.* at 60–61 (citing Ex. 1021 ¶¶ 293–299 (internal quotations omitted)).

Petitioner persuasively maps the limitations of claims 9 and 10 to the cited art. *Id.* at 57–61 (citing, for **claim 9**: Ex. 1005 ¶¶ 39, 50; Ex. 1016, Abstract, Fig. 3, 9:1–26, 9:44–51, 11:30–35, 20:5–10; Ex. 1021 ¶¶ 278–286; for **claim 10**: Ex. 1016, 11:48–49, 13:66–67, 14:17–23, 14:28–48; Ex. 1021 ¶¶ 293–299). Patent Owner does not present separate and specific arguments for these dependent claims. *See* PO Resp. 61 (arguing that the dependent claims not specifically addressed are nonobvious because the claims from which they depend are also nonobvious). We adopt the contentions set forth in the Petition and in Mr. Lipoff's Declaration as mapped to the limitations of the challenged claims as our own findings. *NuVasive*, 841 F.3d at 974.

In addition to the reasons discussed above as to independent claim 1, *supra* § III.E.3, we also determine that Petitioner has made a sufficient showing that the references are properly combined and an ordinarily skilled artisan would have had a reasonable expectation of success in combining Ladd with Gilmore, Dhara, and Dodrill in the manner proposed by Petitioner. Specifically, Petitioner presents persuasive evidence and arguments, supported by Mr. Lipoff's testimony (which we credit), that an ordinarily skilled artisan would have been motivated to incorporate Ladd's speech-to-text application and voice-recognition software into Gilmore's IVR system to "add/expand capability and facilitate processing," and that doing so would merely require the use of commercially available software. Pet. 58–59 (citing Ex. 1021 ¶¶ 287–292).

*2. Claims 29 and 30*

Claim 29 is independent, and is directed to a method of providing responses in a communication system. Ex. 1001, 16:31–55. Claim 30 depends from claim 29, and recites additional method steps. *Id.* at 16:56–63.

Petitioner contends that Gilmore teaches most limitations of claims 29 and 30, except for: limitation 29a, "which is rendered obvious by Dhara," limitations 29b–29c, "which are rendered obvious by Ladd," and limitation 29h, "which is rendered obvious by Dodrill." Pet. 62 (citing Ex. 1021 ¶¶ 303–329), 68–70 (citing Ex. 1021 ¶¶ 330–337). In response, Patent Owner disputes Petitioner's showing as to only limitations 29a and 29h, which we discuss below.

As to the undisputed limitations of claims 29 and 30, we find that Petitioner persuasively maps the limitations of these dependent claims to the cited art (and to the testimony of Mr. Lipoff in support of the combination of references). *See* Pet. 62–70 (citing, for **limitation 29b** and **limitation 29c**: Ex. 1005 ¶¶ 34, 51; Ex. 1016, 9:45–51, 20:5–18; Ex. 1021 ¶¶ 308–315; for **limitation 29d**: Ex. 1005 ¶¶ 45–46, 48, 52, 75 (by reference to limitation 1e); Ex. 1021 ¶ 317; for **limitation 29e**: Ex. 1005 ¶¶ 34, 51; Ex. 1021 ¶¶ 318–319; for **limitation 29f**: Ex. 1005, Figs. 1–2, ¶¶ 29, 31 (by reference to limitation 1a); Ex. 1021 ¶ 320; for **limitation 29g**: Ex. 1005 ¶ 31; Ex. 1006, Fig. 1, 3:27–28, 7:60–63, 9:55–68; Ex. 1021 ¶¶ 321–324; for **claim 30**: Ex. 1005 ¶¶ 33, 51–52, 103, Fig. 9; Ex. 1021 ¶¶ 330–337). Again, Patent Owner does not present separate and specific arguments for these limitations of claim 29, nor does Patent Owner present separate and specific arguments for claim 30. *See* PO Resp. 61 (arguing that the dependent claims not specifically addressed are nonobvious because the claims from which they depend are also nonobvious). We adopt the contentions set forth in the Petition and in Mr. Lipoff's Declaration as mapped to the limitations of the challenged claims as our own findings. *NuVasive*, 841 F.3d at 974.

We now turn to the limitations disputed by Patent Owner.

*a) Limitation 29a*

Limitation 29a recites "receiving, by at least one application server over a first communication link, a request from at least one communication device, wherein the request comprises packetized voice data." Ex. 1001, 16:33–36. Petitioner contends, and Patent Owner does not dispute, that the first portion of limitation 29a corresponds to limitation 1b, and the second portion corresponds to limitation 1c2. Pet. 62.

For "receiving, by at last one application server over a first communication link, a request from at least one communication device," Petitioner relies on its arguments and evidence submitted in connection with limitation 1b. *Id.* (citing Pet. 13–15; Ex. 1021 ¶ 306). And for "wherein the request comprises packetized voice data," Petitioner relies on its arguments and evidence submitted in connection with limitation 1c2. *Id.* (citing Pet. 17–19; Ex. 1021 ¶ 307). For the reasons explained above in connection with limitations 1b and 1c2, we find that Petitioner persuasively maps the first and second portions of limitation 29a to Gilmore and to the combination of Gilmore and Dhara, respectively. *See supra* § III.E.1.b.2 (limitation 1b); § III.E.1.a (limitation 1c2).

Patent Owner argues that the petition fails to identify an application server that establishes a communication session in response to a request from a communication device. *See* PO Resp. 38–39, 43. Specifically, Patent Owner argues that "since the telephone call of *Gilmore* is not a request as used in the '816 [p]atent, Element [29a] is not met." *Id.* at 43 (citing Ex. 2029 ¶ 225). We disagree for the reasons explained above in connection with limitation 1b. *Supra* § III.E.1.b.2.

In particular, we agree with Petitioner's contention (supported by the testimony of Mr. Lipoff regarding the contemporaneous understanding of

the ordinarily skilled artisan, which we credit) that "the call to Gilmore's IVR system is a 'request'" to establish a communication session because the call "initiates retrieval and execution of the script that establishes the session." Pet. 15 (citing Ex. 1021 ¶ 95). We also reiterate that Patent Owner's arguments are unavailing because they are based on an unduly narrow reading of "communication session" as excluding voice telephone calls, which ignore the '816 patent itself. *Supra* § III.E.1.b.2.b. The written description of the '816 patent broadly describes client communication devices as encompassing landline phones. Ex. 1001, 6:5–7 ("Landline phones and/or IP phones can also *communicate* with repository 20 and/or application server 24 *in the same manner* as mobile phones." (emphases added)). Thus, because both the '816 patent and Gilmore contemplate use of similar communication devices, including landline phones, we do not agree with Patent Owner's contention that a telephone call in Gilmore cannot qualify as a "request" as recited in limitation 29a.

*b) Limitation 29h*

Limitation 29h recites "wherein the at least one portion of the second application is maintained in the at least one repository or a database coupled to the at least one repository." Ex. 1001, 16:53–55. For this limitation, Petitioner relies on its arguments and evidence submitted in connection with limitation 1d and claim 3. Pet. 68. Specifically, Petitioner contends that Gilmore teaches that the at least one portion of the second application (i.e., VoiceXML applications stored in data store 214) is maintained in the at least one repository (i.e., application server 110/210) or coupled to the repository externally. *Id.* (citing Ex. 1005 ¶ 45; Ex. 1021 ¶ 328). Petitioner also contends that, based on the teachings of Dodrill, an ordinarily skilled artisan would have understood that Gilmore's data store 214 is a "database" as

claimed, or would have considered the same an obvious modification of Gilmore's data store. *Id.* (citing Ex. 1021 ¶ 329). Patent Owner argues, as it did with claim 3, that the Petition fails to identify a database of applications. *See* PO Resp. 48. We disagree for the same reasons explained above in connection with claim 3. *See supra* § III.E.2.b.

Specifically, we reiterate that Patent Owner's argument is premised on an overly narrow interpretation of the term "application," which we have not adopted. *See supra* § III.C.3. And, because Gilmore's VoiceXML scripts fall within the scope of an "application," as recited in the '816 patent claims, Gilmore's disclosure of the repository being coupled to a data store satisfies the claim's recitation of a repository having access to a database. Ex. 1005 ¶ 42 ("The data store 214 is a storage device that stores file necessary for execution of the voice application . . . includ[ing] script files, prompt files, grammar files, and text-to-speech (TTX) text files."). In any event, even if Gilmore's data store did not qualify as a database, we also find that Dodrill teaches storing interactive voice applications, such as XML voice applications, in "application [document] database [96]." Ex. 1006, 9:16–24, 12:36–42. Thus, Gilmore, alone or in combination with Dodrill, teaches or suggests limitation 29h.

*c) Motivation to combine/reasonable expectation of success*

For reasons discussed above as to independent claim 1 and dependent claim 3, we also determine that Petitioner has made a sufficient showing that the references are properly combined for claims 29 and 30, and that an ordinarily skilled artisan would have had a reasonable expectation of success in combining Ladd with Gilmore, Dhara, and Dodrill in the manner proposed by Petitioner. *Supra* § III.E.3. Specifically, Petitioner presents persuasive evidence and arguments, supported by Mr. Lipoff's testimony

(which we credit), that it would have been obvious to implement Gilmore's voice/data network 104/204 over the Internet, given that Gilmore expressly teaches that the network may be voice-over IP or other "Internet protocol (IP)-based" network. Ex. 1005 ¶ 31; Ex. 1021 ¶ 325; Pet. 67. Indeed, Ladd confirms that the Internet allows access to a voice-over IP network. Ex. 1016, 9:55–66; *see also* Ex. 1021 ¶¶ 325–326; Pet. 67; *Western Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1370 (Fed. Cir. 2010) (confirming the obviousness of "applying the use of the Internet to existing electronic processes at a time when doing so was commonplace").

*3. Summary*

For these reasons, after having analyzed the entirety of the record and assigning appropriate weight to the cited supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence that claims 9, 10, 29, and 30 are unpatentable as having been obvious over the combination of Gilmore, Dhara, Dodrill, and Ladd.

*I. Ground 8: Obviousness over Gilmore, Dodrill, and Ladd*

Petitioner contends that claims 20, 22, 23, and 25–28 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Gilmore, Dodrill, and Ladd. Pet. 71–77. Having considered the totality of the arguments and evidence, we find that Petitioner has shown by a preponderance of the evidence that claims 20, 22, 23, and 25–28 are unpatentable as having been obvious over Gilmore, Dodrill, and Ladd.

*1. Limitations of claim 20*

Claim 20 is independent, and is directed to an interactive, voice-based communication system. Ex. 1001, 15:30–55. Petitioner contends that Gilmore teaches most limitations of claim 20, except for limitation 20e,

"which is rendered obvious by Ladd." Pet. 71 (citing Ex. 1021 ¶¶ 338–339). Petitioner also contends that "Ladd confirms the obviousness" of limitation 20f, while "Dodrill confirms the obviousness" of limitation 20g. *Id.* In response, Patent Owner disputes Petitioner's showing as to only limitations 20b, 20c, and 20g, which we discuss below. PO Resp. 37, 39, 43, 48.

As to the undisputed limitations of claim 20, we find that Petitioner persuasively maps the limitations of these dependent claims to the cited art (and to the testimony of Mr. Lipoff in support of the combination of references). *See* Pet. 71–74 (citing, for **the preamble**: Ex. 1005, Abstract, ¶¶ 2, 32, 36–37, 39, 49–50; Ex. 1021 ¶ 340; for **limitation 20a**: Ex. 1005, Figs. 1–2, ¶¶ 29, 31 (by reference to limitation 1a); Ex. 1021 ¶¶ 341–342; for **limitation 20d**: Ex. 1005 ¶¶ 30–31, 33–35, 39–48, 50; Ex. 1009 ¶¶ 19, 42 (by reference to claim 6); Ex. 1021 ¶¶ 347–348; for **limitation 20e**: Ex. 1005 ¶¶ 3, 33, 37, 39, 40, 44, 48–50, 70, Figs. 9–14; Ex. 1016, Abstract, Fig. 3, 9:1–26, 9:44–51, 11:30–35, 20:5–10 (by reference to claims 2 and 9); Ex. 1021 ¶ 350; for **limitation 20f**: Ex. 1005 ¶ 31; Ex. 1006, Fig. 1, 3:27–28, 7:60–63, 9:55–68 (by reference to limitation 29g); Ex. 1021 ¶¶ 351–352). Patent Owner does not present separate and specific arguments for these limitations of claim 20. *See generally* PO Resp. We adopt the contentions set forth in the Petition and in Mr. Lipoff's Declaration as mapped to the limitations of the challenged claims as our own findings. *NuVasive*, 841 F.3d at 974.

We now turn to the limitations disputed by Patent Owner.

*a) Limitation 20b*

Limitation 20b recites "at least one application server coupled to a first communication link and coupled to a second communication link, the first communication link and the second communication link each

comprising a data connection data." Ex. 1001, 15:32–35. Petitioner contends, and Patent Owner does not dispute, that limitation 20b corresponds to limitation 1b. Pet. 72. Thus, for the reasons explained above in connection with limitation 1b, we find that Petitioner persuasively maps the first and second portions of limitation 20b to Gilmore. *See supra* § III.E.1.b.2 (limitation 1b). Patent Owner again argues that the petition fails to identify an application server that establishes a communication session in response to a request from a communication device. *See* PO Resp. 38–39, 43. We again disagree for the reasons explained above in connection with limitation 1b, *supra* § III.E.1.b.2, as well as limitation 29a, *id.* § III.H.2.a.

*b) Limitation 20c*

Limitation 20c recites "at least one repository coupled to the second communication link, the at least one repository either (a) configured to transmit at least one portion of an application to the at least one application server, or (b) configured to execute the at least one portion of the application." Ex. 1001, 15:39–43. Petitioner contends, and Patent Owner does not dispute, that the first portion of limitation 20c corresponds to limitation 1d, and the second portion corresponds to limitation 1e. Pet. 72.

For "at least one repository coupled to the second communication link," Petitioner relies on its arguments and evidence submitted in connection with limitation 1d. *Id.* (citing Pet. 21–23; Ex. 1021 ¶ 345). Specifically, Petitioner contends that Gilmore teaches at least one repository (i.e., application server 110/210) coupled via a second communication link to the voice gateway 108/208. *Id.* at 22 (citing Ex. 1005, Fig. 1). We find that Petitioner's mapping is supported by the teachings of Gilmore and the testimony of Mr. Lipoff, which we credit. Ex. 1005, Fig. 1; Ex. 1021 ¶ 345.

We note that Patent Owner does not appear to challenge Petitioner's showing with respect to this portion of limitation 20c. *See* PO Resp. 37.

For the repository being "either (a) configured to transmit at least one portion of an application to the at least one application server, or (b) configured to execute the at least one portion of the application," Petitioner relies on its arguments and evidence submitted in connection with limitation 1e. Pet. 72 (citing Pet. 23–26; Ex. 1021 ¶¶ 346). For the reasons explained above in connection with limitation 1e, we find that Petitioner persuasively maps this portion of limitation 20c to Gilmore. *See supra* § III.E.1.b.1 (limitation 1e).

Patent Owner argues that that the Petition fails to show that the repository can be configured to cause the execution of an application via a second communication link, for the same reason the Petition allegedly fails to show that the application server may be configured to cause the execution of an application via a second communication link. *See* PO Resp. 36–37 (arguing that "[t]he Petition fails to show that Gilmore discloses Element[] . . . [20c] for substantially the same reasons"). We reject this argument, however, for the same reasons we rejected Patent Owner's argument with respect to limitation 1e—that is, because Patent Owner's argument is premised on an overly narrow interpretation of the term "application." *See supra* § III.C.3.

We instead find that Petitioner presents persuasive evidence that when Gilmore's "'gateway 208 requests a script from the application server 212,' server 212 'processes the script by resolving any DCG [dynamic content generation] commands within the script into voice instructions' before sending the script to voice gateway 108/208." Pet. 25 (citing Ex. 1005 ¶ 52). Gilmore further explains that "application server 212 provides the execution

environment for voice applications" and that "application code executed by the application server 212 coordinates which scripts to send to the voice gateway 208." Ex. 1005 ¶ 40. Thus, Gilmore confirms that application server 212 may process the scripts before sending the processed scripts to the voice gateway 208, such as by executing DCG commands (which meet the '032 patent's definition of "application") over data connection 112 (second communication link) before receiving the application from application server 212. *Id.* ¶¶ 40, 52. *See also supra* § III.E.1.b.1.a.

Patent Owner's challenge to Petitioner's showing regarding limitation 20c, just as with limitation 1e, is premised on Patent Owner's contention that VoiceXML scripts and DCG commands are not applications. PO Resp. 37. But again, Patent Owner's arguments are unavailing in part because they are premised on an overly narrow interpretation of the term "application," which we have not adopted. *See supra* § III.C.3. As we discuss above, we agree with Petitioner that an "application," within the meaning of the '816 patent claims, includes "functionality that is capable of facilitating the ability to collect information from and/or present information to one or more client devices or users." *Id.*; *see* Ex. 1001, 4:45–49. We further agree, as also noted above, that Gilmore's VoiceXML scripts fall within the scope of an application. We similarly agree that DCG commands fall within the scope of an application, as they are used, for example, to "significantly increase the ability of the scripts to dynamically change in response to different types of callers and in response to different caller inputs." Ex. 1005 ¶ 52. As such, they facilitate the ability to collect information from and/or present information to one or more client devices or users.

For these reasons, we find that Petitioner has shown by a preponderance of the evidence that Gilmore teaches or suggests the subject matter of limitation 20c.

*c) Limitation 20g*

Limitation 20g recites "wherein the at least one portion of the application is maintained in the at least one repository or a database coupled to the at least one repository." Ex. 1001, 15:53–55. For this limitation, Petitioner relies on its arguments and evidence submitted in connection with limitation 1d and claim 3. Pet. 73–74. Specifically, Petitioner contends that Gilmore teaches that the at least one portion of the second application (i.e., VoiceXML applications stored in data store 214) is maintained in the at least one repository (i.e., application server 110/210) or coupled to the repository externally. *Id.* at 73 (citing Ex. 1005 ¶ 45; Ex. 1021 ¶ 353). Petitioner also contends that, based on the teachings of Dodrill, an ordinarily skilled artisan would have understood that Gilmore's data store 214 is a "database" as claimed, or would have considered the same an obvious modification of Gilmore's data store. *Id.* at 74 (citing Ex. 1021 ¶ 354). Patent Owner argues, as it did with claim 3, that the Petition fails to identify a database of applications. *See* PO Resp. 48. We disagree for the same reasons explained above in connection with claim 3 and limitation 29h. *See supra* §§ III.E.2.b. (claim 3), III.H.2.b. (limitation 29h). Thus, we find that, Gilmore, alone or in combination with Dodrill, teaches or suggests the subject matter of limitation 20g.

*2. Limitations of the dependent claims*

Having decided that the combination of Gilmore, Dodrill, and Ladd teaches or suggests each and every limitation of claim 20, we now turn to the remaining challenged claims in this ground of unpatentability—i.e., claims

22, 23, and 25–28. Claims 22, 23, and 25–28 depend, either directly or indirectly, from claim 20. Ex. 1001, 15:61–16:6, 16:10–29. As such, they also include the above-discussed limitations. Patent Owner presents separate arguments for dependent claims 26, 27, and 28. *See* PO Resp. 48–50. We address those claims individually below.

*a) Dependent claims 22, 23, 25*

As to claims 22, 23, and 25, we find that Petitioner persuasively maps the limitations of these dependent claims to the cited art (and to the testimony of Mr. Lipoff in support of the combination of references). *See* Pet. 74–75 (citing, for **claim 22**: Ex. 1005 ¶¶ 33, 34, 40, 48, 51; Ex. 1021 ¶¶ 355–361; for **claim 23**: Ex. 1005 ¶¶ 14, 40, 42, 45, 46, 52, 75, Fig. 2 (by reference to limitation 1d); Ex. 1021 ¶¶ 362–364; for **claim 25**: Ex. 1016, 11:48–49, 13:66–67, 14:17–23, 14:28–48 (by reference to claim 10); Ex. 1021 ¶¶ 365–367). Again, Patent Owner does not present separate and specific arguments for any of these dependent claims. *See* PO Resp. 61 (arguing that the dependent claims not specifically addressed are nonobvious because the claims from which they depend are also nonobvious). We adopt the contentions set forth in the Petition and in Mr. Lipoff's Declaration as mapped to the limitations of the challenged claims as our own findings. *NuVasive*, 841 F.3d at 974.

*b) Dependent claims 26 and 28*

Dependent claim 26 depends from claim 25, and recites "wherein the communication session further comprises at least one instruction transmitted by the at least one server to the at least one communication device, the instruction comprising a request for processing service." Ex. 1001, 16:15–19. Claim 28 depends from claim 27, and recites "wherein the at least one application server is configured to transmit a request for processing service

over the first communication link to the at least one communication device, and wherein the request for processing service comprises an instruction to present a user of the at least one communication device the voice representation." *Id.* at 16:23–29. Petitioner contends, and Patent Owner does not dispute, that these claims are substantially similar to limitations 1h and 1i. Pet. 76–77. Accordingly, Petitioner relies on its arguments and evidence submitted in connection with limitations 1h and 1i. *Id.* (citing Pet. 31–33; Ex. 1021 ¶¶ 368–370, 374–376). For the reasons explained above in connection with limitations 1h and 1i, we find that Petitioner persuasively maps claims 26 and 28 to the combination of Gilmore and Dodrill. *See supra* § III.E.1.b.3.

Patent Owner argues, as it did with limitations 1h and 1i, that the Petition fails to identify "a request for processing service." *See* PO Resp. 44, 47–48. We disagree for the same reasons explained above in connection with limitations 1h and 1i. Specifically, we are persuaded by Petitioner's arguments and evidence that the combination of Gilmore and Dodrill teaches or suggests an application server that communicates a request for processing service to a communication device, as recited in claim 26. In particular, Gilmore teaches the voice gateway generates a voice representation of information derived from executing a VoiceXML application, which it sends as audio prompts to the user communication device. Ex. 1005 ¶¶ 39, 43, 44, 48, 52, 103, Fig. 9. We are also persuaded by Petitioner's arguments that Dodrill teaches that the user communication device receives the voice representation in software and executing an instruction in software on the user device to play the voice representation as audio for the user, as recited in claim 28. Ex. 1006, 8:18–24, 11:66–12:30, Fig. 7.

*c) Dependent claim 27*

Dependent claim 27 depends from claim 20, and recites "wherein the text-to-speech application is configured to generate a voice representation of information derived from the application." Ex. 1001, 16:20–22. Petitioner contends, and Patent Owner does not dispute, that claim 27 is substantially similar to limitation 1g. Pet. 76. Accordingly, Petitioner relies on its arguments and evidence submitted in connection with limitation 1g. *Id.* (citing Pet. 28–31; Ex. 1021 ¶¶ 371–373). For the reasons explained above in connection with limitation 1g, we find that Petitioner persuasively maps claim 27 to the teachings of Gilmore. *See supra* § III.E.1.b.1.c.

Patent Owner argues, as it did with limitation 1g, that the Petition fails to identify "a voice representation of information derived from the application." *See* PO Resp. 38 (arguing that "[t]he Petition fails to show that *Gilmore* satisfies the language of Element [27] for substantially the same reasons"). We disagree for the same reasons explained above in connection with limitation 1g, and reiterate that we are persuaded by Petitioner's arguments and evidence that Gilmore's generation of speech using text-to-speech processing is "a voice representation of information derived from the application," because Gilmore's VoiceXML script determines what audio to present based on the application's instructions (e.g., prompt/grammar) and information in the application, e.g., menu options to speak for a specific user. Ex. 1005 ¶¶ 39, 43–44, 48, 52, 64, 70, 74, 77, 103, Fig. 9; *see also supra* § III.E.1.b.1.c.

*3. Motivation to combine/reasonable expectation of success*

As noted above, Petitioner relies primarily on Gilmore as disclosing the limitations of the challenged claims, but additionally relies on the teachings of Dodrill or Ladd in combination with Gilmore as to certain

limitations of claim 20—namely, limitation 20e (a speech-to-text application), limitation 20f (the first communication link comprising the Internet), and limitation 20g (application maintained in a repository or a database coupled to the repository). Pet. 71 (citing Ex. 1021 ¶¶ 338–339). Petitioner also relies on the combination of Gilmore, Dodrill, and Ladd for claim 25, *id.* at 75, and Gilmore and Dodrill for claims 26 and 28, *id.* at 76–77.

We determine that Petitioner has also made a sufficient showing that the references are properly combined and that an ordinarily skilled artisan would have had a reasonable expectation of success in combining Gilmore, Dodrill, and Ladd in the manner proposed by Petitioner, for essentially the same reasons articulated above, *supra* §§ III.E.3 (addressing motivation to combine and reasonable expectation of success with respect to the combination of Gilmore and Dodrill), III.H.1 (addressing motivation to combine and reasonable expectation of success with respect to the combination of Gilmore, Dhara, Dodrill, and Ladd), III.H.2.c. (addressing motivation to combine and reasonable expectation of success with respect to the combination of Gilmore and Ladd).

As to the combination with Ladd, we reiterate our determinations that (1) implementing Gilmore's voice/data network 104/204 over the Internet as explicitly taught by Ladd would have been obvious to the ordinarily skilled artisan, given that Gilmore expressly teaches that the network may be voice-over IP or other "Internet protocol (IP)-based" network (Ex. 1005 ¶ 31; Ex. 1021 ¶ 325) and Ladd confirms that the Internet allows access to a voice-over IP network (Ex. 1016, 9:55–66); and (2) incorporating Ladd's speech-to-text application and voice-recognition software into Gilmore's IVR system would have been an obvious modification implemented through the

use of commercially available software, and would have been desirable to add/expand capability and facilitate processing (Ex. 1021 ¶¶ 287–292).

As to the combination of Gilmore and Dodrill, we reiterate our determinations that: (1) Dodrill and Gilmore both describe presenting voice prompts to a user on the user's device, and incorporating Dodrill's option of sending the user an executable .wav file that contains instructions to present voice prompts on the user's computer would have been desirable as adding functionality to Gilmore's system and reducing server load (Ex. 1021 ¶¶ 151, 163); and (2) databases as taught by Dodrill were well-known as of the priority date of the '816 patent, and an ordinarily skilled artisan would have understood that using Dodrill's database as Gilmore's data store would result in the ordinary and expected operation of storing applications to be retrieved for execution (Ex. 1021 ¶¶ 186–189).

*4. Summary*

For these reasons, after having analyzed the entirety of the record and assigning appropriate weight to the cited supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence that claims 20, 22, 23, and 25–28 are unpatentable as having been obvious over Gilmore, Dodrill, and Ladd.

*J. Ground 9: Obviousness over Gilmore, Dodrill, Ladd, and Fawcett*

Petitioner contends that claim 24 is unpatentable under 35 U.S.C. § 103(a) over the combination of Gilmore, Dodrill, Ladd, and Fawcett. Pet. 77. Having considered the totality of the arguments and evidence, we find that Petitioner has shown by a preponderance of the evidence that claim 24 is unpatentable as having been obvious over Gilmore, Dhara, Dodrill, and Fawcett.

Claim 24 depends from independent claim 20, and therefore includes the limitations of claim 20, discussed above in connection with Ground 8. *Supra* § III.I. Claim 24 specifies that the first and/or second communication link of claim 20 "further comprise[s] at least one data socket connection." Ex. 1001, 16:7–9. Petitioner contends that Fawcett discloses a data socket connection, and that "[i]nasmuch as Gilmore discloses that both the first communication link (network 104/204) and the second communication link (network 112/unlabeled in FIG. 2) may be implemented by a TCP/IP network," then "it would have been obvious to the artisan to implement the first and/or second communication link of Gilmore using at least one data socket connection" as taught by Fawcett. Pet. 77.

We agree with Petitioner. First, Petitioner persuasively maps the limitation of claim 24 to the teachings of Fawcett. *Id.* (citing Pet. 54–55). Specifically, Fawcett shows an IVR system in which "TCP/IP sockets" 56 connect client and server applications. Ex. 1017, Figs. 4–5. Fawcett explains that "a socket is a communication object from which messages are sent and received," *id.* at 7:35–37, and that communication between a particular client and server application "occurs via a socket identifier allocated to the pair," *id.* at 8:4–5.

Second, in addition to the reasons we discuss above as to independent claim 20, *supra* § III.I, Petitioner has also made a sufficient showing that the references are properly combined and that an ordinarily skilled artisan would have had a reasonable expectation of success in combining Fawcett with Gilmore, Dhara, and Ladd in the manner proposed by Petitioner. Specifically, Petitioner presents persuasive evidence and arguments, supported by Mr. Lipoff's testimony (which we credit), that using Fawcett's data socket connection in Gilmore's TCP/IP connection would have been

conventional and obvious to an ordinarily skilled artisan. Pet. 55–56 (citing Ex. 1021 ¶¶ 274–275). Indeed, Fawcett shows that data socket connections were "common," "well known," and "understood by those skilled in the art" before the '816 patent. Ex. 1017, 7:35–37, 8:4–9. We agree with Petitioner and Mr. Lipoff that it would have been only a matter of routine and ordinary skill to utilize a data socket connection in Gilmore's TCP/IP connection, especially given the ordinarily skilled artisan's familiarity with data socket connections and the "benefit[s] of this architecture" as described by Fawcett. *Id.* at 7:40–54; Pet. 54–55, 77–78; Ex. 1021 ¶¶ 269–274, 377–379.

For these reasons, after having analyzed the entirety of the record and assigning appropriate weight to the cited supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence that claim 24 is unpatentable as having been obvious over the combination of Gilmore, Dodrill, Ladd, and Fawcett.

*K. Ground 11: Obviousness over Gilmore, Dodrill, Ladd, and Patel*

Petitioner contends that claim 21 is unpatentable under 35 U.S.C. § 103(a) over the combination of Gilmore, Dodrill, Ladd, and Patel. Pet. 78–80. Having considered the totality of the arguments and evidence, we find that Petitioner has shown by a preponderance of the evidence that claim 21 is unpatentable as having been obvious over Gilmore, Dodrill, Ladd, and Fawcett.

Claim 21 depends from independent claim 20, and therefore includes the limitations of claim 20, discussed above in connection with Ground 8. *Supra* § III.I. Claim 21 specifies that the application server of claim 20 "is configured to receive, over the first communication link, information originating from the at least one communication device regarding a *stylus input or a touch input*." Ex. 1001, 15:56–60 (emphasis added). Petitioner

contends that, although Gilmore's voice gateway 108/208 (application server) is configured to receive information such as a user passcode, PIN, or other number input, Gilmore does not explicitly disclose entering such information via a touch input. Pet. 78–79 (citing Ex. 1021 ¶¶ 382–386). Petitioner points out, however, that Patel expressly discloses a touchscreen user interface for inputting information into an IVR system, and contends that an ordinarily skilled artisan "would have found it obvious to incorporate Patel's touchscreen inputs into Gilmore's communication devices." Pet. 79 (citing Ex. 1007 ¶¶ 14, 17–18; Ex. 1021 ¶¶ 387–388).

We agree with Petitioner. First, Petitioner persuasively maps the limitation of claim 21 to teachings of Patel. *Id.* (citing Ex. 1007 ¶¶ 14, 17–18). Specifically, Patel discloses an IVR system comprising a communication device (e.g., a cell phone, personal computer, or PDA) that "include[] a user interface (e.g., keypad, voice, touch-screen, etc.) that enables the caller to input data" such as "keypad or touch-tone input." Ex. 1007 ¶ 18.

Second, in addition to the reasons we discuss above as to independent claim 20, *supra* § III.I, Petitioner has also made a sufficient showing that the references are properly combined and that an ordinarily skilled artisan would have had a reasonable expectation of success in combining Patel with Gilmore, Dodrill, and Ladd in the manner proposed by Petitioner. Specifically, Petitioner presents persuasive evidence and arguments, supported by Mr. Lipoff's testimony (which we credit), that an ordinarily skilled artisan would have been motivated to include a touchscreen input, as taught by Patel, in Gilmore's communication device, because touchscreen input "permit the user to provide key-based responses, equivalent to a numerical keypad, using touch-based devices," and thus "expand the

availability of response options and increase compatibility with more devices." Pet. 79 (citing Ex. 1021 ¶ 390). We further agree with Petitioner and Mr. Lipoff that "touch inputs, e.g., touchscreens that respond to finger or stylus inputs, were conventional devices," *id.* (citing Ex. 1007 ¶ 18), and, accordingly, implementing touch inputs for Gilmore's communication device would have involved "only the known application of conventional technologies operating in the ordinary and predictable manner," *id.* (citing Ex. 1021 ¶¶ 392–393).

For these reasons, after having analyzed the entirety of the record and assigning appropriate weight to the cited supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence that claim 21 is unpatentable as having been obvious over the combination of Gilmore, Dodrill, Ladd, and Patel.

## IV. CONCLUSION[18]

| **Claims** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 1–6, 11–13 | 103(a) | Gilmore, Dhara, Dodrill | 1–6, 11–13 | |
| 14, 16 | 103(a) | Gilmore, Creamer | | 14, 16 |
| 15 | 103(a) | Gilmore, Creamer, | | 15 |

[18] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| | | Dhara | | |
| 7, 8 | 103(a) | Gilmore, Dhara, Dodrill, Creamer | 7, 8 | |
| 17 | 103(a) | Gilmore, Creamer, Fawcett | | 17 |
| 18 | 103(a) | Gilmore, Creamer, Dodrill | | 18 |
| 9, 10, 29, 30 | 103(a) | Gilmore, Dhara, Dodrill, Ladd | 9, 10, 29, 30 | |
| 20, 22, 23, 25–28 | 103(a) | Gilmore, Dodrill, Ladd | 20, 22, 23, 25–28 | |
| 24 | 103(a) | Gilmore, Dodrill, Ladd, Fawcett | 24 | |
| 19 | 103(a) | Gilmore, Creamer, Dodrill, Ladd | | 19 |
| 21 | 103(a) | Gilmore, Dodrill, Ladd, Patel | 21 | |
| **Overall Outcome** | | | 1–13, 20–30 | 14–19 |

## V. ORDER

Accordingly, it is

ORDERED that claims 1–13 and 20–30 of U.S. Patent No. 10,270,816 B1 are held unpatentable under 35 U.S.C. § 103 as obvious;

ORDERED that claims 14–19 of U.S. Patent No. 10,270,816 B1 are not held unpatentable under 35 U.S.C. § 103 as obvious; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of this decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Erika H. Arner
Kevin D. Rodkey
John M. Mulcahy
FINNEGAN, HENDERSON, FARABOW, GARRETT, & DUNNER LLP
erika.arner@finnegan.com
kevin.rodkey@finnegan.com
john.mulcahy@finnegan.com

FOR PATENT OWNER:

Andrew J. Wright
Joseph P. Oldaker
NELSON BUMGARDNER ALBRITTON P.C.
andrew@nbafirm.com
joseph@nelbum.com

Trials@uspto.gov
571.272.7822

Paper 39
Entered: August 2, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE OFFICE OF THE UNDERSECRETARY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

GOOGLE LLC,
Petitioner,

v.

HAMMOND DEVELOPMENT INTERNATIONAL, INC.,
Patent Owner.

IPR2020-00081
Patent 10,270,816 B1

Before ANDREW HIRSHFELD, *Commissioner for Patents, Performing the Functions and Duties of the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

# ORDER

The Office has received a request for Director review of the Final Written Decision in this case. *See* Ex. 3100. The request was referred to Mr. Hirshfeld, Commissioner for Patents, Performing the Functions and Duties of the Under

Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

It is ORDERED that the request for Director review is denied; and

FURTHER ORDERED that the Patent Trial and Appeal Board's Final Written Decision in this case is the final decision of the agency.

For PETITIONER:

Erika H. Arner
Kevin D. Rodkey
John M. Mulcahy
FINNEGAN, HENDERSON, FARABOW,
GARRETT, & DUNNER LLP
erika.arner@finnegan.com
kevin.rodkey@finnegan.com
john.mulcahy@finnegan.com

For PATENT OWNER:
Andrew J. Wright
Joseph P. Oldaker
NELSON BUMGARDNER ALBRITTON P.C.
andrew@nbafirm.com
joseph@nelbum.com

US010270816B1

(12) **United States Patent**
**Hammond**

(10) **Patent No.: US 10,270,816 B1**
(45) **Date of Patent: *Apr. 23, 2019**

(54) **METHOD AND SYSTEM FOR ENABLING A COMMUNICATION DEVICE TO REMOTELY EXECUTE AN APPLICATION**


(71) Applicant: **Hammond Development International, Inc.**, Dallas, TX (US)

(72) Inventor: **Daniel D. Hammond**, Dallas, TX (US)

(73) Assignee: **Hammond Development International, Inc.**, Dallas, TX (US)


(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.


(21) Appl. No.: **16/193,532**

(22) Filed: **Nov. 16, 2018**


**Related U.S. Application Data**

(63) Continuation of application No. 15/613,756, filed on Jun. 5, 2017, which is a continuation of application
(Continued)

(51) **Int. Cl.**
***G06F 15/16*** (2006.01)
***G06F 9/00*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ...... ***H04L 65/1069*** (2013.01); ***G06F 17/3056*** (2013.01); ***G06F 17/30312*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ............ H04L 63/0272; H04L 63/0281; H04M 2203/105
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS


5,253,341 A 10/1993 Rozmanith et al.
5,835,724 A 11/1998 Smith
(Continued)

FOREIGN PATENT DOCUMENTS

EP 1885096 A1 6/2008
JP 2007274105 A 10/2007
(Continued)

OTHER PUBLICATIONS

Laing, John, "Client/Server Setup and Implementation: Web and non-Web Environments," Advanced Tutorials, Paper 19-25, SAS Institute (Canada) Inc., Toronto, ON, (date unknown), 10 pages, retrieved from http://www2.sas.com/proceedings/sugi25/25/aa/25p019.pdf on Jan. 19, 2016.
(Continued)


*Primary Examiner* — Joshua L Schwartz
(74) *Attorney, Agent, or Firm* — Fogarty LLP


(57) **ABSTRACT**

A communication system capable of enabling one or more communication devices to remotely execute one or more applications includes one or more communication devices that are coupled to a data connection. At least one of the one or more communication devices is operable to communicate a request to establish a communication session over the data connection. The system also includes one or more application servers that are coupled to the data connection. At least one of the one or more application servers is adapted to execute an application to establish the requested communication session with the at least one communication device. The at least one application server resides at a location remote from the at least one communication device. The at least one application server communicates a request for processing service to the at least one communication device. The request for processing service is communicated to the at least one communication device over the data connection.


**30 Claims, 3 Drawing Sheets**



**Related U.S. Application Data**

No. 15/236,644, filed on Aug. 15, 2016, now Pat. No. 9,705,937, which is a continuation of application No. 14/975,747, filed on Dec. 19, 2015, now Pat. No. 9,420,011, which is a continuation of application No. 11/779,722, filed on Jul. 18, 2007, now Pat. No. 9,264,483.

(51) **Int. Cl.**

| | |
|---|---|
| ***H04L 29/06*** | (2006.01) |
| ***H04W 4/60*** | (2018.01) |
| ***H04M 11/00*** | (2006.01) |
| ***H04L 29/08*** | (2006.01) |
| ***G06F 17/30*** | (2006.01) |

(52) **U.S. Cl.**

CPC .. ***G06F 17/30424*** (2013.01); ***G06F 17/30864*** (2013.01); ***H04L 67/02*** (2013.01); ***H04L 67/10*** (2013.01); ***H04L 67/1097*** (2013.01); ***H04L 67/141*** (2013.01); ***H04L 67/18*** (2013.01); ***H04L 67/42*** (2013.01); ***H04M 11/007*** (2013.01); ***H04W 4/60*** (2018.02); *H04M 2203/1016* (2013.01)

(58) **Field of Classification Search**

USPC ............................................ 709/219; 726/15

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,195,357 | B1 | 2/2001 | Polcyn |
| 6,327,363 | B1 | 12/2001 | Henderson et al. |
| 6,362,836 | B1 | 3/2002 | Shaw et al. |
| 6,418,199 | B1 | 7/2002 | Perrone |
| 6,430,174 | B1 | 8/2002 | Jennings et al. |
| 6,512,818 | B1 | 1/2003 | Donovan et al. |
| 6,556,997 | B1 | 4/2003 | Levy |
| 6,721,705 | B2 | 4/2004 | Kurganov et al. |
| 6,753,884 | B1 | 6/2004 | Finch, II et al. |
| 6,854,009 | B1 | 2/2005 | Hughes |
| 7,068,643 | B1 | 6/2006 | Hammond |
| 7,469,293 | B1 | 12/2008 | Yoakum et al. |
| 7,881,285 | B1 | 2/2011 | Hammond |
| 7,889,852 | B2 | 2/2011 | Whitehead |
| 7,912,966 | B2 | 3/2011 | Witkowski et al. |
| 8,060,624 | B1 | 11/2011 | McKinney et al. |
| 8,272,045 | B2 | 9/2012 | Azeez et al. |
| 8,402,115 | B2 | 3/2013 | Franco et al. |
| 8,442,221 | B2 | 5/2013 | Yoakum et al. |
| 8,532,000 | B2 | 9/2013 | Bolliero et al. |
| 8,719,375 | B2 | 5/2014 | Hildreth et al. |
| 9,015,297 | B2 | 4/2015 | Putman et al. |
| 9,038,162 | B2 | 5/2015 | Hagiu et al. |
| 2001/0047406 | A1 | 11/2001 | Araujo |
| 2002/0016814 | A1 | 2/2002 | Convent et al. |
| 2002/0046286 | A1 | 4/2002 | Caldwell et al. |
| 2002/0120719 | A1 | 8/2002 | Lee et al. |
| 2002/0130900 | A1 | 9/2002 | Davis |
| 2003/0060896 | A9 | 3/2003 | Hulai et al. |
| 2003/0074393 | A1 | 4/2003 | Peart |
| 2003/0149728 | A1 | 8/2003 | Wewalaarachchi |
| 2003/0204562 | A1 | 10/2003 | Hwang |
| 2005/0070262 | A1 | 3/2005 | Weigand |
| 2006/0037071 | A1 | 2/2006 | Rao et al. |
| 2006/0182103 | A1 | 8/2006 | Martini et al. |
| 2007/0118534 | A1 | 5/2007 | Hayes |
| 2007/0168352 | A1 | 7/2007 | Satyanarayana |
| 2007/0220009 | A1 | 9/2007 | Morris et al. |
| 2014/0364110 | A1 | 12/2014 | Rao et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | 0157691 | A1 | 8/2001 |
| WO | 0206963 | A1 | 1/2002 |
| WO | WO 2005/022882 | A1 | 3/2005 |

OTHER PUBLICATIONS

Peterson, Jon, "Securing Real-Time Communications", ITU-T IETF Workshop, May 2005, 13 Pages, Geneva.

Oracle, "Oracle Application Server TopLink Application Developers Guide," (date unknown), 15 pages, retrieved from: http://docs.oracle.com/cd/B14099_19/web.1012/b15901/sessions008.htm on Jan. 19, 2016.

Nieh, Jason, et al., "A Comparison of Thin-Client Computing Architectures," Technical Report CUCS-022-00, Nov. 2000, Network Computing Laboratory, Columbia University.

Schmidt, Brian K., et al., "The nteractive performance of SLIM: a stateless, thin-client architecture," SOSP '99 Proceedings of the seventeenth ACM symposium on Operating systems principles, pp. 32-47, Charleston, South Carolina, USA, Dec. 12-15, 1999.


18a
CELL PHONE
18b
PDA
18c
Wi-Fi DEVICE
14
WIRELESS NETWORK
10
12
NETWORK
32a
PC
32b
18e
30a
APP SERVER
24
30n
REPOSITORY
20
34
DATABASE
28
22
IP PHONE
18d
WIRED NETWORK
32n
IP PHONE
18n
16

FIG. 1A


10
18a
CELL PHONE
14
WIRELESS NETWORK
18b
PDA
18c
Wi-Fi DEVICE
APP SERVER 1
24a
APP SERVER 2
24b
APP SERVER n
24n
30a
12
32a
NETWORK
PC
32b
18e
REPOSITORY
20
30n
34
IP PHONE
18d
WIRED NETWORK
32n
36
DATABASE
DATABASE
28
IP PHONE
18n
16
26
22

FIG. 1B


10
18a
CELL PHONE
14
18b
PDA
WIRELESS NETWORK
18c
Wi-Fi DEVICE
32a
12
30a
APP SERVER 1
24a
APP SERVER 2
24b
APP SERVER n
24n
PC
32b
18e
NETWORK
30n
REPOSITORY
20
34
IP PHONE
18d
WIRED NETWORK
32n
IP PHONE
18n
16
DATABASE
28a
22a
DATABASE
28n
22n

FIG. 1C


18a
CELL PHONE
14
18b
PDA
WIRELESS NETWORK
10
18c
Wi-Fi DEVICE
12
32a
PC
NETWORK
30a
APP SERVER
24
32b
18e
36
REPOSITORY
20
IP PHONE
18d
WIRED NETWORK
32n
34
IP PHONE
18n
16
DATABASE
28
22

FIG. 1D



FIG. 2



FIG. 3



FIG. 4

# METHOD AND SYSTEM FOR ENABLING A COMMUNICATION DEVICE TO REMOTELY EXECUTE AN APPLICATION

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 15/613,756, filed Jun. 5, 2017, which is a continuation of U.S. application Ser. No. 15/236,644, filed on Aug. 15, 2016, now U.S. Pat. No. 9,705,937, which is a continuation of U.S. application Ser. No. 14/975,747, filed on Dec. 19, 2015, now U.S. Pat. No. 9,420,011, which is a continuation of U.S. application Ser. No. 11/779,722, filed on Jul. 18, 2007, now U.S. Pat. No. 9,264,483, the disclosures of which are hereby incorporated by reference herein in their entirety.

## TECHNICAL FIELD

This disclosure relates in general to the field of communication systems, and more particularly to a method and system that enables a communication device to remotely execute an application.

## BACKGROUND

Communication systems often operate to collect information from and/or provide information to one or more users of the communication system. The communication systems typically employ one or more programs that guide the collection of information from and/or the presentation of information to a user. Conventional communication systems may, in some cases, require interaction with a remote input/output device to collect information from the user during the information collection process. For example, the input/output device may provide a communication path between the user of the device and a voice processing system (VPS). The VPS may include programs that respond to audio input, such as dual-tone multi-frequency (DTMF) or voice, and produce audio output back through the network to the user.

## SUMMARY OF EXAMPLE EMBODIMENTS

In one embodiment, a communication system capable of enabling one or more communication devices to remotely execute one or more applications comprises one or more communication devices that are coupled to a first communication link that comprises a data connection. At least one of the one or more communication devices is adapted to communicate a request to establish a communication session over the first communication link. In one particular embodiment, the at least one communication device is a thin-client device that provides processing services to an application substantially executed at a location remote from the at least one communication device. The system also comprises one or more application servers that are coupled to the first communication link and are operable to receive the request communicated over the first communication link. The system further comprises one or more repositories that are coupled to at least one of the one or more application servers and are operable to communicate with the one or more application servers. At least one of the one or more repositories having access to one or more applications maintained in a database coupled to the at least one repository. The at least one repository adapted to communicate the identified application over a second communication link to the at least one application server. The at least one application server adapted to execute the identified application remote from the at least one communication device and to establish the communication session with the at least one communication device. In this particular embodiment, the at least one application server communicates a request for processing service to the at least one communication device. The request for processing service is communicated to the at least one communication device over the data connection.

In another embodiment, a communication system capable of enabling one or more communication devices to remotely execute one or more applications comprises one or more communication devices that are coupled to a data connection. At least one of the one or more communication devices is operable to communicate a request to establish a communication session over the data connection. The system also includes one or more application servers that are coupled to the data connection. At least one of the one or more application servers adapted to execute an application to establish the requested communication session with the at least one communication device. In this particular embodiment, the at least one application server resides at a location remote from the at least one communication device. The at least one application server communicates a request for processing service to the at least one communication device. The request for processing service is communicated to the at least one communication device over the data connection.

In one example of a method for enabling one or more communication devices to remotely execute one or more applications, the method comprises communicating a request to establish a communication session from at least one communication device over a data connection. The method also comprises executing an application to establish the requested communication session over the data connection. The application executed remotely from the at least one communication device. The method further comprises communicating a request for processing service to the at least one communication device. In this particular embodiment, the request for processing service is communicated to the at least one communication device over the data connection.

Depending on the specific features implemented, particular embodiments of the present invention may exhibit some, none, or all of the following technical advantages. For example, various embodiments may be capable of executing an application for a thin-client device. Some embodiments may be capable of improving the efficiency of a user's interaction with a communication system. Certain embodiments of the present disclosure provide improvements for voice processing applications, including cost, performance, and availability.

Other technical advantages will be readily apparent to one skilled in the art from the following figures, description and claims. Moreover, while specific advantages have been enumerated, various embodiments may include all, some or none of the enumerated advantages.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention, and for further features and advantages thereof, reference is now made to the following description taken in conjunction with the accompanying drawings, in which:

FIGS. 1A-1D illustrate example embodiments of a communication system capable of collecting information from one or more users of the system;

FIG. **2** illustrates one example of a client for use with a communication system that enables a client to have one or more applications executed remotely;

FIG. **3** illustrates one example embodiment of a repository for use in a communication system that that enables a client to have one or more applications executed remotely; and

FIG. **4** illustrates one example embodiment of an application server for use in a communication system that that enables a client to have one or more applications executed remotely.

## DETAILED DESCRIPTION

Particular examples and dimensions specified throughout this document are intended for exemplary purposes only, and are not intended to limit the scope of the present disclosure. In particular, this document is not intended to be limited to remote processing of voice-based applications, such as, Voice XML-based applications.

FIGS. **1A-1D** are block diagrams of example embodiments of a communications system **10** capable of collecting information from one or more users of system **10**. In various embodiments system **10** can comprise a network or communication system used by an entity, such as, for example, a hospital, a bank, or other business entity. It should be appreciated that other embodiments of system **10** may be used without departing from the scope of the present disclosure.

In these examples, system **10** includes one or more application servers **24** capable of performing a desired communicating and/or computing functionality, such as, for example, accessing, retrieving, and/or executing one or more system applications **28**, or portions thereof. As non-limiting examples, application servers **24** could comprise some or all of a Voice XML-based system, an extensible interactive voice response (XIVR) system, an interactive web-based system, or a combination of these or other information systems. In particular embodiments, application servers **24** may include one or more software and/or firmware modules. In various embodiments, application servers **24** could comprise, for example, one or more software engines, one or more memory modules, and/or one or more speech recognition modules capable of processing Voice XML-based applications, XIVR-based applications, voice responses, text-to-speech translations, and/or speech-to-text translations.

In one particular embodiment, application servers **24** receive and/or communicate information, portions of an application, and/or one or more requests for processing service through a network **12** coupled to application server **24**. As used throughout this document, the term "couple" and/or "coupled" refers to any direct or indirect communication between two or more elements, whether or not those elements are in physical contact with one another. In this example, application servers **24** couple to network **12** through one or more communications links **30**. In other embodiments, application servers **24** operate to collect, store, and/or communicate information to and/or from network **12**.

Network **12** may comprise any wireless network, wireline network, or combination of wireless and wireline networks capable of supporting communication between network elements using ground-based and/or space-based components. In this particular embodiment, network **12** comprises at least a portion of the global computer network known as the Internet. In other embodiments, network **12** may comprise a information network, a public switched telephone network (PSTN), an integrated services digital network (ISDN), a local area network (LAN), a wide area network (WAN), a metropolitan area network (MAN), and/or other communication systems or combination of communication systems at one or more locations.

One or more clients **18*a*-18*n*** may couple to network **12** through one or more communications links **32** and/or one or more networks **14**, **16**. Each client **18** may include any computing and/or communication device capable of enabling the communication of information to and/or from network **12**. In some embodiments, clients **18*a*-18*n*** may enable a user of system **10** to communicate information to and/or receive information from one or more of application servers **24**. In other embodiments, clients **18*a*-18*n*** can enable a user of system **10** to communicate information to and/or receive information from one or more repositories **20**.

In various embodiments, clients **18** may comprise a thin-client. As used throughout this document the phrase "thin-client" refers to a device that provides processing services to an application executed at a location remote from the device. Each client **18** may include, for example, a wireless device, a voice over IP device, a desktop computer, a laptop computer, a personal digital assistant, a cell-phone, a Wi-Fi device, a workstation, a mainframe computer, a mini-frame computer, a web server, or any other computing and/or communicating device. Although these examples show clients **18** communicating with application servers **24** and/or repositories **20** over network **12**, in other embodiments, some or all clients **18** could alternatively, or in addition, communicate with application server **24** and/or repositories **20** using direct links.

System **10** also includes one or more repositories **20** coupled to network **12** and capable of performing a desired communicating and/or computing functionality. In this particular embodiment, one or more repositories **20** include application logic adapted to identify a desired application **28**. In various embodiments, repositories **20** may operate to identify a desired application **28** and to communicate application **28**, or portions thereof, to one or more of application servers **24** for execution. In some cases, one or more repositories **20** may be capable of storing and/or having access to one or more applications **28**.

In this particular embodiment, repository **20** accesses applications **28** stored in a database **22**. As used throughout this document, the term "application" refers to functionality that is capable of facilitating the ability to collect information from and/or present information to one or more clients **18** or users of system **10**. In one particular non-limiting example, application **28** comprises a series of queries requesting information from and/or presenting information to a user of client **18**. In some cases, applications **28** may include, for example, a Voice XML-based application, an HTML-based application, an XML-based application, an XIVR-based application, or a combination of these or other application formats. Applications **28** may comprise, for example, software, firmware, code, portions of code, a program, a web-page, information compilations, and/or a combination of these or any other types of utilities. In other embodiments, database **22** may be capable of storing, for example, one or more functions and/or other information.

Database **22** may include any hardware, software, firmware, or combination thereof operable to store and facilitate retrieval of one or more applications **28** and/or information. Database **22** may store information and applications **28** using any of a variety of information structures, arrangements, and/or compilations. In some embodiments, database

22 can also store a record of any interaction between a user of client **18** and system **10**. Database **22** may, for example, include a dynamic random access memory (DRAM), a static random access memory (SRAM), a NAND flash memory, or any other suitable volatile or nonvolatile storage and retrieval device or combination of devices. Although this example depicts database **22** as a single medium, database **22** may comprise any additional number of storage media without departing from the scope of the present disclosure. Additionally, all or part of database **22** could reside locally within repository **20** or could reside in a location remote from and accessible to repository **20**. Although these examples shows repository **20** communicating with application servers **24** and/or clients **18** over network **12**, in other embodiments, repository **20** could alternatively, or in addition, communicate with application server **24** and/or clients **18** using direct links.

In the illustrated embodiment, system **10** includes at least first communications links **30** and second communications links **32** operable to facilitate the communication of information to and/or from network **12**. System **10** also includes a third communications link **34** operable to facilitate the communication of information between repositories **20** and database **22**. Communications links **30**, **32**, and **34** may include any hardware, software, firmware, or combination thereof. In various embodiments, communications links **30**, **32**, and **34** may comprise communications media capable of assisting in the communication of analog and/or digital signals. Communications links **30**, **32**, and **34** may, for example, comprise a fiber optic line, a Digital Subscriber Line (DSL), a wireless link, a USB bus, a PCI bus, an ethernet interface, or any other suitable interface and/or medium operable to assist in the communication of information to and/or from network **12**. In this particular embodiment, communication links **30**, **32**, and **34** comprise data connections. In this example, any data communicated between application servers **24** and clients **18** over communication links **30** and **32** is advantageously communicated asynchronously. Communicating the data asynchronously allows more than one user to connect to application servers **24** at the same time over a single data connection.

In this particular embodiment, communication link **32*a*** is coupled to a wireless network **14** and communication link **32*n*** is coupled to a wireline network **16**. Although communication links **32*a*** and **32*n*** are coupled to wireless network **14** and wireline network **16**, respectively, in this example, other embodiments may exclude wireless network **14** and/or wireline network **16** without departing from the scope of the present disclosure.

In some embodiments, clients **18** can be configured to initiate a connection with repositories **20** and/or application servers **24**. In some cases, clients **18** can initiate a data connection with repositories **20** and/or application servers **24**. For example, if client **18** is a mobile phone, a wireless connection can be processed through wireless network **14** to application server **24**. After the client **18** connects to application server **24**, application server **24** can initiate a preliminary communication session with the user of client **18**. Through this initial communication session, information regarding the target address of client **18** can be established. Address information can be gathered automatically, for example by reading a unique identification number of the device, or by question and answer sequences with the user of device **18**. Repository **20**, database **22**, and/or application server **24** can also store caller associated data, such as an IP address used to establish a data connection. In some cases, repository **20** and/or application server **24** can establish a data socket connection to communicate with client **18**, or the repository **20** can notify the application server **24** to establish this connection with client **18**. This connection can then be used for the duration of the communication session.

Landline phones and/or IP phones can also communicate with repository **20** and/or application server **24** in the same manner as mobile phones described above. Also, repository **20** and/or application server **24** may also use simultaneous or duplexed data connections with clients **18**. This can allow repository **20** and/or application server **24** to simultaneously execute the initial communication session while also communicating over another data connection with client **18**.

FIG. **1**A is a block diagram of one example embodiment of communication system **10** that enables a client **18** to have one or more applications **28** executed remotely. In this particular embodiment, a user of client **18*a*** initiates an information collection and/or retrieval process by communicating a request to application server **24**. Although a user of client **18*a*** initiates a communication session in this example with application server **24**, any of clients **18*a*-18*n*** could initiate the communication session with application server **24** and/or repository **20** without departing from the scope of the present disclosure. In other embodiments, a user of client **18*a*** could initiate the information collection and/or retrieval process by connecting to repository **20**. In some embodiments, one of applications server **24** and/or repository **20** could initiate the information collection process with client **18**.

In this particular embodiment, client **18*a*** comprises a thin-client. In this example, client **18*a*** preferably has memory and some processing capabilities that enable client **18*a*** to execute portions of code to assist with the interaction with remotely executed application **28**. A remotely executed application is one in which a substantial portion of the code executes on a device other than client **18**. In this example, application server **24** is addressed using an Internet Protocol (IP) layer address. In other embodiments, application server **24** could be addressed using any other addressing format, such as, for example, uniform resource locator (URL).

In this example, application server **24** notifies repository **20** that a communication session with client **18** has been requested. Repository **20** using its application logic operates to identify a desired application **28** and to communicate application **28**, or portions thereof, to application server **24** for execution. Upon receipt of application **28**, application server **24** executes application **28** and begins a communication session with client **18*a***. In this example, application server **24** begins the process of communicating information to and/or retrieving information from client **18*a***. In this particular embodiment, application server **24** executes a Voice XML-based application that enables application server **24** to interact with and collect information from client **18*a***. In other embodiments, the application executed by application server **24** may comprise, for example, an XIVR-based application, an HTML-based application, a VML-based application, or a combination of these or other application formats.

In this particular embodiment, application server **24** executes the Voice XML-based application **28** remote from client **18*a***. In this example, client **18*a*** provides application independent processing services to Voice XML-based application **28** executing remotely. In some cases, application server **24** can communicate some programs to client **18*a*** for downloading to assist application server **24** in interacting with client **18*a***. In most cases, any program downloaded to client **18*a*** would assist with the collection of information from and/or the presentation of information to the user of

client **18***a*. For example, application server **24** may communicate a voice recognition software program to client **18***a* for downloading, which will assist client **18***a* in executing one or more queries associated with the Voice XML-based application **28** being executed on application server **24**.

Application server **24** interacts with the user of client **18***a* by requesting that the user of client **18***a* respond to a series of queries associated with application **28**. To that end, application server **24** communicates information relating to portions of Voice XML-based code to client **18***a* for execution on client **18***a*, which enables the user of client **18***a* to interact with application server **24**. In some embodiments, the user of client **18***a* can respond through a DTMF input, a voice input, a stylus input, a keyboard input, and/or any other device capable of receiving a response that is comprehensible to client **18***a*. In this particular embodiment, the user of client **18***a* responds to each of the series of queries by "speaking" a response to each query communicated to client **18***a* for execution. In this example, client **18***a* communicates the user's spoken response as a data communication. That is, the user's response is packetized and communicated in a packet based communication. By transmitting only data, problems associated with voice quality degradation are advantageously reduced.

In this particular embodiment, application server **24** receives and decodes the user's responses to each of the queries associated with the Voice XML-based application. Although application server **24** receives the responses to the queries in this example, repository **20** and/or database **22** could alternatively receive the responses without departing from the scope of the present disclosure. Upon receipt, application server **24** executes the next portion of Voice XML-based application **28** based at least in part on the user's response. Application server **24** will continue to interact with client **18***a* until the communication session is terminated. In this example, the user of client **18***a* interacts with application server **24** until the remaining information has been collected and/or presented to the user of client **18***a*. In other embodiments, application server **24** can associate the user of client **18***a* with another one of application servers **24** to collect another portion of information from and/or present another portion of information to the user of client **18***a* using, for example, another application **28**.

In some embodiments, after the communication session between client **18***a* and application server **24** is terminated, any programs downloaded to client **18***a* could be deleted to free up the memory. In other embodiments, any programs downloaded to client **18***a* could be retained for use with a future request. Although the program is downloaded to client **18***a* in this example, in alternative examples the program may be pre-installed in client **18***a* without departing from the scope of the present disclosure. For example, a user may anticipate using client **18***a* for buying and selling stocks in real-time and may pre-install a program or interface for performing the necessary communication and/or computing functionality.

In yet another embodiment, client **18***a* could use an Internet browser to host one or more plug-ins that facilitates the processing of commands from the user or the device. In one embodiment, application servers **24** could host the application logic in an enhanced HTML format. A browser utilized by client **18** could read the logic and execute it. The internet browser could be used as an interface to input user information to application **28**, and/or present information from application **28** executed on application server **24**.

In yet another embodiment, application server **24** and/or repository **20** could package multiple queries or request together and send them to client **18***a* in an executable for interaction with the user. In that embodiment, client **18***a* executes multiple queries or requests for information before communication the users responses to application server **24**. When the multiple questions or requests are complete, the responses are sent to the application server **24** for processing, which could result in information being sent back to the user or further requests from the application server **24**. The process can be repeated as necessary. In this example, the entire application **28** is not communicated sent to client **18**, thus reducing the memory and processing power needed within the device.

FIG. **1**B is a block diagram of one example embodiment of communication system **10** that enables a client **18** to have one or more applications **28** executed remotely. FIG. **1**B is similar to FIG. **1**A; however, in this particular embodiment, system **10** includes a plurality of application servers **24***a*-**24***n* coupled to network **12**. Coupling multiple application servers **24** to system **10** advantageously allows system **10** to handle a larger number of simultaneous requests from users of clients **18***a*-**18***n*.

In an alternative embodiment, system **10** could include a load balancer (not illustrated) that is coupled to network **12** and application servers **24***a*-**24***n*. In that example, the load balancer can comprise logic that enables it to decide which application server **24***a*-**24***n* can support a particular request or application **28**. In some cases, the load balancer can perform a round-robin assignment. In other cases, the load balancer can choose a particular application server **24** based on dynamic information. For example, the load balancer could choose application server **24***b* since it just handled a similar request and already has the desired application downloaded.

In this example, system **10** also includes a database **26** coupled to network **12** by data connection **36**. In various embodiments, the structure and function of database **26** can be substantially similar to the structure and function of database **22**. Database **26** can contain a variety of information accessible through network **12**. In some cases, database **26** can include user-specific information that can be retrieved by clients **18** or by application server **24**, such as account information, credit information, medical information, insurance information, and/or any user-related information. In other cases, database **26** may include nonuser specific information that can be retrieved by clients **18** or application server **24**, such as airline flight information, order status information, movie information, and

In another alternative embodiment, system **10** could comprise a plurality of repositories **20** connected to a single database **22**, or connected to multiple databases **22**. In that embodiment, each of the plurality of repositories **20** could be coupled to a load balancer capable of balancing traffic between the plurality of repositories **20**. The repositories could be assigned to perform different tasks, or they could perform tasks based on the order they are requested or based on any other allocation system.

In this example, a user of client **18***b* desires to check the balance of his bank account. Although the user of client **18***b* desires to check the balance in his bank account in this example, the user could use system **10** to retrieve and/or communicate any information without departing from the scope of the present disclosure. In this particular embodiment, client **18***b* is a thin-client device. Although client **18***b* is used in this example, any other of clients **18***a*-**18***n* could be used without departing from the scope of the present disclosure.

Using client **18***b* the user initiates a communication session with application server **24***a* by communicating a request through network **12**. In this embodiment, client **18***b* communicates with application server **24***a* over a data connection. Application server **24***a* notifies repository **20** of the request and repository **20** communicates with database **22** to retrieve application **28** that will assist the user of client **18***b* in performing the desired functionality. In some cases, database **22** may retrieve any information about the user maintained in database **22**. In this particular embodiment, repository **22** identifies that client **18***b* is adapted to provide processing services for application **28** that will execute remote from client **18***b*. After receiving application **28** from database **22**, repository **20** communicates application **28** and any user information to application server **24***a* for execution.

Application server **24***a* executes application **28** and initiates its communication session with client **18***b*. While the application server **24***a* executes application **28**, client **18***b* is capable of locally executing commands related to application **28** and delivered via the data connection. By executing these commands, client **18***b* enables information to be communicated to the user, to be retrieved from the user, to be presented to the user, and to perform any other desired communicating and/or computing functionality with the user. In some cases, the locally executed commands enable client **18***b* to retrieve information from database **26**. That is, the locally executed commands received from application server **24***a* direct client **18***b* to access database **26***b* and retrieve the desired information. In other cases, the locally executed commands enable client **18***b* to communicate any information provided by the user of client **18***b* to database **26** for storage.

To check a bank account balance, application **28** executing on application server **24***a* may send a first executable to client **18***b* for execution. This first executable may contain information relating to a portion of Voice XML code that requests the user to enter or speak an account number. Client **18***b* executes the executable by prompting the user to enter an account number. In some cases, client **18***b* can execute voice recognition software, text-to-speech software, and/or any other desired software that would assist with the collection of information from and/or the presentation of information to the user of client **18***b*. In this particular embodiment, the user of **18***b* enters the account number using a keypad. Although the user enters the account number using a keypad in this example, any other method may be used to enter the desired information without departing from the scope of the present disclosure. After the user enters the account number, client **18***b* communicates the information to application server **24***a* over the data communication link.

Upon receipt of the account number, application server **24***a* continues the execution of application **28**. In this example, application **28** directs application server **24***a* to retrieve the account balance for the account number provided by the user of client **18***b* from database **22**. In other embodiments, the account balance information may be received by application server **24***a* with receipt of application **28**. In some cases, application server **24***a* may compare the account number received from the user of client **18***b* with the account number retrieved from database **22** for fraud protection purposes.

Once application server **24***a* has the account balance information, application server **24***a* can communicate an executable that contains the account balance information to client **18***b* for local execution. In some cases, the account balance could be sent as a data message for the user to view on a display associated with client **18***b* or the application server **24***a* could package a voice representation of the account balance as an executable, and transmit the executable to client **18***b*. In that case, client **18***b* would execute the executable, converting the data to voice, and the user hears his account balance from client **18***b*.

In the above embodiment, application server **24** retrieves information directly from database **22**. In an alternative embodiment, application server **24** can send an executable to client **18***b* instructing client **18***b* to retrieve the desired information from database **22** and/or database **26**, either directly or through a network connection. The executable can also instruct device **18** to send information to database **22** and/or **26**. In various embodiments, database **22** and/or **26** can comprise user-specific information. For example, database **26** may include account information, credit information, medical information, and/or any other information of the user of client **18***b* In other embodiment, database **22** and/or **26** can comprise generally available information. For example, database **26** can include airline flight information, stock quotes, weather information, sports ticket information, movie information, and/or any other desired information.

In some cases, the information retrieved by client **18***b* can be processed by client **18***b* using an executable received from application server **24***a*. In other cases, the information retrieved by client **18***b* can be processed by one or more software modules that assist with the collection of information from and/or the presentation of information to the user of client **18***b*. In other embodiments, the data sought by client **18***b* can be communicated to client **18***b* through application server **24***a*.

As an example, a user may want to check on the status of an airline flight. Client **18***d* connects to application server **24***b*, which requests the appropriate application **28** from repository **20**. Application **28** is executed on application server **24***b*. Application **28** sends an executable from application server **24***b* to client **18***d* that instructs client **18***d* to retrieve the flight information from database **26**, which in this example contains flight status information. Client **18***d* initiates a connection to database **26** through network **12** to retrieve the information. The information can be sent back through network **12** to client **18***d*. In this example, the executable then instructs client **18***d* to present the flight status information to the user using one of a variety of methods, such as by text or voice. The user can then end the connection, or continue with other business.

In another embodiment, the executable could instruct client **18***d* to retrieve the information from database **26**, but instead of processing the information at client **18***d* for presentation to the user, the information could be sent through network **12** to application server **24***b* for further processing. Application server **24***b*, for example, may convert the data concerning the flight status into an easily-readable text format, and then transmit that information to client **18***d* for presentation to the user.

FIG. **1**C is a block diagram of one example embodiment of communication system **10** that enables a client **18** to have one or more applications **28** executed remotely. FIG. **1**C is similar to FIG. 1B; however, in this particular embodiment, system **10** includes a plurality of databases **22***a*-**22***n* coupled to repository **20**. Although a plurality of databases **22** are coupled to repository **20** in this example, system **10** could comprise a plurality of repositories **20** each including one or more databases **22** without departing from the scope of the present disclosure.

FIG. **1**D is a block diagram of one example embodiment of communication system **10** that enables a client **18** to have an application **28** executed remotely. FIG. **1**D is similar to

FIG. **1**A; however, in this particular embodiment, system **10** includes a direct communication link **36** between repository **20** and application server **24**. Although one cluster that includes application server **24**, repository **20**, and database **22** is coupled to network **12** in this example, system **10** could comprise a plurality of clusters coupled to network **12** without departing from the scope of the present disclosure.

FIG. **2** illustrates one example embodiment of a client **18**. In this particular embodiment, client **18** comprises a mobile telephone. Although client **18** comprises a mobile phone in this example, client **18** could comprise any other desired computing and/or communication device without departing from the scope of the present disclosure. For example, client **18** could comprise a voice over IP device, a desktop computer, a laptop computer, a personal digital assistant, a cell-phone, a Wi-Fi device, a workstation, a mainframe computer, a mini-frame computer, a web server, or any other computing and/or communicating device. In this particular embodiment, client **18** comprises a thin-client device that provides processing services to application **28** executing remotely from client **18**.

In this example, client **18** comprises a processor **40**, memory **42**, and digital signal processor (DSP) **44**. Client **18** also includes at least a display, input device, and speaker. Many communication devices already have processors and memory operable to interact with a communication system. Devices that use application server **24** to execute one or more executables associated with one or more applications **28**, as described above, require less processing power and memory than a device that executes substantially all of applications **28**.

Memory **42** provides storage for data, information, and/or programs to assist in communicating information to and/or receive information from application server **24** and/or the repository **20**. The memory in the example embodiments is sufficient to handle the tasks that application servers **24** and/or repository **20** request of the device. Processing power also is sufficient to handle these, as well as the other tasks the device performs outside the context of the data collection system (such as making phone calls, sending and receiving text messages, other computing functions, etc.).

FIG. **3** shows one example of a repository for use in a communication system that enables a client to have one or more applications executed remotely. In this particular embodiment, repository **20** functions to communicate one or more applications and/or discrete programs to external devices, like application servers **24** and/or clients **18** of FIG. **1**, for processing or execution.

In this example, repository **20** includes application logic **70** that is capable of performing a desired communicating and/or computing functionality, such as, for example, identifying a desired application and communicating the application, or portions thereof, to one or more of application servers for execution. In particular embodiments, application logic **70** may include one or more software and/or firmware modules, such as, for example, one or more software engines and/or one or more memory modules. Although application logic **70** is shown as being contained within repository **20** in this example, application logic could reside external to repository **20** without departing from the scope of the present disclosure.

In one particular example, application logic has access to one or more applications stored in a memory coupled to application logic **70**. IN some cases, the memory can be substantially similar to the structure and function of database **22** of FIG. **1**. In some cases, the one or more applications may include, for example, a Voice XML-based application, an HTML-based application, an XML-based application, an XIVR-based application, or a combination of these or other application formats.

In this particular example, repository **20** communicates an executable copy of a desired application to one or more application servers **24** for execution and establishment of a communication session with client **18**. In various embodiments, the applications can be developed with development environment **72** through computer workstations ***76a-76n***. The applications can be programmed in proprietary languages requiring resident interpreters or compilers, or can use an extensible language, which can be transferable to a host processor (such as application servers **24**) with the components used to run the given application. Languages such as hypertext markup language (HTML), extensible markup language (XML), Voice XML, and the like may be utilized in providing the extensibility to program applications for use with the present system.

Repository **20** may also facilitate browsing the Internet from a compatible client **18**. In order to accomplish this, repository **20** includes an HTTP translator **74**. Repository **20** can browse through the Internet, read the HTML web pages, and convert the HTML into a compatible format for communication to a user of client **18**. Repository **20** can also direct application server **24** to perform these actions instead. The HTTP can then be converted into the appropriate transport protocol and the web pages, or portions thereof, can be sent to the client **18** by application server **24**. In certain embodiments, the translation executed by HTTP translator **74** can convert text-to-speech and note hyperlinks as special cues to inform users of the executable links available. Additionally or alternatively, portions of the web site may be visually presented as text or graphics on a display associated with client **18**. These conversion components can be included in the application processed by application server **24**, or, if small enough, can be sent to client **18** and executed there.

FIG. **4** shows one example of an application server for use in a communication system that that enables a client to have one or more applications executed remotely. In this example, application server **24** is capable of performing a desired communicating and/or computing functionality, such as, for example, accessing, retrieving, and/or executing one or more system applications, or portions thereof. As non-limiting examples, application server **24** could comprise some or all of a Voice XML-based system, an extensible interactive voice response (XIVR) system, an interactive web-based system, or a combination of these or other information systems. In particular embodiments, application server **24** may include one or more software and/or firmware modules. In various embodiments, application server **24** could comprise, for example, one or more software engines, one or more memory modules, and/or one or more speech recognition modules capable of processing Voice XML-based applications, XIVR-based applications, voice responses, text-to-speech translations, and/or speech-to-text translations.

In this particular embodiment, application server **24** includes a processor **80** and memory **82**. Although application server **24** includes processor **80** and memory **82** in this example, any other desired computing and/or communication components may be included without departing from the scope of the present disclosure. In this example, processor **80** is capable of processing one or more requests received from a client and executing one or more applications. Processor **80** can comprise any computer processor,

such a, for example, single-core, duel-core, and/or any other server processor that is capable of processing requests and executing applications.

In this example, memory **82** provides storage for data, information, and/or other programs to assist in the operation of application server **24**. Memory **82** may include any hardware, software, firmware, or combination thereof operable to store and facilitate retrieval of one or more applications and/or information. Memory **82** may, for example, include a dynamic random access memory (DRAM), a static random access memory (SRAM), a NAND flash memory, or any other suitable volatile or nonvolatile storage and retrieval device or combination of devices. Although this example depicts memory **82** as a single medium, memory **82** may comprise any additional number of storage media without departing from the scope of the present disclosure. Additionally, all or part of memory **82** could reside at a location remote from and accessible to application server **24**.

In this particular embodiment, memory **82** includes application logic **84** that is capable of processing a request received from a client and to determine the location of the application necessary to establish the requested communication session with the user of the client. Application logic **84** may comprise, for example, software, firmware, code, portions of code, a program, a web-page, information compilations, and/or a combination of these or any other types of utilities.

Although the present invention has been described in several embodiments, a myriad of changes, variations, alterations, transformations, and modifications may be suggested to one skilled in the art, and it is intended that the present invention encompass such changes, variations, alterations, transformations, and modifications as falling within the spirit and scope of the appended claims.

What is claimed is:

**1**. A communication system comprising:

an application server coupled to a first communication link and coupled to a second communication link, the first communication link and the second communication link each comprising a data connection, the application server adapted to establish a communication session with at least one communication device coupled to the first communication link in response to a request from the at least one communication device to establish the communication session, wherein the application server comprises a voice processing software program and the request from the at least one communication device comprises packetized voice data;

a repository having access to an application comprising at least a portion of computer code;

wherein the application server is either (a) configured to receive the application via the second communication link, or (b) configured to cause an execution of the application via the second communication link;

wherein the application server is configured to execute or cause the execution of the application remote from the at least one communication device;

wherein the voice processing software program is configured to generate a voice representation of information derived from the application;

wherein the application server is configured to transmit the voice representation and a request for processing service over the first communication link to the at least one communication device; and

wherein the request for processing service comprises an instruction to present a user of the at least one communication device the voice representation.

**2**. The communication system of claim **1**, wherein the voice processing software program comprises at least one selected from the group of a voice recognition application, a speech-to-text application, a text-to-speech application, and a voice XML-based application; and

wherein the voice representation comprises an executable.

**3**. The communication system of claim **1**, wherein the repository comprises a database, and the application is stored in the database.

**4**. The communication system of claim **1**, wherein the repository comprises a server; and wherein the application is executed by the repository.

**5**. The communication system of claim **1**, wherein the repository comprises a plurality of servers.

**6**. The communication system of claim **1**, wherein the communication session comprises an exchange of the packetized voice data from the at least one communication device and packetized voice data or audio data from the application server.

**7**. The communication system of claim **1**, wherein the application server comprises a plurality of servers.

**8**. The communication system of claim **7**, wherein the voice processing software program is distributed across the plurality of servers.

**9**. The communication system of claim **1**, wherein the voice processing software program comprises a voice recognition application, a speech-to-text application, and a text-to-speech application.

**10**. The communication system of claim **9**, wherein the at least one communication device comprises a second voice recognition application configured to recognize at least one word spoken by a user of the at least one communication device.

**11**. The communication system of claim **1**, wherein the application server is coupled to a plurality of servers via the second communication link.

**12**. The communication system of claim **11**, wherein at least one of the plurality of servers is configured to execute the application in response to the receipt of a command related to the application sent by the application server via the second communication link.

**13**. The communication system of claim **12**, wherein at least one of the plurality of servers comprises the repository.

**14**. A communication system, comprising:

a plurality of application servers;

a first communication link coupled to the plurality of application servers, the first communication link comprising a data connection;

a first one of the plurality of application servers configured to execute a first application to establish a communication session with at least one communication device coupled to the first communication link in response to a request from the at least one communication device to establish the communication session;

a second one of the plurality of application servers coupled to a second communication link, the second one of the plurality of servers either (a) configured to receive a second application from at least one repository having a database maintaining the second application over the second communication link, or (b) configured to cause an execution of the second application via the second communication link;

wherein the second communication link comprises a data connection;

wherein the second one of the plurality of application servers is configured to execute or cause the execution of the second application remote from the at least one communication device;

wherein at least one of the plurality of application servers is configured to communicate a request for processing service to the at least one communication device; and

wherein the request for processing service is communicated to the at least one communication device over the first communication link.

**15**. The communication system of claim **14**, wherein the first one of the plurality of application servers comprises a voice processing software program and the request from the at least one communication device comprises packetized voice data.

**16**. The communication system of claim **14**, wherein the at least one repository comprises a server.

**17**. The communication system of claim **14**, wherein the second communication link comprises a plurality of data socket connections.

**18**. The communication system of claim **14**, wherein the request for processing service comprises an instruction to present a user of the at least one communication device voice data or audio data.

**19**. The communication system of claim **18**, wherein the at least one communication device comprises a voice recognition application configured to recognize at least one word spoken by a user of the at least one communication device.

**20**. An interactive, voice-based communication system, comprising:

at least one application server coupled to a first communication link and coupled to a second communication link, the first communication link and the second communication link each comprising a data connection, the at least one application server operable to establish a communication session in response to a request from at least one communication device;

at least one repository coupled to the second communication link, the at least one repository either (a) configured to transmit at least one portion of an application to the at least one application server, or (b) configured to execute the at least one portion of the application;

wherein the communication session comprises an exchange of packetized voice data from the at least one communication device and packetized voice data or audio data from the at least one application server;

wherein the at least one application server comprises a first voice recognition application, a speech-to-text application, and a text-to-speech application;

wherein the first communication link comprises the Internet; and

wherein the at least one portion of the application is maintained in the at least one repository or a database coupled to the at least one repository.

**21**. The communication system of claim **20**, wherein the at least one application server is configured to receive, over the first communication link, information originating from the at least one communication device regarding a stylus input or a touch input.

**22**. The communication system of claim **20**, wherein the at least one repository coupled to the second communication link is either (i) configured to send at least an additional portion of the application or a second application to the at least one application server over the second communication link or (ii) configured to execute at least the additional portion of the application or the second application in response to a request from the at least one application server.

**23**. The communication system of claim **20**, wherein the at least one repository is a server.

**24**. The communication system of claim **20**, wherein the first communication link and/or the second communication link further comprise at least one data socket connection.

**25**. The communication system of claim **20**, wherein the at least one communication device comprises a second voice recognition application configured to recognize at least one word spoken by a user of the at least one communication device.

**26**. The communication system of claim **25**, wherein the communication session further comprises at least one instruction transmitted by the at least one server to the at least one communication device, the instruction comprising a request for processing service.

**27**. The communication system of claim **20**, wherein the text-to-speech application is configured to generate a voice representation of information derived from the application.

**28**. The communication of claim **27**, wherein the at least one application server is configured to transmit a request for processing service over the first communication link to the at least one communication device, and wherein the request for processing service comprises an instruction to present a user of the at least one communication device the voice representation.

**29**. A method of providing responses in an interactive, voice-based communication system, comprising:

receiving, by at least one application server over a first communication link, a request from at least one communication device, wherein the request comprises packetized voice data;

translating, by the at least one application server, the packetized voice data to a text representation using a first application;

identifying, by the at least one application server or at least one repository coupled to the at least one application server, a second application to be executed in response to the request using the text representation;

executing at least one portion of the second application;

transmitting, by the at least one application server, packetized voice or audio data to the at least one communication device, the packetized voice or audio data responsive to the request;

wherein the first communication link comprises a data connection;

wherein the first communication link further comprises the Internet; and

wherein the at least one portion of the second application is maintained in the at least one repository or a database coupled to the at least one repository.

**30**. The method of claim **29**, further comprising communicating by the at least one repository the at least one portion of the second application to the at least one application server over a second communication link if at least one portion of the second application is not stored on the at least one application server at a time the request is received;

wherein the at least one portion of the second application is executed by the at least one application server.

* * * * *

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(a) or Federal Circuit Rule 28.1:

This brief contains 9,978 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Circuit Rule 28.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6):

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point font, Times New Roman.

| | |
|---|---|
| Erika H. Arner | /s/ *Erika H. Arner* |
| Name of Counsel | Signature of Counsel |


| | |
|---|---|
| Firm: | Finnegan, Henderson, Farabow, Garrett & Dunner, LLP |
| Address: | 901 New York Avenue, NW |
| City, State, and Zip: | Washington, DC 20001 |
| Telephone: | 202-408-4000 |
| Fax #: | 202-408-4400 |
| E-Mail address: | erika.arner@finnegan.com |